Alexander A. Berengaut*
Megan A. Crowley*
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5367
aberengaut@cov.com
mcrowley@cov.com
*pro hac vice application forthcoming

Rob Cameron
Nathan D. Bilyeu
JACKSON, MURDO & GRANT, P.C.
203 North Ewing
Helena, MT 59601
(406) 389-8244
rcameron@jmgattorneys.com
nbilyeu@jmgattorneys.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| _____ )<br>TIKTOK INC., )<br> )<br> *Plaintiff*, )<br> )<br> v. )<br> )<br>AUSTIN KNUDSEN, *in his official* )<br>*capacity as Attorney General of the* )<br>*State of Montana*, )<br> )<br> *Defendant*. )<br>_____ ) | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff TikTok Inc., for its Complaint against Defendant Austin Knudsen, in his official capacity as Attorney General of the State of Montana, alleges as follows:

## INTRODUCTION

1.     This action seeks to prevent the State of Montana from unlawfully banning TikTok, a short-form video sharing platform that empowers hundreds of thousands of users in Montana to communicate and express themselves, primarily through creating, sharing, and interacting with short-form videos on topics "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  Montana's ban abridges freedom of speech in violation of the First Amendment, violates the U.S. Constitution in multiple other respects, and is preempted by federal law.

2.     Every month, more than 150 million Americans use TikTok to express themselves and connect with others.  Montanans use TikTok to communicate with each other and others around the world on an endless variety of topics, from business to politics to the arts, by creating and sharing videos, sending messages to each other, and interacting with each other's content.  By fostering connections among individuals, TikTok has become home to thousands of different communities and a thriving forum for a wide range of businesses and entrepreneurs to communicate about their products and services.

3.      On May 17, 2023, the Governor of Montana signed An Act Banning TikTok in Montana (the "TikTok Ban" or the "Ban"), which prohibits the operation of TikTok throughout the State.  A copy of the TikTok Ban is attached as Exhibit A to this Complaint.  To enforce the TikTok Ban, the legislation imposes a $10,000 penalty for each "discrete violation," defined as any time an individual in Montana accesses TikTok, is offered the ability to access TikTok, or is offered the ability to download TikTok.  The TikTok Ban—including its substantial penalties—is set to take effect January 1, 2024.

4.      The State has enacted these extraordinary and unprecedented measures based on nothing more than unfounded speculation.  Specifically, the State claims that the government of the People's Republic of China ("China") could access data about TikTok users, and that TikTok exposes minors to harmful online content.  Yet the State cites nothing to support these allegations, and the State's bare speculation ignores the reality that Plaintiff has not shared, and would not share, U.S. user data with the Chinese government, and has taken substantial measures to protect the privacy and security of TikTok users, including by storing all U.S. user data by default in the United States and by erecting safeguards to protect U.S. user data.  TikTok has also implemented safeguards to foster a safe environment for all users, including teens.

5.      Ignoring these facts and the federal statutory framework already in place to address any purported concerns about foreign government access to TikTok user data, the State has mandated a complete and total ban of TikTok in Montana.  It has done so despite the availability of more targeted measures to address its purported concerns.  In less than eight months, no resident of, visitor to, or worker passing through Montana will be able to download TikTok on his or her phone or mobile device, post any videos to TikTok for others to see, or view any content on the platform.

6.      Acknowledging "legal concerns" about the TikTok Ban, the Montana Governor suggested changes to the legislation after it had already been passed by the Montana Legislature.[1]  Those changes would have shifted the Ban's focus from TikTok specifically (and the content on the TikTok platform) to social media applications connected to foreign entities more generally.  But the Legislature did not consider the Governor's suggested changes—which were legally problematic in their own right—and yet the Governor signed the TikTok Ban into law anyway. This unprecedented and extreme step of banning a major platform for First Amendment speech, based on unfounded speculation about potential foreign

---

[1] Haleluya Hadero, *Montana Gov Seeks To Expand TikTok Ban to Other Social Apps*, ASSOCIATED PRESS (Apr. 26, 2023), https://apnews.com/article/tiktok-ban-montana-bytedance-b735350b367c3f3a0076eaf1267dab18.

4

government access to user data and the content of the speech, is flatly inconsistent with the Constitution.

7.      The TikTok Ban is unlawful and should be enjoined for multiple, independent reasons.  Specifically:

      a.      ***First Amendment***.  The TikTok Ban violates Plaintiff's First Amendment rights.  Through TikTok, Plaintiff exercises its constitutionally protected editorial judgment on whether, and how, to host, disseminate, and promote third-party speech created by others, and also shares its own content with users in Montana about a variety of issues and current events.  The TikTok Ban, however, effects a prior restraint on the speech of Plaintiff and other TikTok users, unconstitutionally shutting down the forum for speech for all speakers on the app and singling these speakers out for disfavored treatment with the content-based rationale that videos on TikTok are harmful to minors.

      b.      ***Federal Preemption***.  The TikTok Ban is preempted by federal law because it intrudes upon matters of exclusive federal concern. The TikTok Ban is based on the State's purported concern about the security of U.S. user data vis-à-vis the Chinese government. But foreign affairs and national security are matters over which the U.S. Constitution vests exclusive authority in the federal government, not the States.  Indeed, Congress has created a specific federal regulatory process by which the purported national security concerns that have animated this legislation may be addressed.  The TikTok Ban would necessarily disrupt and interfere with that process, which is currently underway.

      c.      ***Commerce Clause***.  The TikTok Ban violates the Commerce Clause of the U.S. Constitution, which limits the authority of States to enact legislation that unduly burdens interstate and foreign commerce.  By banning Plaintiff from operating TikTok within Montana, the TikTok Ban imposes a state-specific ban on a communication platform that is national (indeed, international) in scope.  The Ban interferes with TikTok's operation and availability

to users in other States and it risks disrupting the flow of travel and commerce between States.

d. ***Bill of Attainder***.  The TikTok Ban is an unconstitutional bill of attainder.  Rather than regulate social media companies more generally, the Ban banishes TikTok, and just TikTok, from the State for purely punitive reasons, as evidenced by the State's decision to single out Plaintiff for harsh penalties based on speculative concerns about TikTok's data security and content moderation practices.

8.     To halt this unlawful conduct, Plaintiff seeks a declaratory judgment and order invalidating and preliminarily and permanently enjoining Defendant from enforcing the TikTok Ban.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.  This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) to redress deprivations "under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

10.    The Court has authority to grant declaratory and injunctive relief pursuant to 42 U.S.C. § 1983; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the only Defendant, the Attorney General of Montana, resides in this

district.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

12.     Venue is proper in this division pursuant to Local Rule 3.2(b) and Mont. Code § 25-2-125.  Based on IP address information for March 2023, Plaintiff estimates that approximately 110,000 monthly active users accessed TikTok in the counties within the Missoula Division, which was the greatest concentration of TikTok users for any division of the District of Montana.

13.     On May 17, 2023, a related case was filed in this division by five individual TikTok users residing in Missoula, Bozeman, and Custer, who also allege that the TikTok Ban violates the First Amendment and other provisions of federal law.  *See Alario et. al v. Knudsen*, No. 23-cv-00056 (D. Mont. May 17, 2023).  That related case involves common questions of law and fact with this suit.

## PARTIES

### A.     Plaintiff

14.     Plaintiff TikTok Inc. is a company incorporated in California, with its principal address in Culver City, California.  The TikTok platform is provided in the United States by TikTok Inc.

7

**B.      Defendant**

15.     Defendant Austin Knudsen is the Attorney General of Montana and is

sued in his official capacity.  The TikTok Ban charges the Montana Department of

Justice, of which Attorney General Knudsen is the head, with its enforcement.

## FACTUAL ALLEGATIONS

**A.      TikTok is a Popular and Important Platform for Users to
         Communicate With Others Through a Wide Range of Expression
         and Creative Content.**

16.     TikTok is a short-form video sharing platform that enables users to

create, share, and view videos.  TikTok encourages users to celebrate what makes

them unique, while finding a community that does the same.  TikTok's mission is

"to inspire creativity and bring joy."[2]

17.     TikTok users can both create and share their own videos and watch

and interact with videos posted by others, such as by "liking" a video or posting a

comment on it.  To help TikTok users connect with others who post video content

that would be interesting to them, TikTok offers a "For You" page, which opens to

a stream of videos that is curated by TikTok's recommendation system.  TikTok

users can also use TikTok's "Discover" page to explore diverse content by

searching for particular topics in videos posted by other users.  In addition, TikTok

---

[2] *Our Mission*, TIKTOK, https://www.tiktok.com/about?lang_en (last visited May
22, 2023).

recently introduced a "STEM" initiative in the United States to provide users with a dedicated space to explore video content related to science, technology, engineering, and math.

18.     In addition to sharing and commenting on videos, TikTok users can connect with one another in a variety of ways.  For example, users can "tag" other users in the comments, use the app's "duet" and "stitch" tools to create new content that incorporates and responds to content created by others, use the "TikTok LIVE" feature to communicate live with others on the platform, and send direct messages to one another.[3]

19.     TikTok is operated by and provided in the United States by a U.S. company, Plaintiff TikTok Inc.  Plaintiff is led by an executive team located in the United States and Singapore and has offices across the United States, including in Los Angeles, New York, and Washington, D.C.  Plaintiff has almost 7,000 employees in the United States.  The TikTok platform is not available in China.

20.     Plaintiff is ultimately owned by ByteDance Ltd. ("BDL").  BDL is a global company incorporated in the Cayman Islands that conducts business through local subsidiaries, such as Plaintiff TikTok Inc. and other TikTok operating entities.  BDL is a privately owned company.  Roughly sixty percent of

---

[3] As discussed below, certain age restrictions apply to TikTok features for users under 18. *See also Guardian's Guide*, TIKTOK, https://www.tiktok.com/safety/en/guardians-guide (last visited May 22, 2023).

BDL is beneficially owned by global institutional investors, such as Carlyle Group, General Atlantic, and Susquehanna International Group; approximately twenty percent of the company is owned by the company's subsidiaries' employees around the world; and approximately twenty percent is owned by the company's founder, who is a private individual and is not part of any state or government entity.

21.    TikTok was first launched globally in 2017 and re-launched in the United States in August 2018.  Within a year-and-a-half, TikTok had nearly 40 million U.S. monthly active users.  In September 2021, TikTok surpassed more than 1 billion monthly active users worldwide.  As of March 2023, more than 150 million Americans use TikTok every month.

22.    TikTok operates in all fifty States and more than 170 countries.  Users can access TikTok on their phones, computers, and other mobile devices to create, share, view, and interact with video content to and from other users around the country and the world.

23.    TikTok enables users to express themselves creatively to others.  The range of expression between users on TikTok is vast and diverse, including music, art, sports, food, pets, hobbies, books, civic engagement, religion, and politics. Popular videos with millions of views span these topics and beyond.  For example,

one of the most popular videos ever on TikTok is a video of a magician pretending to fly on a broomstick, which has been viewed over 2 billion times.[4]

24.    TikTok has evolved into a community in which individuals who might otherwise feel isolated are able to share their experiences with each other and advocate for one another.  TikTok fosters these communities, which can act as important support groups for groups such as recovering alcoholics and people living with rare diseases.[5]  For example, a recent news story highlighted a supportive community on TikTok composed of individuals who care for dementia patients.[6]  These caregivers post short-form videos on the app that share their experiences with—and provide practical advice for—caring for loved ones with dementia.  These videos provide caregivers with a "strong sense of community" that helps them "weather the highs and lows" of serving as a caregiver.[7]

---

[4] Zach King (@zachking), TIKTOK, https://www.tiktok.com/t/ZTR3xCjdv (last visited May 22, 2023).

[5] AJ Willingham, Leah Asmelash, & Scottie Andrew, *The Biggest Ways TikTok Has Changed American Culture*, CNN (Apr. 2, 2023), https://edition.cnn.com/2023/04/02/us/tiktok-american-culture-effects-cec/index.html.

[6] *#Dementia TikTok is a Vibrant, Supportive Community*, NAT'L PUBL. RADIO (Oct. 12, 2022), https://www.npr.org/2022/10/12/1128358073/-dementia-tiktok-is-a-vibrant-supportive-community.

[7] *Id.*

25.     In Montana and elsewhere, individuals use TikTok to communicate and connect with one another and share their unique experiences and life stories with others around the world.  As just one example, a rancher in Montana, whose TikTok username is @bigskycaroline, has fostered a community of over 88,000 followers by sharing videos of her experiences caring for sheep and other animals on her ranch.[8]  Her videos have received over 1.2 million likes.[9]

26.     The vast majority of content on TikTok is affirming, healthy, and suitable for all users.  A particularly popular community on TikTok, for example, is #BookTok, where individuals discuss, recommend, and celebrate literature. Videos with the hashtag #BookTok have over 100 billion views.[10]  "BookTok is widely believed to have driven a big bump in book sales and increased the popularity of reading in general."[11]

27.     Beyond serving as a forum for users to enjoy entertaining content and find supportive communities, TikTok also enables users to engage in civic discourse with each other.  Many teachers, for example, "leverage their TikTok

---

[8] Big Sky Caroline (@bigskycaroline), TIKTOK, https://www.tiktok.com/@bigskycaroline? (last visited May 22, 2023).

[9] *Id.*

[10] #BookTok, TIKTOK, https://www.tiktok.com/tag/booktok (last visited May 22, 2023).

[11] *TikTok Users Report Reading 50% More Because of BookTok*, BOOK RIOT (May 16, 2023), https://bookriot.com/booktok-survey/.

platforms to highlight serious issues in education and the teaching profession."[12]

More broadly, TikTok users of all stripes communicate and express their views on

the app about the issues they care about, including individual rights and health

care.[13]  Many of the app's features, such as the "stitch" tool and in-video comment

replies, provide users with an "organic way to comment on political

information."[14]

28.    TikTok is also a forum for users to express their faith.  Through

TikTok, individuals of diverse faiths connect with others throughout the world to

share aspects about their faith and answer questions about their beliefs.[15]  For

example, the hashtag #christiantiktok has over 40 billion views.[16]

---

[12] Hayley Hardison, *How Teachers Use TikTok: To Get New Ideas, Feel Inspired, and Indulge a Laugh or Two*, EDUCATION WEEK (Feb. 14, 2023), https://www.edweek.org/teaching-learning/how-teachers-use-tiktok-to-get-new-ideas-feel-inspired-and-indulge-a-laugh-or-two/2023/02.

[13] Jacob Fulton, *Gen Z Activists Worry That University TikTok Bans Could Hurt Their Ability to Organize*, BOSTON GLOBE (Feb. 2, 2023), https://www.bostonglobe.com/2023/02/02/nation/gen-z-activists-worry-that-university-tiktok-bans-could-hurt-their-ability-organize/.

[14] Sofia Andrade, *The Growing Political Power of TikTok*, THE NATION (Jan. 25, 2023), https://www.thenation.com/article/politics/tiktok-election-gen-z-voters/.

[15] John Reynolds, *TikTok is Helping Us Reach Millions with the Gospel*, PREMIER CHRISTIANITY (Aug. 22, 2022), https://www.premierchristianity.com/real-life/tiktok-is-helping-us-reach-millions-with-the-gospel/13647.article.

[16] #christiantok, TIKTOK, https://tiktok.com/tag/christiantiktok?lang=en (last visited May 22, 2023).

29.     Although TikTok does not permit political advertising or campaign fundraising on its platform,[17] TikTok is an increasingly important channel for constituents and voters to obtain information and advocacy directly from elected officials and political candidates and to send and receive information and encouragement about exercising the right to vote.[18]  American politicians from across the political spectrum communicate on TikTok.[19]  These politicians use TikTok to communicate with voters in an informal and accessible way.

30.     Operating and using TikTok is also a form of expression for Plaintiff itself.  One way Plaintiff expresses itself is through the content it promotes on the platform.  For example, Plaintiff recently launched a campaign called "EduTok," which encourages users to create and share educational and motivational content

---

[17] *TikTok's Stance on Political Ads*, TIKTOK, https://www.tiktok.com/creators/creator-portal/community-guidelines-and-safety/tiktoks-stance-on-political-ads (last visited May 22, 2023).

[18] *See, e.g.*, Lindsay Gorman & Nash Miller, *Not Just Dance Videos: How Candidates Are Using TikTok in the US Midterms*, ALL. FOR SECURING DEMOCRACY (Oct. 31, 2022), https://securingdemocracy.gmfus.org/candidates-tiktok-us-midterm-elections-2022/; *TikToks to Get Out the Vote*, LEAGUE OF WOMEN VOTERS (Sept. 20, 2022), https://www.lwv.org/blog/tiktoks-get-out-vote ("There are a million ways to get-out-the-vote (GOTV), and when it comes to reaching new voters, one of the best methods is via the incredibly popular video app, TikTok!").

[19] Cat Zakrzewski, Naomi Nix & Taylor Lorenz, *As Midterms Loom, TikTok Faces its Next Political Test*, WASH. POST (Oct. 31, 2022), https://www.washingtonpost.com/technology/2022/10/31/tiktok-faces-2022-midterm-elections.

on a variety of themes.  Plaintiff has also launched other campaigns to share public interest content.  Through special effects, filters, and stickers offered by the platform, TikTok users have the ability to share their perspectives about these public interest issues.

31.    Plaintiff also expresses itself through its own account, which has more than 70 million followers, and through which Plaintiff shares messages with users about a variety of issues and current events, including, for example, Plaintiff's support for small businesses and Earth Day.

32.    TikTok is also a platform through which individuals, including many TikTok users in Montana, earn a living.[20]  Small businesses use TikTok to reach new audiences and grow their businesses, and for some, success can happen overnight.[21]  Based on this kind of success, "[m]any small businesses that rely on TikTok for marketing don't want to see it go, saying it's changed their lives."[22]

---

[20] *See, e.g.*, Madison Malone Kircher, *In Montana, Creators Await—and Dread—a TikTok Ban*, N.Y. TIMES (May 18, 2023), https://www.nytimes.com/2023/05/18/style/montana-tiktok-ban-influencers.html.

[21] Kristin Merkel, *Montana Business Owners Say They're Concerned by Possible TikTok Ban in the State*, KBZK 7 BOZEMAN (Mar. 14, 2023), https://www.kbzk.com/news/local-news/montana-legislature-tiktok-ban-business-owners.

[22] Dominic Vitiello, *Some Local Businesses Disheartened by Potential Statewide TikTok Ban*, NBC MONTANA (Apr. 11, 2023), https://nbcmontana.com/news/local/some-local-businesses-disheartened-by-potential-statewide-tiktok-ban#.

33.     For instance, Montana resident Shauna White Bear is an artisan who uses TikTok to promote her business, White Bear Moccasins.[23]  White Bear has over 70,000 followers on TikTok and communicates with her customers by, among other things, posting informative, creative videos showing how she makes bison leather moccasins.  Hundreds of Montana businesses, like White Bear Moccasins, use TikTok to boost sales and find new customers.[24]

34.     In 2020, TikTok launched the TikTok Creator Fund to support its users in creating and sharing content on the platform.  In 2021, TikTok announced that it would invest $1 billion in the fund to support U.S.-based creators who make and share videos with others on the platform.  U.S. users who are at least 18 years old and meet certain other criteria are eligible to participate in, and can receive funds from, the Creator Fund to help them further their creative pursuits on the app.

**B.     Plaintiff Has Implemented Safeguards to Protect the Privacy and Security of U.S. User Data.**

35.     TikTok is popular because people feel comfortable on the platform expressing themselves openly and creatively.  A priority for Plaintiff is therefore

---

[23] white_bear_moccasins (@whitebearmocs), TIKTOK, https://www.tiktok.com/@whitebearmocs?lang=en (last visited May 22, 2023).

[24] *A Message to Our Community in Montana*, TIKTOK (Mar. 13, 2023), https://newsroom.tiktok.com/en-us/stop-montana-ban.

maintaining a safe and supportive environment on TikTok. Part of this mission is designing and operating TikTok in a way that protects the privacy and security of U.S. user data.

36.     Privacy is built into TikTok by design, including through the app's data collection practices. As set out in its Privacy Policy and like other platforms, TikTok collects certain information from its U.S. users, such as username, date of birth,[25] and, depending on the process by which a user signs up for TikTok, the user's phone number or email address.[26] TikTok does not, however, require users to provide their real names during registration, nor does TikTok ask its users about their employment or relationship status. Moreover, current versions of the TikTok app do not collect precise or approximate GPS information from U.S. users.

37.     With respect to the limited data that TikTok does collect from U.S. users, Plaintiff devotes significant resources to keeping that data secure. The centerpiece of Plaintiff's data security efforts is an unprecedented initiative dedicated to safeguarding U.S. user data and addressing national security concerns expressed by the U.S. government. To date, over $1.5 billion has been spent on Plaintiff's initiative.

---

[25] Dates of birth are necessary for Plaintiff to provide an age-appropriate experience to users.

[26] *Privacy Policy*, TikTok (last updated Mar. 21, 2023), https://www.tiktok.com/legal/privacy-policy?lang=en.

38.     In furtherance of this initiative, Plaintiff has formed a special-purpose subsidiary, TikTok U.S. Data Security Inc. ("USDS"), that will oversee protected U.S. user data and the underlying TikTok U.S. platform.  To provide further assurance and protection, TikTok has also contracted with Oracle Corporation, a prominent U.S. public company and provider of cloud-based services, to store TikTok's U.S. user data.  TikTok currently routes 100% of U.S. user traffic to Oracle and USDS-controlled infrastructure in the United States.

39.     Oracle also provides a variety of other services for TikTok.  For example, USDS is running the recommendation system for U.S. users, which determines what appears in their "For You" page, in the Oracle Cloud infrastructure.  Oracle has also begun inspecting TikTok's source code, which will ultimately serve to identify instances of potential malicious code or security vulnerabilities.  No other social media company or entertainment platform provides this type of access and transparency to third-party entities.

40.     As these and other efforts show, Plaintiff is committed to safeguarding U.S. user data against unauthorized access from outside the United States, including by any foreign government.  Plaintiff has never shared, or received a request to share, U.S. user data with the Chinese government.  Nor would Plaintiff honor such a request if one were ever made.

**C.      TikTok Has Safeguards in Place to Moderate Harmful Content and Protect Minor Users.**

41.      Another aspect of Plaintiff's commitment to creating a safe and supportive environment is protecting TikTok users against harmful content that might be uploaded to the platform.  Safety and wellness—particularly for minors—is a core priority for Plaintiff.  By deciding what content is (and is *not*) appropriate on the platform, Plaintiff exercises its editorial judgment as to what kind of community it wants to foster on TikTok.

42.      While the vast majority of content on TikTok is suitable for all TikTok users, the reality of modern communication is that some users will inevitably seek to share content that is inappropriate and harmful.  All online platforms that host user-generated content face this challenge.  In response, TikTok maintains a multi-layered set of product features, policies, and procedures to help protect its users—and minor users in particular—against inappropriate and harmful content.

43.      TikTok enforces rules governing the scope of permissible content on TikTok, which it has labeled its Community Guidelines.  The Guidelines, which are available to users and the general public, prohibit certain categories of videos, including those featuring nudity, sexual activity, and sexually explicit or exploitative content, as well as videos that appear dangerous or otherwise harmful.

The Community Guidelines were created and are continually refined in consultation with third-party experts.

44.   A stated basis for the TikTok Ban is that "TikTok fails to remove, and may even promote, dangerous content that directs minors to engage in dangerous activities."  In fact, TikTok dedicates a section of its Community Guidelines to forbidding "[d]angerous activities and challenges."  As that section explains, TikTok "do[es] not allow showing or promoting dangerous activities and challenges . . . includ[ing] . . . activities that may lead to significant physical harm."[27]

45.   TikTok uses both technology and human moderators to remove content that violates the Community Guidelines.  In the fourth quarter of 2022, 96.2% of content identified as violative was removed before receiving any reports from users or others.[28]  In 91.2% of cases during the same time period, the removal occurred within 24 hours of when the content was posted, and in 84.7% of cases, the removal occurred before the video received any views.  For videos deemed to violate the Guideline against "dangerous acts and challenges" during this same

---

[27] *Community Guidelines*, TIKTOK (Mar. 2023),
https://www.tiktok.com/community-guidelines/en/mental-behavioral-health/#3.

[28] *Community Guidelines Enforcement Report*, TIKTOK (Mar. 31, 2023),
https://www.tiktok.com/transparency/en/community-guidelines-enforcement-2022-4/.

time period, TikTok proactively removed 96.0% of videos before they were reported, with 82.2% removed within 24 hours of being posted on the platform. TikTok removed 70.5% of the videos identified as involving dangerous acts or challenges before they received any views.

46.     TikTok is an active member of the Technology Coalition, an organization that works to protect children from online sexual exploitation and abuse.  TikTok screens content for signs of potential predatory or abusive behavior.  TikTok's moderation system is automated to identify content, including videos, captions, and comments, that violate TikTok's Youth Safety and Wellbeing Policy.  Every video uploaded to TikTok goes through automated moderation, and potentially violative content can be automatically removed or escalated for human review by teams of trained moderators.

47.     For U.S. users under 13, TikTok provides a different, age-appropriate experience, with stringent safeguards and privacy protections designed specifically for this age group.  In this experience, users under 13 can view fun, creative, and educational videos that are vetted by a third-party expert, Common Sense Networks.  These users cannot post videos on the platform, comment on others' videos, exchange messages with others, or maintain a profile or followers.

48.     Similarly, TikTok provides age-appropriate settings and controls for its teen users.  For users between 13 and 16, TikTok sets their accounts to private

21

by default.  For example, such accounts are prevented from sending direct messages, and their content is ineligible for recommendation into the "For You" page.  TikTok also prevents teens from receiving late-night push notifications and gives parents and guardians the ability to create further restrictions on notifications.  Another safety feature is that users under 18 cannot host LIVE.

49.     TikTok's parental control feature, Family Pairing, allows a parent to link their TikTok account to their child's account and set certain parental controls, including restricting the child's ability to search for content, limiting the amount of time the child may spend on TikTok, and preventing other users from commenting on the child's videos.  These controls have been recognized by independent experts as "the most comprehensive" in the industry.[29]

50.     TikTok continues to enhance its robust existing safety settings for teen accounts.  For example, in March 2023, after consulting with the Digital Wellness Lab at Boston Children's Hospital, TikTok announced that every account belonging to a person under age 18 will have a 60-minute daily screen time limit by default.  If the 60-minute limit is reached, teens will be prompted to enter a passcode in order to continue watching, requiring them to make an active decision to extend that time.  In the under-13 experience, the daily screen time limit will

---

[29] Julie Jargon, *How to Use Parental Controls on YouTube, TikTok, Instagram and Snapchat*, WALL ST. J. (Apr. 16, 2022), https://www.wsj.com/articles/how-to-use-parental-controls-on-youtube-tiktok-instagram-and-snapchat-11650065233.

also be set to 60 minutes, and a parent or guardian will need to set or enter a passcode to enable 30 minutes of additional watch time.

### D.    The Montana Government's Ban of TikTok in the State.

51.    Notwithstanding Plaintiff's ongoing efforts to provide all users, including Montanans, with a robust set of privacy, security, and safety protections, on April 14, 2023, the Montana Legislature took the unprecedented step of passing An Act Banning TikTok in Montana.  Before the Act reached Governor Gianforte's desk, the Governor suggested amendments to the Act that would have shifted its focus from targeting TikTok specifically to social media applications connected to foreign entities more generally.  The Governor's office stated that these suggested changes were meant to address the Act's "technical and legal concerns."[30]  The Legislature did not consider the Governor's suggested changes, and Governor Gianforte signed the TikTok Ban into law anyway on May 17, 2023.

52.    Supporters of the TikTok Ban made clear that its purpose was to target China.  The bill's primary sponsor, Sen. Shelley Vance, stated in a March 28, 2023 hearing that the bill "puts an end to China's surveillance operation in Montana."  At a floor session on April 13, 2023, another sponsor of the bill,

---

[30] Haleluya Hadero, *Montana Gov Seeks to Expand TikTok Ban to Other Social Apps*, ASSOCIATED PRESS (Apr. 26, 2023), https://apnews.com/article/tiktok-ban-montana-bytedance-b735350b367c3f3a0076eaf1267dab18.

Rep. Brandon Ler, linked TikTok to the balloon shot down in Montana and stated: "I believe it's time we stand up to the Chinese and ban TikTok."

53.    The TikTok Ban does precisely what its formal name ("An Act Banning TikTok") suggests.  *See* Ex. A Section 1(1).  Specifically, it prohibits "the operation of tiktok" within the territorial jurisdiction of Montana and bans any efforts by Plaintiff or app stores to afford anyone in Montana "the option to download the tiktok mobile application."  *Id.*

54.    To enforce the TikTok Ban, the legislation imposes a $10,000 penalty for each "discrete violation," defined as any time "a user accesses tiktok, is offered the ability to access tiktok, or is offered the ability to download tiktok" in the State. *Id.* Sections 1(2), 1(7)(a).  Such penalties accrue against Plaintiff and any "mobile application store," but not against any "users of tiktok."  *Id.* Sections 1(5), 1(7)(b).

55.    The ramifications of the TikTok Ban are sweeping.  By banning TikTok, the State has taken the unprecedented step of eliminating a popular communication and information-sharing platform that many thousands of Montanans use to express themselves, engage in discussions with others, receive information from others inside and outside the State, and share their viewpoints

with people around the world.  Since Governor Gianforte signed the Ban, creators from Montana have explained how it will harm them and their businesses.[31]

56.     The State has also curtailed Plaintiff's speech rights.  Through the Ban, the State has taken away the mechanism through which Plaintiff communicates with Montana residents and exercises its editorial judgment regarding what content to allow on the platform and what types of public interest messaging to promote, such as EduTok.

57.     To attempt to justify this sweeping prohibition, the TikTok Ban makes a variety of unsubstantiated allegations about the threat that TikTok poses to national security.  For example, the "findings" in the legislation accuse TikTok of "gather[ing] significant information from its users," which it allegedly "share[s] with the People's Republic of China."  The findings further charge TikTok with "stealing . . . information and data from users," which it allegedly provides to "the Chinese Communist Party" to enable it to engage in "corporate and international espionage."

---

[31] Madison Malone Kircher, *In Montana, Creators Await—and Dread—a TikTok Ban*, N.Y. TIMES (May 18, 2023), https://www.nytimes.com/2023/05/18/style/montana-tiktok-ban-influencers.html; Jacey Fortin, Eliza Fawcett & Jim Robbins, *In Montana, a TikTok Ban Could Be a 'Kick in the Face,'* N.Y. TIMES (May 18, 2023), https://www.nytimes.com/2023/05/18/us/tiktok-ban-montana-reaction.html.

58.     These allegations are entirely false.  Indeed, Plaintiff has made clear, through its actions and statements, that it shares no U.S. user data with the Chinese government and will not do so in the future.  TikTok also has a highly developed and sophisticated content moderation program designed to provide a safe forum for its users and to express Plaintiff's editorial judgment as to the kind of platform TikTok wants to be.  This moderation system does not censor content to advance the objectives of any government, and there is no evidence that TikTok has ever been used to engage in espionage on behalf of any foreign government.

59.     In any event, banning TikTok is neither necessary nor effective in protecting user data.  As privacy experts have emphasized, much of the data collected by TikTok is no different in kind from the data routinely collected by other apps and sources in today's online world, which is widely available in the data broker market.  *See, e.g.*, Alfred Ng, *TikTok Fervor Sparks Push for U.S. Data Privacy Legislation*, PoliticoPro (Mar. 22, 2023) ("Even if they actually did ban TikTok, governments could go purchase much of the same information from unregulated data brokers, who flourish in the U.S. with basically no laws to keep them in check." (quoting Evan Greer, deputy director for the digital rights group Fight for the Future)).  In other words, the TikTok Ban does not address the concerns that purportedly animate it, and it rests not on the reality of Plaintiff's business, but on conjecture, hyperbole, and demonstrable falsehoods.

**E.**  **The TikTok Ban Encroaches on the Federal Government's Exclusive Authority Over Matters of National Security and Foreign Affairs.**

60.  "The Constitution gives the federal government the exclusive authority to administer foreign affairs," *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012) (en banc), as well as to "provide for the common Defence . . . of the United States," U.S. Const. art. 1, § 8, cl. 1.

61.  By enacting a state law intended to address the national security concerns purportedly posed by TikTok, Montana has intruded upon not only the federal government's constitutionally-assigned primacy in matters of national security and foreign affairs, but also the comprehensive and carefully crafted regime that Congress set up to regulate in this area.

62.  Two relevant federal authorities in this area are Section 721 of the Defense Production Act of 1950, as amended ("Section 721"), 50 U.S.C. § 4565, and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–08.  These statutes (described in greater detail below) authorize the Committee on Foreign Investment in the United States ("CFIUS") and the President, respectively, to investigate and, if warranted, to mitigate national security risks arising out of foreign acquisitions or other various foreign economic activities.  Furthermore, Congress is actively considering additional legislation in this area, such as the Restricting the Emergence of Security Threats that Risk

Information and Communications Technology Act, or "RESTRICT Act," which according to the federal Executive Branch would provide the federal government with "new mechanisms to mitigate the national security risks posed by high-risk technology businesses operating in the United States."[32]

63.     Both Section 721 and IEEPA have been invoked in recent years by the federal government in its engagement with Plaintiff and its ultimate parent company BDL over perceived national security risks related to TikTok.  Plaintiff and BDL have been engaging with CFIUS for more than three years, including on proposals to address perceived national security risks through a National Security Agreement ("NSA") that would be entered with CFIUS.  These negotiations and the engagement with CFIUS have led TikTok to restructure its U.S. business by creating USDS to be responsible for the operation of the TikTok U.S. platform and for the safeguarding of protected U.S. user data.  Montana's Ban ignores Congress's clear intention to address national security concerns at a national level rather than to allow a patchwork of State laws.

---

[32] Statement from National Security Advisor Jake Sullivan on the Introduction of the RESTRICT Act (Mar. 7, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/07/statement-from-national-security-advisor-jake-sullivan-on-the-introduction-of-the-restrict-act/.

a.   *Section 721 and CFIUS*

64.    Congress enacted Section 721, which codifies CFIUS's authority to review foreign acquisitions of U.S. businesses, to investigate and address the sorts of purported national security risks that Montana seeks to regulate through the TikTok Ban.

65.    CFIUS is an interagency committee of the executive branch tasked with reviewing foreign acquisitions of U.S. businesses to determine their impact on national security.  *See* 50 U.S.C. §§ 4565(b)(1)(A)–(B), 4565(a)(4)(B)(i).  CFIUS is empowered to address identified national security risks arising out of acquisitions of U.S. businesses by foreign persons by imposing or otherwise reaching agreement with the transaction parties on conditions to address national security concerns.  *Id.* § 4565(*l*)(3)(A).  The specific measures imposed by the Committee "shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction, which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction."  *Id.* § 4565(*l*)(4)(A).  If the risks to a particular transaction cannot be mitigated, the President is empowered to prohibit the transaction.  *Id.* § 4565(d).

66.    In 2019, BDL was notified that CFIUS was considering whether to review a 2017 acquisition by BDL of Musical.ly, a China-headquartered company

29

that distributed a video-sharing application also called Musical.ly.  CFIUS has

sought to review the TikTok business in connection with that acquisition.  Since

2019, Plaintiff has proposed a number of measures to mitigate any purported

national security concerns of the U.S. government around TikTok U.S. user data.

    67.    Plaintiff has already begun the implementation of these mitigation

strategies, including moving protected U.S. user data under the exclusive control of

USDS and in the cloud environment maintained by Oracle Corporation.  Plaintiff

remains in discussions with the U.S. government regarding this implementation

and other safeguards.  *See* Status Report, *TikTok Inc. v. CFIUS*, No. 20-1444 (D.C.

Cir. Apr. 24, 2023) (explaining that the U.S. government, Plaintiff, and BDL

"continue to be involved in ongoing negotiations to determine" whether any

national security concerns of the U.S. government related to TikTok's data

management practices "may be resolved by mutual agreement").

        b.    *IEEPA*

    68.    Congress also addressed national security concerns posed by foreign

economic activity and transactions involving foreign ownership of domestic

companies through IEEPA.

    69.    Enacted in 1977, IEEPA grants the President significant authority to

regulate foreign commerce upon declaring a national emergency.  *See* 50 U.S.C.

§ 1701(a) (authorizing the President "to deal with any unusual and extraordinary

threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat").

70.   Specifically, IEEPA permits the president to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).[33]

71.   IEEPA places several limitations on the President's authority in recognition of the limits of the First Amendment, providing that it "does not include the authority to regulate or prohibit, directly or indirectly," the importation or exportation of "information or informational materials" or "personal communication[s], which do[] not involve a transfer of anything of value."  50 U.S.C. § 1702(b)(1), (3).  IEEPA includes these limitations to "avoid[] serious questions about the constitutionality" of IEEPA, and in an effort to "prevent the

---

[33] The President has delegated authority to the Treasury Department's Office of Foreign Assets Control to "block" or "regulate" prohibited transactions under IEEPA.

statute from running afoul of the First Amendment." *Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989).

72.    On August 6, 2020, President Trump issued an executive order entitled "Addressing the Threat Posed by TikTok," which purported to act under IEEPA to prohibit "any transaction" with BDL or its subsidiaries, including Plaintiff, by "any person, or with respect to any property, subject to the jurisdiction of the United States."  Exec. Order No. 13942, 85 Fed. Reg. 48637.  In September 2020, the Secretary of Commerce issued a list of prohibited transactions to implement the President's executive order.

73.    On September 18, 2020, Plaintiff and BDL filed an action opposing the prohibitions, including because they violated IEEPA's limitation against regulating the importation or exportation of "information or informational materials" or "personal communication[s], which do[] not involve a transfer of anything of value." *TikTok Inc. v. Trump*, No. 20-cv-2658 (D.D.C. Sept. 18, 2020), Compl. at 40.

74.    The United States District Court for the District of Columbia agreed, and by orders dated September 27, 2020, and December 7, 2020, granted two preliminary injunctions preventing those prohibitions from going into effect.  *See TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 76 (D.D.C. 2020); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 96 (D.D.C. 2020).

75.     On June 9, 2021, President Biden issued an executive order entitled

"Protecting Americans' Sensitive Data From Foreign Adversaries," which, among

other things, revoked President Trump's executive order purporting to ban under

IEEPA any U.S. transaction with BDL or Plaintiff.  Exec. Order No. 14034, 86

Fed. Reg. 31423.

76.     On July 14, 2021, the D.C. Circuit granted the federal government's

motion to voluntarily dismiss the government's appeal of those decisions.  *See*

*TikTok Inc. v. Biden*, No. 20-5381, 2021 WL 3082803 (D.C. Cir. July 14, 2021).

\*      \*      \*

77.     As these federal statutory authorities demonstrate, Congress has

enacted a comprehensive statutory regime that takes account not only of the

country's national security needs, but also the protection of expressive activity and

the federal government's concurrent obligation to manage foreign affairs.  The

TikTok Ban undermines, disrupts, and conflicts with this federal scheme.  For

example, the TikTok Ban undermines the years-long negotiations between

Plaintiff, BDL, and CFIUS, pursuant to which Plaintiff has implemented a

comprehensive set of measures to address national security concerns.  The TikTok

Ban, by contrast, is not based on any particularized assessment of Plaintiff's actual

practices, nor is it reasonably calibrated to address the specific issues raised in the

legislation, *i.e.*, alleged Chinese government access to U.S. user data and TikTok's

33

content moderation practices.  Instead, the TikTok Ban effects a wholesale ban on TikTok in the State, notwithstanding the many ways in which Plaintiff can—and does—protect U.S. user data and attempts to shield users from harmful content.

### F.    Enforcement of the TikTok Ban Would Cause Plaintiff Irreparable Harm.

78.    Enforcement of the TikTok Ban would result in myriad harms to Plaintiff, both inside and outside of Montana, including but not limited to the following:

79.    First, enforcement of the Ban would infringe upon Plaintiff's First Amendment rights, as well as those of its users.  As Attorney General Knudsen acknowledged, the State is "under no illusions that this is not going to get challenged" on First Amendment grounds.[34]  While Attorney General Knudsen went on to characterize the TikTok Ban as being at "the next frontier in First Amendment jurisprudence that's probably going to have to come from the U.S. Supreme Court," it does not take further guidance from the Supreme Court to recognize that the TikTok Ban's blanket prohibition on a popular communications platform runs afoul of the First Amendment.  As one Montana TikTok creator put

---

[34] David McCabe, *A Plan to Ban TikTok in Montana Is a Preview for the Rest of the Country*, N.Y. TIMES (Apr. 12, 2023), https://www.nytimes.com/2023/04/12/technology/tiktok-ban-montana.html.

it, the TikTok Ban is "censorship at its finest form."[35]  The Ban would bar Plaintiff

from making editorial decisions on whether, and how, to publish and disseminate

speech created by Montanans to others and vice versa.  It would also prevent

Plaintiff from creating and sharing its own content about a variety of issues and

current events with Montanans.  The harm from abridgment of such First

Amendment freedoms is inherently irreparable.

80.     Second, enforcement of the Ban would destroy Plaintiff's business in

Montana.  The Ban will mean that TikTok will no longer be available in Montana,

resulting in the loss of many thousands of current and future users.  Competitors

will undoubtedly benefit as TikTok creators and users in Montana switch

platforms.  And even if the Ban were lifted after a period of weeks or months, the

harm to TikTok's user base and Plaintiff's competitive position in Montana would

be permanent.

81.     Third, the TikTok Ban will destroy the goodwill that Plaintiff needs to

partner with other businesses and advertisers that are either based in Montana or

wish to advertise to Montana consumers.  Commercial partners seeking to sell their

products in Montana or otherwise reach Montana audiences will move away from

---

[35] Dominic Vitiello, *Some Local Businesses Disheartened by Potential Statewide TikTok Ban*, NBC MONTANA (Apr. 11, 2023), https://nbcmontana.com/news/local/some-local-businesses-disheartened-by-potential-statewide-tiktok-ban#.

TikTok, leading not just to a loss of revenue but extraordinary harm to Plaintiff's reputation and goodwill, making it unlikely that these relationships could be salvaged if the Ban were to be lifted.  These reputational harms will not be limited to TikTok's business operations in Montana; advertisers and other business partners outside of Montana will also be less likely to partner with TikTok because it is banned in Montana.

82.     Fourth, because the TikTok Ban imposes liability not just on Plaintiff, but also on "mobile application store[s]" that make TikTok available to download in Montana (even if individuals in Montana do not actually download, activate, or otherwise access the app while in the State), the TikTok Ban may lead one or more app stores to remove TikTok from their store.  Depending on the technical difficulties faced by the app stores in ensuring that users are not able to access TikTok within Montana's state borders, one or more of these app stores may decide not to offer TikTok *at all*, rather than risk the legislation's draconian penalties.  Were the app stores to remove the TikTok app altogether, that would prevent everyone in the United States from downloading TikTok, causing further irreparable harm to Plaintiff.

83.     Furthermore, even though the TikTok Ban is not scheduled to take effect until January 1, 2024, its planned prohibition on TikTok in the State is already having a negative business impact on Plaintiff, as well as a chilling effect

36

on the speech of Plaintiff and other TikTok users in Montana.  Like any business,

Plaintiff must plan for the future, and the prospect that TikTok could become

entirely unavailable in Montana negatively affects Plaintiff's ability to operate in

Montana and elsewhere.

84.     If not for the TikTok Ban, Plaintiff would continue to operate TikTok

in Montana.  Attorney General Knudsen has warned, however, that he "absolutely"

will "go after the company itself" and "anybody that allows it to be downloaded"

with a "$10,000 per day civil penalty."[36]  Plaintiff brings this suit to enjoin

Defendant Knudsen from carrying out this express intention to use the legislation's

penalties to shut down TikTok, and thus suppress free speech, across the State of

Montana.

## CLAIMS FOR RELIEF

### Count 1: The TikTok Ban Violates the First Amendment.

85.     Plaintiff realleges and incorporates by reference all prior paragraphs

of this Complaint and the paragraphs in the counts below as though fully set forth

in this count.

---

[36] Fran Beyer, *Mont. AG Knudsen to Newsmax:  State TikTok Ban First of Its Kind*,
NEWSMAX (Apr. 17, 2023), https://www.newsmax.com/newsmax-tv/tiktok-montana-ban/2023/04/17/id/1116448.

86.     The First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, prohibits state laws that "abridg[e] the freedom of speech."  U.S. Const., amend. I.

87.     By banning TikTok—a forum that Plaintiff and hundreds of thousands of individuals in Montana use to engage in constitutionally protected speech—the TikTok Ban unlawfully abridges one of the core freedoms guaranteed by the First Amendment.  *See U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 926 (N.D. Cal. 2020) (preliminarily enjoining the federal government's ban of the Chinese-owned WeChat app because plaintiffs had "shown serious questions going to the merits of their First Amendment claim that" the Ban "effectively eliminate[d] the plaintiffs' key platform for communication, slow[ed] or eliminate[d] discourse, and was the equivalent of censorship of speech or a prior restraint on it").

88.     Plaintiff is among the speakers whose expression the TikTok Ban prohibits.  As a U.S. corporation, Plaintiff TikTok Inc. is entitled to First Amendment protections.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) ("The Court has recognized that First Amendment protection extends to corporations.").

89.     The TikTok Ban prevents Plaintiff from exercising editorial discretion over the third-party speech published on the app.  Plaintiff "is more than a passive

receptacle or conduit for news, comment, and advertising" of others; its "choice of

material" to recommend or forbid "constitute[s] the exercise of editorial control

and judgment" that is independently protected by the First Amendment. *Miami*

*Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  For example, Plaintiff

encourages users to create and share education and environment-focused content

on the app, such as through the "EduTok" campaign, which results in the

promotion of certain public interest content on the app.  Moreover, Plaintiff, like

operators of other online platforms, engages in content moderation and

enforcement of its Community Guidelines, which includes "decisions about what

content to include, exclude, moderate, filter, label, restrict, or promote."

*O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022).

> 90.     This editorial discretion is constitutionally protected speech. *See, e.g.*,

*NetChoice, LLC v. Att'y General, Florida*, 34 F.4th 1196, 1210 (11th Cir. 2022)

("[W]hen a platform removes or deprioritizes a user or post, it makes a judgment

about whether and to what extent it will publish information to its users—a

judgment rooted in the platform's own views about the sorts of content and

viewpoints that are valuable and appropriate for dissemination on its site," and

"thereby engages in 'speech' within the meaning of the First Amendment.");

*O'Handley*, 579 F. Supp. 3d at 1188 ("Twitter has important First Amendment

rights that would be jeopardized by a Court order telling Twitter what content-moderation policies to adopt and how to enforce those policies.").

91.     Plaintiff also uses TikTok to create and share its own content about a variety of issues and current events, including, for example, its support for small businesses, Earth Day, and literacy and education.[37]  When Plaintiff publishes its own posts and other information, it is engaging in core speech protected by the First Amendment.  *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."); *NetChoice*, 34 F.4th at 1210 ("Social-media platforms like . . . TikTok are private companies with First Amendment rights, and when they (like other entities) disclose, publish, or disseminate information, they engage in 'speech within the meaning of the First Amendment.'" (internal quotation marks, alterations, and citations omitted)).

92.     The restrictions that the TikTok Ban imposes on Plaintiff's speech and that of TikTok users violate the First Amendment.  The TikTok Ban is subject to strict scrutiny because it constitutes government action that singles out TikTok and

---

[37] TikTok (@tiktok), TIKTOK, https://www.tiktok.com/t/ZTRELfewn (last visited May 22, 2023); TikTok (@tiktok), TIKTOK, https://www.tiktok.com/t/ZTRELWoCN (last visited May 22, 2023); TikTok (@tiktok), TIKTOK, https://www.tiktok.com/t/ZTRTqtL7D (last visited May 22, 2023); TikTok (@tiktok), TIKTOK, https://www.tiktok.com/t/ZTRTqnrSJ (last visited May 22, 2023).

its users for disfavored treatment with the content-based rationale that videos on

TikTok are harmful to minors.  As a content-based restriction on speech, the

TikTok Ban is "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377,

382 (1992), and must be struck down unless Defendant can satisfy his burden of

meeting the stringent requirements of strict scrutiny, meaning that the relevant

restrictions must be the least-restrictive means of promoting a compelling

government interest, *see United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813

(2000).  "It is rare that a regulation restricting speech because of its content will

ever be permissible." *Id.* at 818.  The TikTok Ban is also subject to strict scrutiny

to the extent the State seeks to justify the Ban based on purported concerns that

Plaintiff will use TikTok to promote certain viewpoints on the platform over

others. *See, e.g.*, *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1163 (9th Cir. 2022).

93.     When the Act was first introduced in the Montana Senate, a legal

memorandum written by a staff attorney for the Montana Legislature read at a

Senate hearing agreed that "a court would likely apply a strict scrutiny approach in

construing the provisions of the draft."[38]  Governor Gianforte subsequently

suggested amendments to the bill that would have applied its prohibitions to a

---

[38] Hearing, Montana Senate Business, Labor, and Economic Affairs (Feb. 27, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/48139.

broad range of social media applications, not just TikTok, and would have removed the legislation's purported content-based concerns about the material available on TikTok.[39]  Setting aside whether those changes would have been sufficient to subject the Ban to a lower tier of scrutiny (they would not), the Montana Legislature did not consider Governor Gianforte's suggested amendments.

94.     Strict scrutiny applies also because the TikTok Ban constitutes a prior restraint on Plaintiff's and its users' speech—"the most serious and the least tolerable infringement on First Amendment rights."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  The TikTok Ban entirely prohibits the use of TikTok in Montana, barring Plaintiff and the many thousands of Montanans who use the app from engaging in protected speech.  *See U.S. WeChat Users All.*, 488 F. Supp. 3d at 926 (holding it was a "serious question[]" whether the government's ban on WeChat was a prior restraint).  Such prior restraints are reviewed for strict scrutiny, *In re Dan Farr Prods.*, 874 F.3d 590, 593 n.2 (9th Cir. 2017), and "bear a heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

---

[39] *See* Eric Dietrich, *Gianforte Signals He'll Sign TikTok Ban—But He Prefers Changes First*, MONTANA FREE PRESS (Apr. 27, 2023), https://montanafreepress.org/2023/04/27/montana-governor-gianforte-pushes-back-on-tiktok-ban-bill/.

95.     The State cannot meet its demanding burden to show that the TikTok

Ban satisfies strict scrutiny.  Even if the State could articulate a general interest in

securing its residents' data or protecting minors from harmful content, the State has

failed to point to anything beyond speculation to suggest that banning TikTok

would advance either interest.  The purported national security concerns animating

the TikTok Ban are outside the State's realm of expertise and constitutional

authority.  And the State has failed entirely to substantiate the assertion that

TikTok is harmful to minors, or that TikTok is more dangerous than the many

other online entertainment, communications, and social-media services that the

TikTok Ban does not touch.  The State's "justification for" the TikTok Ban's

"novel burden on expression must be 'far stronger than mere speculation about

serious harms.'"  *Bartnicki v. Vopper*, 532 U.S. 514, 532 (2001) (quoting *United

States v. Treasury Empls.*, 513 U.S. 454, 475 (1995)); *see also Washington Post v.

McManus*, 944 F.3d 506, 522 (4th Cir. 2019) ("Without direct evidence (or

anything close to it) of [foreign] meddling," the State "has failed to show that this

purported threat is likely or imminent enough to justify the Act's intrusive

preventative measures.").

96.     Even if the State could show that the TikTok Ban served a compelling

government interest, the legislation's total ban on TikTok is far from the least-

restrictive means of promoting that interest.  Numerous less-restrictive alternatives

exist that could address the State's perceived concerns.  The State could, for

example, enact an appropriately tailored data privacy law of general application, or

mandate additional protections designed to protect the safety of minors on the

internet.  By disregarding these alternatives, the TikTok Ban burdens far more

speech than necessary by completely extinguishing a forum used by Plaintiff and

hundreds of thousands of users in Montana for constitutionally protected speech.

*See, e.g.*, *U.S. WeChat Users All.*, 488 F. Supp. 3d at 927 (holding that, "while the

government has established that China's activities raise significant national-

security concerns[,] it has put in scant little evidence that its effective ban of

WeChat for all U.S. users addresses those concerns.  And, as the plaintiffs point

out, there are obvious alternatives to a complete ban.").

97.    Even if strict scrutiny did not apply, at a minimum, the TikTok Ban is

subject to intermediate scrutiny as a government regulation of the time, place, or

manner of protected speech, because the TikTok Ban prohibits the manner in

which Plaintiff and its users may communicate with one another (*i.e.*, through the

TikTok app).  *See Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Intermediate scrutiny requires that a government speech restriction must be

"narrowly tailored to serve a significant government interest," may not "burden

substantially more speech than is necessary to further the government's legitimate

interests," and must "leave open ample alternative channels for communication of

the information." *McCullen v. Coakley*, 573 U.S. 464, 477, 486 (2014) (internal quotation marks omitted).

98.     For many of the same reasons the TikTok Ban cannot survive strict scrutiny, it cannot survive intermediate scrutiny.  The State cannot show that the TikTok ban serves a significant government interest, because the connection between the legislation and the issues it purports to address are purely speculative, *see supra* ¶ 95.  Nor can the State show that the TikTok Ban is narrowly tailored to serve any such interest, given the sweeping breadth of the legislation and the existence of numerous, substantially less-restrictive alternatives that the State could enact instead, *see supra* ¶ 96.

99.     Furthermore, because the TikTok Ban "effectively prevents" Plaintiff "from reaching [its] intended audience, it fails to leave open ample alternative means of communication," and thus fails intermediate scrutiny for this independent reason.  *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001).  The First Amendment protects a speaker's interest in reaching an audience of its choosing in a manner of its choosing.  *See, e.g.*, *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004) ("[T]here is a strong First Amendment interest in . . . protecting speakers seeking to reach a particular audience.").  While Plaintiff might be able to communicate with individuals *other* than Montana TikTok users, and through means *other* than the TikTok app, it has no meaningful alternative means to

communicate with Montana TikTok users. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) ("[A]n alternative is not adequate if it foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups." (internal quotation marks omitted)).

100.   Indeed, laws like the TikTok Ban that impose a total prohibition on a medium of expression are particularly disfavored, because they often suppress more speech than necessary. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) ("Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression. . . . Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech.").

101.   For many of these same reasons, the TikTok Ban is unconstitutionally "overbroad" on its face due to its burdens on the speech of the many thousands of people in Montana who currently use TikTok or might wish to do so in the future. A statute is constitutionally overbroad if a "substantial number" of its "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  Here, because the TikTok Ban would completely destroy an important medium of communication

throughout the State, based on speculative and unfounded concerns about national security and minor safety, *all* of its applications are unconstitutional, not just a substantial number.

102.   At a minimum, the TikTok Ban suffers from unconstitutional overbreadth as a result of its ban on TikTok use *by adults*.  While the Ban purports to express concern about "minors'" access to "dangerous content," there is no similar concern expressed about adults' ability to access content on the app.  The TikTok Ban, however, applies to all users in Montana, not just users under the age of 18.  Thus, even if the TikTok Ban could survive constitutional scrutiny with respect to minors (it cannot), there is no equivalent justification for the Ban with respect to adults.

103.   The TikTok Ban's violation of Plaintiff's First Amendment rights is causing and will continue to cause ongoing and irreparable harm to Plaintiff.

**Count 2: The TikTok Ban Is Preempted by Federal Law.**

104.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

105.   As explained above, the TikTok Ban purports to ban TikTok based on perceived national security concerns as well as unsubstantiated fears that Plaintiff may share Montanans' user data with Chinese authorities.  But in attempting to ban

47

Plaintiff from operating in the State, the TikTok Ban runs afoul of basic tenets of federal preemption.

106.   The Supremacy Clause of the U.S. Constitution prohibits States from regulating conduct "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  State laws are also preempted when they conflict with federal law, including when they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

107.   Here, the TikTok Ban is preempted by federal law because it regulates conduct in the field of national security and foreign affairs, purporting to remedy concerns posed by foreign involvement in domestic businesses—an area that the Constitution has assigned to the federal government and that Congress has occupied by enacting an extensive regulatory framework.  The TikTok Ban also conflicts with this federal regulatory framework, including by interfering with the accomplishment of the full objectives of Congress in Section 721, IEEPA, and related regulations.  *See Zschernig v. Miller*, 389 U.S. 429, 432 (1968) (States may not trespass into the realm of "foreign affairs which the Constitution entrusts to the President and the Congress."); *Movsesian*, 670 F.3d at 1071 ("Under the foreign

affairs doctrine, state laws that intrude on this exclusively federal power are preempted.").

108.   "The Supreme Court has long recognized that foreign relations and national security are preeminently federal concerns that are exclusive of state regulation." *NLMK Pa., LLC v. U.S. Steel Corp.*, 592 F. Supp. 3d 432, 452 (W.D. Pa. 2022); *see also, e.g.*, *Zschernig*, 389 U.S. at 432 (invalidating an Oregon statute that represented "an intrusion by the State into the field of foreign affairs"). This is especially true with respect to the regulation of national security risks posed by the foreign involvement in domestic businesses. In this area, Congress has legislated so pervasively—including by enacting Section 721 and IEEPA—that it is clear Congress intended to leave no room for States to make separate determinations that would create a patchwork of different laws affecting national security and foreign affairs. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Furthermore, "even in the absence of any express federal policy, a state law still may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian*, 670 F.3d at 1072.

109.   The TikTok Ban purports to justify prohibiting TikTok by asserting, *inter alia*, that China is an "adversary of the United States," that China uses TikTok as a tool to conduct "international espionage," and that TikTok allows

China "to track the real-time locations of public officials, journalists, and other individuals adverse to the Chinese Communist Party's interests."  These concerns are unfounded, but even setting that aside, the TikTok Ban's purported justifications regarding national security and foreign relations are not grounded in an area of traditional state responsibility, but are instead, as noted, *supra* ¶¶ 107-108, distinctly federal interests that are addressed through nationwide law and policy.  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010) ("Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs.").

110.   The TikTok Ban thus contravenes Congress's manifest intent to deal with national security threats posed by foreign economic activity and involvement in U.S. business through Section 721 and IEEPA on a nationwide basis.

111.   The TikTok Ban not only intrudes upon the federal government's field of exclusive regulation over matters of national security and foreign affairs; it also conflicts with congressional policy in that field.

112.   For example, Congress gives CFIUS a broad range of tools short of an outright prohibition to mitigate the national security risks the U.S. government determines are posed by certain categories of transactions.  *See* 50 U.S.C. § 4565(l)(3)(A)(i) (permitting CFIUS to "negotiate, enter into or impose, and

enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction"). Indeed, Plaintiff and CFIUS have been in negotiations for nearly three years to identify mitigation measures that further national security, short of a complete ban. The President also has the authority to mandate divestiture under Section 721 in certain circumstances. *See id.* § 4565(d).

113.   In passing the TikTok Ban, however, the Montana government has substituted its own view of how best to address perceived national security threats from China, requiring a total ban on TikTok regardless of CFIUS and the President's ultimate conclusions regarding this same matter. While the TikTok Ban purports to address this issue by declaring that it is contingently void "if tiktok is acquired by or sold to a company that is not designated as a foreign adversary" under federal regulations, this provision merely reinforces the conflict between the TikTok Ban and federal law. CFIUS expressly has authority to take actions short of a divestiture, such as by entering into mitigation agreements, and the statute makes clear that the President has discretion as to whether to take action pursuant to the statute or not. Thus, the President's and CFIUS's authorities under Section 721 extend beyond the circumstances posited by the Ban's contingent voidness clause, and Montana's efforts to short-circuit and constrain the ongoing CFIUS review represent a clear obstacle to Congress's objectives in enacting Section 721.

114.   Furthermore, Congress gave the President specified authorities to regulate foreign commerce upon declaring a national emergency under IEEPA. *See* 50 U.S.C. § 1701(a).  But Congress also made that authority subject to certain express limitations, including that the President may not "regulate or prohibit, directly or indirectly," the importation or exportation of "information or information materials," or "personal communication[s], which do[] not involve a transfer of anything of value."  *Id.* § 1702(b)(1), (3).

115.   Montana's TikTok Ban conflicts with Congress's judgment as to the proper limits of government authority over foreign economic activity because it restricts the types of personal communications and informational materials excluded from the scope of IEEPA—limits that were included to, among other things, "prevent the statute from running afoul of the First Amendment."  *Cernuda*, 720 F. Supp. at 1553.

116.   Accordingly, the TikTok Ban is preempted by federal law and stands in violation of the Supremacy Clause of the U.S. Constitution.

117.   The TikTok Ban's violation of the Supremacy Clause is causing and will continue to cause ongoing and irreparable harm to Plaintiff.

**Count 3: The TikTok Ban Violates the Commerce Clause and Disrupts the Constitution's Structural Distribution of Authority Between Federal and State Governments.**

118.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

119.   The Commerce Clause of the U.S. Constitution grants Congress the power to regulate commerce "with foreign Nations, and among the several States." U.S. Const. art. 1, § 8, cl. 3.  While the Commerce Clause is framed "by its text [as] an affirmative grant of power to Congress," the so-called "Dormant" component of the Clause "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce."  *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).

120.   The TikTok Ban imposes substantial burdens on interstate commerce in violation of the Commerce Clause and other structural provisions of the Constitution by prohibiting Plaintiff from operating TikTok in Montana and penalizing Plaintiff any time a user in Montana accesses TikTok or is offered the ability to access or download TikTok in the State.  The TikTok Ban is not limited to Montana residents; it applies to anyone in the State, including those visiting or merely passing through for work.

53

121.   Substantial burdens on interstate commerce "generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1135 (9th Cir. 2021) (quoting *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012)).

122.   Plaintiff's operation of TikTok, an application used by over 150 million users in the United States, including in every State, is inherently national in scope and requires a uniform system of regulation, not one subject to the policy decisions of fifty separate States.

123.   Implementing the TikTok Ban would cause inevitable disruption that would impede the flow of interstate commerce and spill over into neighboring States.  This is especially true given that the TikTok Ban is not limited to Montana residents; rather, the TikTok Ban prohibits the use of TikTok by anyone physically present in the State, including visitors and others passing through, such as long-haul truckers and railroad employees.  Montana also hosts millions of tourists each year.  To comply with the Ban, Plaintiff would need to block any user from accessing TikTok the moment they cross State lines, and for those users who want to retain access to TikTok, they would be required to adjust their plans accordingly.

124.   Separately, because the TikTok Ban penalizes not only Plaintiff for violations of the legislation but also "mobile application store[s]" merely for making TikTok *available* to download (regardless of whether the app is *actually* downloaded), the TikTok Ban may lead one or more app stores to elect not to offer TikTok *at all*, rather than risk the significant penalties under the legislation. *See supra* ¶ 82.  If national app stores remove the app, TikTok would lose access to new users across the entire United States based on the actions of the Montana Government.  Such a possibility is forbidden by the Commerce Clause and structure of the Constitution.

125.   These "burdens on interstate commerce" flowing from the TikTok Ban are "excessive" in relation to the putative local benefits.  *Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015).  Indeed, the resulting "confusion and difficulty" of trying to comply with this "varied system of state regulation" in an area where there is an inherent "need for uniformity" is exactly the sort of burden on interstate commerce the Commerce Clause prohibits.  *S. Pac. Co. v. Arizona*, 325 U.S. 761, 774 (1945).

126.   The Ban also facially discriminates against foreign commerce by prohibiting TikTok in the State due to Plaintiff's asserted economic relationship with a foreign-owned entity.  By imposing the Ban as long as Plaintiff purportedly remains a subsidiary of a company "incorporated in" China or "any country

55

designated as a foreign adversary" of the United States, the Ban aims to "affect business decisions pertaining to a foreign nation." *Nat'l Fed'n Trade Council v. Natsios*, 181 F.3d 38, 46–47 (1st Cir. 1999). The Ban is thus a "direct attempt regulate the flow of foreign commerce." *Id.* State laws like the Ban that facially discriminate against foreign commerce are subject to the "strictest scrutiny." *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979). The fact that Plaintiff "could avoid that discrimination by changing the domicile" of its parent company under the Ban's contingent voidness provision confirms that the Ban violates the Commerce Clause. *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 76 (1992). And the State cannot carry its heavy burden of showing that the Ban's discrimination serves a legitimate local purpose or that there is an absence of nondiscriminatory alternatives.

127. The TikTok Ban's substantial burden on interstate commerce and facial discrimination against foreign commerce therefore violates the Commerce Clause and constitutional structure.

128. The TikTok Ban's violation of the Commerce Clause and constitutional structure is causing and will continue to cause ongoing and irreparable harm to Plaintiff.

**Count 4: The TikTok Ban Is an Unconstitutional Bill of Attainder.**

129.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth in this count.

130.    Article I of the U.S. Constitution provides that "[n]o State shall . . . pass any Bill of Attainder."  U.S. Const. art. I, § 10, cl. 1.  A bill of attainder is "legislative punishment, of any form or severity, of specifically designated persons or groups."  *United States v. Brown*, 381 U.S. 437, 447 (1965).[40]

131.    By singling out TikTok for legislative punishment applicable to no other social media or entertainment platform, the TikTok Ban is an unconstitutional bill of attainder.  Although numerous companies, both foreign and domestic, operate social media platforms, communications services, and online entertainment platforms in Montana, the TikTok Ban prohibits TikTok—and *only* TikTok—based on purported concerns about its data security practices.  The TikTok Ban singles out the TikTok application for this punishment, notwithstanding that the data allegedly collected by the app is no different in kind than data collected from any number of other sources and that is widely available in the data broker market.  *See supra* ¶ 59.

---

[40] Courts in the Ninth Circuit "do not distinguish in [their] analysis between the Bill of Attainder Clauses in section 10, which applies to the states, and in section 9, which applies to Congress."  *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 672 n.6 (9th Cir. 2002); *see also Fowler Packing Co. v. Lanier*, 844 F.3d 809, 817 n.5 (9th Cir. 2016) (similar).

132.   The TikTok Ban's creation of liability each time a user in Montana accesses TikTok, is offered the ability to access TikTok, or is offered the ability to download TikTok constitutes unconstitutional legislative punishment.

133.   First, the TikTok Ban inflicts "pains and penalties" that historically have been associated with bills of attainder.  Among other things, the legislation banishes Plaintiff from Montana and punitively confiscates Plaintiff's business expectancy relating to the ongoing operation of TikTok in the State.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 474 (1977) ("'[P]ains and penalties' historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by the sovereign.").  Furthermore, the TikTok Ban imposes those pains and penalties on Plaintiff as a result of its perceived disloyalty to the United States—*i.e.*, based on unfounded allegations that Plaintiff might misappropriate U.S. user data to share with the Chinese government.  *See id.* (explaining that pains and penalties were "[g]enerally addressed to persons considered disloyal to the Crown or State").

134.   Second, "viewed in terms of the type and severity of burdens imposed" on Plaintiff, the TikTok Ban's treatment of Plaintiff cannot "reasonably . . . be said to further nonpunitive legislative purposes."  *Id.* at 475–76.  A $10,000 penalty imposed each time a user in Montana accesses TikTok (or is even *offered* the opportunity to download the app) is too severe a penalty not to be punitive.

58

Furthermore, the fact that the TikTok Ban targets TikTok exclusively—and no other application with foreign ownership—confirms that the State lacks a legitimate interest in enacting the TikTok Ban apart from inflicting legislative punishment.

135.    Third, and finally, the legislative record evinces an intent to punish Plaintiff.  Prior to the TikTok Ban's passage, members of the Montana Legislature expressed their support for the legislation in terms of the opportunity it presented to punish Plaintiff, often for perceived wrongdoing by China.  For example, Attorney General Knudsen, whose office reportedly drafted the TikTok Ban, explicitly tied support of the legislation to a broader effort to exact payback on China, stating that, "[f]rankly, the Chinese did us a favor by floating that spy balloon over Montana when they did."[41]  Similarly, in a House debate on April 13, 2023, Representative Edward Butcher referred to Plaintiff—a private U.S. company—as both an "economic adversary" and a "political adversary," and urged his colleagues not to "bury our head in the sand and say 'oh gee, well, we don't

---

[41] David McCabe, *A Plan to Ban TikTok in Montana Is a Preview for the Rest of the Country*, N.Y. TIMES (Apr. 12, 2023), https://www.nytimes.com/2023/04/12/technology/tiktok-ban-montana.html.

want to pick on one company,'" because "[t]hey're the ones that started this thing."[42]

136.   As another example, during a House Judiciary Committee Hearing on March 28, 2023, Representative Neil Duram referred to TikTok as "the music played by the Pied Piper to steal this generation's heart and mind."[43]  Other legislators remarked on the punitive nature of the TikTok Ban, including Representative Zooey Zephyr, who in opposition to the bill at a House floor session on April 13, 2023, said that while "[d]ata privacy is a really serious concern, . . . that's not really being addressed in this Bill."  Instead, Representative Zephyr noted, "[w]hat we heard in Committee, what we heard from proponents of this Bill, was a lot of conversation around China, around communists, around red scare stuff."[44]  These and other comments from legislators during deliberation of the TikTok Ban confirm that the legislation was not an effort to regulate in an area

---

[42] Floor Session, Montana House (Apr. 13, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20230416/21/46167.

[43] Hearing, Montana House Judiciary (Mar. 28, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20230416/30/47792; *see also* David McCabe, *A Plan to Ban TikTok in Montana Is a Preview for the Rest of the Country*, N.Y. TIMES (Apr. 12, 2023), https://www.nytimes.com/2023/04/12/technology/tiktok-ban-montana.html.

[44] Floor Session, Montana House (Apr. 13, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20230416/21/46167.

of legitimate state concern, but instead a political act of retribution aimed at punishing Plaintiff erroneously as a perceived proxy for the Chinese government.

137.   Accordingly, the TikTok Ban constitutes an unconstitutional bill of attainder.

138.   The TikTok Ban's imposition of an unconstitutional bill of attainder is causing and will continue to cause ongoing and irreparable harm to Plaintiff.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

(1)   Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the TikTok Ban is unconstitutional and preempted by federal law;

(2)   Issue an order invalidating the TikTok Ban and preliminarily and permanently enjoining Defendant from implementing or enforcing the TikTok Ban, and preserving the status quo; and

(3)   Grant any other and further relief that this Court may deem just, equitable, and proper.

Dated: May 22, 2023                    Respectfully submitted,

Rob Cameron
Nathan D. Bilyeu
JACKSON, MURDO & GRANT, P.C.
203 North Ewing
Helena, MT 59601
(406) 389-8244
rcameron@jmgattorneys.com
nbilyeu@jmgattorneys.com

Alexander A. Berengaut*
Megan A. Crowley*
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5367
aberengaut@cov.com
mcrowley@cov.com
*pro hac vice application forthcoming

*Attorneys for Plaintiff*