# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| SAMANTHA ALARIO, et al.,<br><br>*Plaintiffs*,<br><br>and<br><br>TIKTOK INC.,<br><br>*Consolidated Plaintiffs*,<br><br>v.<br><br>AUSTIN KNUDSEN, in his official capacity as Attorney General of Montana,<br><br>*Defendant.* | Civil Action Nos.<br>9:23-cv-00056-DWM<br>9:23-cv-00061-DWM |

**BRIEF OF *AMICUS CURIAE* THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF PRELIMINARY INJUNCTIVE RELIEF**

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association representing a broad cross-section of communications, technology, and internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA has considerable experience litigating the First Amendment implications of restrictions on online speech, including as co-plaintiff in two federal cases presently before the Supreme Court on petitions for certiorari. *See* Pet. for Cert., *NetChoice, LLC v. Paxton*, No. 22-555; Pet. for Cert., *NetChoice, LLC v. Moody*, No. 22-393; Pet. for Cert., *Moody v. NetChoice, LLC*, No. 22-277.

Several CCIA members are directly regulated by SB419.[2] Unless SB419 is enjoined, these companies' core First Amendment rights will be infringed. CCIA submits this brief in support of the requested preliminary injunction to emphasize the importance of the First Amendment for the online ecosystem.

---

[1] This brief was written and funded entirely by CCIA, its members, and its counsel. No person or party other than CCIA, its counsel, and its members contributed to the creation, filing, or service of this brief.

[2] TikTok is not a member of CCIA; see list at https://www.ccianet.org/members.

## INTRODUCTION

Software applications on mobile devices, commonly called apps, are a ubiquitous feature of modern life. Not only do they "offer a range of tools for managing detailed information," *Riley v. California*, 573 U.S. 373, 396 (2014), but they are a critical means of expression. They provide news, entertainment, access to the arts, political information, and health data, and cater to hobbies and interests of all description. "[T]he phrase 'there's an app for that' is now part of the popular lexicon." *Id*.

Through SB419, the State of Montana has singled out one app and one means of expression—TikTok—for banishment. SB419 works in two ways. First, it prohibits TikTok from operating in the State. *See* SB419 §§ 1(1)(a), 1(2). Second, it prohibits mobile application stores ("app stores") from providing even "the option to download the tiktok mobile application" "within the territorial jurisdiction of Montana." *Id*. § 1(1)(b). An app store that does not remove TikTok by January 1, 2024, will be fined $10,000 for each person within Montana who has access to TikTok for every day that TikTok is available. *Id*. §§ 1(1)(b), 1(2), 1(7)(a). For example, an app store accessible by 100,000 people within Montana will be liable for $1 billion in civil fines for every day TikTok remains available. By punishing app stores for every person who *could* access TikTok, even if they never download or use it, SB419 imposes harsher penalties on app stores than on TikTok itself, which

is liable only if people within Montana actually access it, *id.* §§ 1(1)(a), 1(2), 1(7)(a).

Several of CCIA's members provide consumers with app stores that are subject to SB419. App stores' expressive control is essential to the flourishing array of experiences that users seek on their devices. Like a publisher who selects and arranges articles by third-party authors, a bookstore that selects which books to offer and promote, and a cable operator selecting its programming, app stores engage in protected speech when they exercise their editorial discretion about which apps to present and how. Montana's "unprecedented"[3] and severe restriction on what app stores can offer infringes these private companies' First Amendment rights.

CCIA submits this brief to provide the Court with a unique perspective on SB419's impact on app stores and its broader implications for the entire internet. The Court should evaluate the unconstitutionality of SB419's restrictions on app stores in determining whether Plaintiffs' facial challenge to SB419 is likely to succeed. Plaintiffs have presented an overbreadth challenge to SB419. *See* Br. ISO Consol. Pls.' Mot. for Preliminary Injunction, No. 9:23-cv-00056, ECF 12 at 16-17; Pls.' Mem. of Law ISO Mot. for Preliminary Injunction, ECF 18 at 13-14. The overbreadth doctrine provides that a law is facially invalid when its unconstitutional scope is both real and substantial in relation to any lawful effect. *See United States*

---

[3] Complaint for Injunctive and Declaratory Relief, No. 9:23-cv-00056, ECF 1 at 22 ¶ 53 (quoting Attorney General Knudsen). SB419 is the only statute in the U.S. that applies to private citizens' use of TikTok.

*v. Hansen*, 143 S. Ct. 1932, 1939 (2023). Overbreadth analysis accounts for a law's effects on all parties, including those "not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Though the overbreadth doctrine may often turn on "hypotheticals," *Hansen*, 143 S. Ct. at 1947 n.5, in this case it turns on direct, concrete, and explicit effects on CCIA's members: SB419 squelches app stores' First Amendment rights.

If, as seems likely, Montana cannot justify SB419's restrictions on TikTok and its users, then it plainly has no basis to prohibit app stores from making TikTok available. Nor can it justify targeting app stores for draconian sanctions. And the Court should consider the broader danger to online expression if other states feel empowered to target app stores to ban apps and other content that they wish to suppress.

## SUMMARY OF ARGUMENT

The First Amendment protects app stores' editorial discretion. Like traditional publishers and distributors of speech, app stores have a First Amendment right to curate the third-party content they provide. The Supreme Court has repeatedly held that the First Amendment protects the exercise of editorial discretion by publishers and distributors of speech. Those principles shield the selection and presentation of articles in a newspaper, books in a bookstore, and broadcast channels

in a cable lineup. They also protect app stores' selection of apps.

Montana cannot justify SB419, which is subject to strict scrutiny both because it operates as a prior restraint and because it is a content-based restriction on speech. If the State's purported justifications for SB419 are valid, the State could accomplish its goals without imposing massive penalties on app stores. And if the State's asserted interests are not compelling, no basis exists to punish app stores for making TikTok available, and Montana's entire law is facially invalid. Therefore, SB419 should be preliminarily enjoined.

## ARGUMENT

### I.  THE FIRST AMENDMENT PROTECTS APP STORES' EDITORIAL DECISIONS

The First Amendment protects those who curate, select, and present the speech of others. *See Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 569-70 (1995) ("the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security"). App stores engage in this constitutionally protected expression by developing standards governing the types of apps allowed, applying those standards, and curating a user experience that reflects the app store's editorial discretion.

#### A.  App Stores Are Entitled To First Amendment Protection

In deciding which apps to allow and how to present them to users, app stores function like publishers and distributors of third-party speech. The First Amendment

protects the rights of publishers and distributors to make these "editorial" choices, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), and to "disseminate" speech, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

    1. The Supreme Court has explained that publishers are "more than a passive receptacle or conduit for news, comment, and advertising" of others. *Tornillo*, 418 U.S. at 258. Rather, publishers exercise "editorial control and judgment" over the "choice of material" to present or exclude in their publications. *Id.*; *see also Hurley*, 515 U.S. at 570.

    In *Tornillo*, the Supreme Court invalidated Florida's "right of reply" statute, which punished any newspaper that did not allow political candidates that the paper criticized to publish a reply free of charge. The statute "fail[ed] to clear the barriers of the First Amendment because of its intrusion into the function of editors." 418 U.S. at 258. "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" that state regulation cannot override. *Id.*

    In *Hurley*, the Supreme Court again held that editorial discretion is protected by the First Amendment. There, a Massachusetts law required the private organizers of a parade to include gay, lesbian, and bisexual marchers. The Court invalidated that requirement, relying on *Tornillo* to hold that the First Amendment does not

"require a speaker to generate, as an original matter, each item featured in the communication" to qualify for protection. 515 U.S. at 570. Just as cable operators "are engaged in protected speech activities even when they only select programming originally produced by others," *id*. (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994)), and just as a newspaper engages in protected speech by compiling its "opinion pages" or undertaking "even the simple selection of a paid noncommercial advertisement for inclusion," *id*. (citing *Tornillo* and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265-66 (1974)), so too does an organizer engage in protected speech when it selects "contingents to make a parade," *id*. The First Amendment applies fully to publishers who exercise editorial discretion over third-party speech, whether through a newspaper, TV, a parade, or online.

2. "[D]isseminat[ing]" the speech of others is equally protected. *Sorrell*, 564 U.S. at 570; *accord Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011). As a long line of precedent establishes, "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1; *see Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("disclosing and publishing information") (alterations omitted); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768 (1988) ("Liberty of circulating is as essential to freedom of expression as liberty of publishing") (alterations and quotations omitted); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("constitutional guarantee

of freedom of the press embraces the circulation of books"); *Smith v. California*, 361 U.S. 147, 150 (1959) ("free publication and dissemination of books and other forms of the printed word" including by "retail bookseller"). Cable programmers and operators are protected by the First Amendment where they exercise "editorial discretion over which stations or programs to include." *Turner*, 512 U.S. at 636 (internal quotation marks omitted).

3. First Amendment protection applies equally to app stores. App stores provide an outlet for third-party speech and thus have constitutional rights independent of the third parties whose speech they disseminate. As *Hurley* confirms, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices" in a single communication. 515 U.S. at 569. When a broadcaster—public or private—exercises "editorial discretion in the selection and presentation of its programming," that broadcaster engages in "speech activity." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673-674 (1998). And "[a]lthough programming decisions often involve the compilation of speech of third parties, the decisions nonetheless constitute communicative acts." *Id.*; *see also Bantam Books*, 372 U.S. at 64 n.6 (book publishers "are not in the position of mere proxies arguing another's constitutional rights"). The editorial discretion exercised by app stores is no less a protected communicative act than are print publications and broadcasts that present speech.

It is particularly vital to recognize the First Amendment interests inherent in the exercise of editorial discretion on the internet given its extraordinary power, reach, and prevalence. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) (recognizing that even the early internet granted users a voice that "resonates farther than it could from any soapbox"); *Packingham v. North Carolina,* 582 U.S. 98, 104 (2017) (it is "clear" that the internet, "and social media in particular," are "the most important places . . . for the exchange of views"). "All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections; no less can hold true when it comes to speech . . . conveyed over the Internet." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023); *see NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1213 (11th Cir. 2022), pets. for cert. pending, Nos. 22-277, 22-393 ("When platforms choose to . . . deprioritize content in viewers' feeds or search results, or sanction breaches of their community standards, they engage in First-Amendment-protected activity.").

Applying these principles, courts routinely find that search engines—which curate and present the speech of others—are entitled to First Amendment protection. *See, e.g.*, *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265, 1274 (M.D. Fla. 2016); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 438-40 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007). Like

search engines, app stores "inevitably make editorial judgments about what information (or kinds of information) to include . . . and how and where to display that information." *Zhang*, 10 F. Supp. 3d at 438.

4. In sum, "[t]ogether, *Tornillo*" and its progeny "establish that a private entity's decisions about whether, to what extent, and in what manner to disseminate third-party created content to the public are editorial judgments protected by the First Amendment." *NetChoice*, 34 F.4th at 1212. Like print publishers, broadcasters, or bookstores, app stores exercise editorial discretion when deciding which third-party applications to make available and how to organize those applications for users. And the way app stores make *different* judgments about how to curate content underscores the protected expressive nature of app stores' speech.

**B.     App Stores Are Curators Of Online Content In The Form Of Digital Apps**

Apps have emerged as essential forms of expression in contemporary life. The number, variety, and prevalence of apps has only increased in recent years—and with it the number and variety of app stores exercising editorial judgment about which apps to include and how to present them.

App stores' editorial discretion is evident in the wide variety of approaches they take. Like the traditional print editors in *Tornillo* and the cable operators in *Turner*, app stores express themselves by selecting which apps to make available and how to present those apps to users. These editorial decisions, in turn, are based

in large measure on the expressive content of the apps themselves.

For example, Google employs several editorial parameters on the third-party content that appears in its Play Store to ensure that its users enjoy "the best user experience" possible in a "safe and secure environment" in which user privacy is protected.[4]  The Play Store's content policy rejects apps that contain "content that is harmful or inappropriate" for users, like apps containing "Spam," "Malware," "Privacy, Deception and Device Abuse," or "Inappropriate Content" such as pornography, hate speech, bullying and harassment, or gratuitous violence.  *Id.*

Google also makes expressive judgments through its curation of the store for its users—*i.e.*, by organizing and arranging the apps.  In order to "help users discover the right app at the right time," Google ranks and sorts apps based on characteristics including, for example, developers' descriptions of their apps, user feedback, and Google's own editorial judgments.[5]  Further, the Google Play team "provides curated recommendations to help users find content that is noteworthy and interesting."  *Id.*  Through this process of selection and presentation, Google offers its users a curated ecosystem produced by Google's expressive judgments.

To take another example, Apple curates its App Store to cultivate a safe and

---

[4] Google, *Developer Policy Center*, https://play.google.com/intl/en-US/about/developer-content-policy/.
[5] Google, *Policy Center: App Discovery and Ranking*, https://support.google.com/googleplay/android-developer/answer/9958766.

creative platform for users to discover, and developers to share, a wide variety of apps.[6] Apple editors decide which apps to allow and how to present those apps to users. The Ninth Circuit has described the App Store as a "walled garden" in which "Apple plays a significant curating role." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023); *see also* Apple App Store ("[T]he App Store is more than just a storefront — it's an innovative destination focused on bringing you amazing experiences. . . . Curated by experts. Handpicked for you.").[7]

Beyond selecting which apps to offer, Apple also engages in its own distinct, expressive activity by organizing and suggesting apps to users in unique ways. Apple sorts apps based on categories and keywords selected by developers as well as other factors such as customer behavior, including the number and quality of ratings.[8] The App Store also features a "Today" tab, which compiles original stories from Apple's editors, "featuring exclusive premieres, new releases, a fresh look at our all-time favorites, an App of the Day, a Game of the Day, and more." *Id.* Apple's editors also "shine a light" on apps by creating "curated collections." *Id.*

Samsung curates apps in the Galaxy Store to "ensure[]" that they meet

---

[6] Apple, *App Store Review Guidelines*, https://developer.apple.com/app-store/review/guidelines/#safety.
[7] Apple, *App Store*, https://www.apple.com/app-store/.
[8] Apple, *Discovery on the App Store and Mac App Store*, https://developer.apple.com/app-store/discoverability/.

Samsung's "high standards of quality."[9]  "Apps must be valuable, entertaining, unique, or informative." *Id.*  Not only must apps meet multiple requirements, but they are screened for impermissible content and behaviors.  *Id.*  And Samsung, too, employs content-based selection criteria, restricting apps containing sexually explicit content, promoting violence, or presenting defamatory or vulgar content.  *Id.*  Samsung also outlines detailed specifications for advertising on apps offered through the Galaxy Store, and rejects apps from offering "[o]vertly political" advertising, or advertising that contains content "that reasonable public consensus may find to be improper or inappropriate." *Id.*  The Galaxy Store incorporates search functionality, offers personalized recommendations, and designates certain apps as "Editor's Choice" applications.[10]

Other app stores—including (for example) Amazon Appstore and the Microsoft Store—have their own standards, policies, and procedures, resulting in varied content choices and arrangements presented to the app stores' users. Relevant here, TikTok is available on Google's Play Store, Apple's App Store, Samsung's Galaxy Store, the Amazon Appstore, and the Microsoft Store, but is *not* available, for example, on the F-Droid app store.  This variety of approaches evidences the variety of editorial approaches in traditional media and avenues for disseminating

---

[9] Samsung, *App Distribution Guide*, https://developer.samsung.com/galaxy-store/distribution-guide.html.
[10] Samsung, *Galaxy Store*, https://galaxystore.samsung.com/apps.

-13-

speech. Wherever private enterprises publish, republish, select, arrange, or distribute speech—from a newspaper, to a playhouse, to a movie theater, to a bookstore—the First Amendment protects those editorial decisions.

## II. MONTANA'S SB419 VIOLATES APP STORES' FIRST AMENDMENT RIGHTS

SB419 eliminates app stores' editorial discretion by completely banning one particular app from being made available to users in Montana. That ban infringes app stores' First Amendment rights. Montana cannot carry its burden to justify that severe restriction of expression.

### A. Established First Amendment Doctrine Sharply Limits Montana's Authority To Regulate App Store Speech

SB419 prohibits not only the use of, but the presence of, a digital app. The ban restricts expressive activity before it even occurs. It is therefore an impermissible prior restraint that warrants strict scrutiny.

Such "prior restraints" on speech implicate a "heavy presumption" of invalidity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976) (quotation omitted); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979) ("most exacting scrutiny" applicable to prior restraints). "In order to justify a prior restraint, the government must demonstrate that the restraint is justified without reference to the content of the speech, and is narrowly tailored to serve a compelling governmental interest." *Twitter, Inc. v. Sessions*, 263 F. Supp. 3d 803, 810 (N.D.

Cal. 2017).

SB419 also triggers strict scrutiny as a content-based restriction on speech. Content- and viewpoint-based restrictions are invalid unless the government shows that the law is the least-restrictive means of promoting a compelling government interest. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). "A regulation is content-based" if it either "singles out particular content for differential treatment" or "the underlying purpose of the regulation is to suppress particular ideas." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (citation omitted); *see Reed*, 576 U.S. at 166 ("strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based"). Here, Montana has singled out one particular app, and SB419's "formal legislative findings," *Sorrell*, 564 U.S. at 564, leave no doubt that the law is justified in part by communicative content on TikTok, thus triggering strict scrutiny. If, as the Montana Legislature stated, the State's ban on speech through TikTok is meant to protect "minors" from "dangerous content," SB419 (whereas clause), then SB419 is a glaringly overbroad content-based restriction. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (law "designed to protect minors from viewing harmful materials" is necessarily "content-based").

Montana "is not free to interfere with speech for no better reason than

-15-

promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579. Laws "that suppress, disadvantage, or impose differential burdens upon speech because of its content . . . are subject to the same rigorous scrutiny" as "[l]aws that compel speakers to utter or distribute speech bearing a particular message." *Turner*, 512 U.S. at 642 (internal citation omitted); *see also, e.g.*, *Tornillo*, 418 U.S. at 256 ("The Florida statute operates as a command in the same sense as a statute or regulation forbidding appellant to publish specified matter.").

### B. Montana Cannot Carry Its Burden To Justify Its Interference With App Stores' First Amendment Rights

Montana cannot carry its burden to justify SB419.[11] The Montana Legislature asserted two purported justifications in support of SB419: (1) that TikTok serves the interests of the Chinese government; and (2) that it allows content that is dangerous to children. *See* SB419 (whereas clauses). Plaintiffs ably demonstrate that those are not compelling state interests and that Montana's law is not narrowly tailored to serve them. *See* Br. ISO Consol. Pls.' Mot. for Preliminary Injunction, No. 9:23-cv-00056, ECF 12 at 9-16; Pls.' Mem. of Law ISO Mot. for Preliminary Injunction, No.

---

[11] Montana must satisfy that burden now, because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006); *see also Ashcroft*, 542 U.S. at 666 ("respondents must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than [the statute]").

9:23-cv-00056, ECF 18 at 16-20.

However the Court resolves those arguments, SB419's restriction on app store speech cannot survive judicial review. Even if Montana's interests are found "compelling," the law is not narrowly tailored in imposing punitive sanctions on app stores; Montana could adequately serve its interests by enforcing its ban on TikTok operating in the State. SB419 § 1(1)(a). Just as "[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," *Bartnicki*, 532 U.S. at 529-30, Montana could achieve its interests by regulating those who create and host the challenged content directly, SB419 § 1(1)(a), rather than regulating app stores layers removed from the alleged harms. Alternatively, if the ban on TikTok is constitutionally invalid, Montana plainly cannot prohibit app stores from making the app available, let alone impose exorbitant sanctions on app stores for doing so. Either way, Montana's imposition on app stores' editorial discretion cannot be justified under the rigorous constitutional review required for speech restrictions.

## CONCLUSION

For all these reasons, this Court should enjoin SB419.

Respectfully submitted,

Dated:  August 10, 2023                    By: /s/ Paul J. Lopach

                    Paul J. Lopach
                    Bryan Cave Leighton Paisner LLP
                    1700 Lincoln Street, Suite 4100
                    Denver, CO 80203-4541
                    Telephone:  (303) 861-7000
                    Facsimile:  (303) 866-0200
                    Email:  paul.lopach@bclplaw.com

                    Michael R. Dreeben
                    *Admitted pro hac vice*
                    O'Melveny & Myers LLP
                    1625 Eye Street, NW
                    Washington, DC  20006-4061
                    Telephone:   (202) 383-5300
                    Facsimile:    (202) 383-5414
                    Email:  mdreeben@omm.com

                    *Attorneys for* Amicus Curiae *The Computer & Communications Industry Association*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), the undersigned hereby certifies that this motion contains 3929 words as calculated by Word for Office 365, excluding the Caption, Certificate of Compliance, counsel signature, and Certificate of Service. The undersigned also certifies that this brief is typewritten and double-spaced excluding block quotes, in 14-point font.

By: */s/ Paul J. Lopach*

Paul J. Lopach
*Attorney for* Amicus Curiae *The Computer & Communications Industry Association*