AUSTIN KNUDSEN
Montana Attorney General
CHRISTIAN B. CORRIGAN
  *Solicitor General*
PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone:  406-444-2026
Fax:  406-444-3549
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| SAMANTHA ALARIO, et. al., | Lead Case No. CV-23-56-M-DWM |
| Plaintiffs, | |
| and | Member Case No. CV 23-61-M-DWM |
| TIKTOK INC., | |
| Consolidated Plaintiff, | **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION** |
| v. | |
| AUSTIN KNUDSEN, *in his official capacity as Attorney General of the State of Montana,* | |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION.............................................................................1

BACKGROUND...............................................................................1

STANDARD OF REVIEW...................................................................7

ARGUMENT...................................................................................8

I.      Plaintiffs Are Unlikely to Succeed on the Merits..........................8

        A. SB419 Is a Valid Exercise of Montana's Police Power...............8

                1.      SB419 permissibly exercises Montana's police power to
                        ban TikTok's harmful conduct. .....................................9

                2.      If SB419 implicates First Amendment rights, it passes
                        scrutiny under O'Brien. ...............................................11

                3.      SB419 satisfies intermediate and strict scrutiny........14

                        i.  SB419 passes intermediate scrutiny.......................16

                        ii. SB419 passes strict scrutiny..................................18

                4.      SB419 isn't a prior restraint. ......................................19

                5.      SB419 isn't overbroad. ...............................................20

        B. SB419 Isn't Preempted by Federal Law. ...............................21

                1.      SB419 isn't preempted under the foreign affairs
                        doctrine.....................................................................21

                2.      SB419 isn't preempted by the IEEPA or the DPA. ......26

                        i. SB419 doesn't interfere with IEEPA's purpose or
                        intended effects. ..........................................................27

                        ii. SB419 doesn't  interfere with the DPA's purposes or
                        intended effects. ..........................................................31

C. SB419 Doesn't Violate the Commerce Clause. .........................34

II.   The Remaining Factors Do Not Weigh in Plaintiffs' Favor. .........40

A. Plaintiffs Have Not Shown Immediate Irreparable Harm
to Support Preliminary Relief. ...................................................40

B. The Balance of the Equities and Public Interest Favor
Montana. ..................................................................................41

CONCLUSION ...................................................................................42

CERTIFICATE OF COMPLIANCE ....................................................43

CERTIFICATE OF SERVICE ............................................................43

TABLE OF AUTHORITIES

## Cases

*Aargon Agency, Inc. v. O'Laughlin,*
  2022 WL 377784 (D. Nev. Feb. 7, 2022) ............................................ 2

*ACLU v. Johnson,*
  194 F.3d 1149 (10th Cir. 1999) .................................................. 38-39

*Aguayo v. U.S. Bank,*
  653 F.3d 912 (9th Cir. 2011) .......................................................... 23

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ......................................................... 21, 22, 23

*Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n,*
  545 U.S. 429 (2005) ................................................................ 34-35

*Arcara v. Cloud Books, Inc.,*
  478 U.S. 697 (1986) ............................................................ 9, 10-11

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
  729 F.3d 937 (9th Cir. 2013) .......................................................... 36

*Aguayo v. U.S. Bank,*
  653 F.3d 912 (9th Cir. 2011) .......................................................... 22

*Barnes v. Glen Theatre,*
  501 U.S. 560 (1991) ................................................................ 12, 13

*Bendix Autolite Corp. v. Midwesco Enterprises, Inc.,*
  486 U.S. 888 (1988) ......................................................................... 37

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018) ...................................................................... 7

*Bibb v. Navajo Freight Lines, Inc.*
  359 U.S. 520 (1959) ................................................................. 39, 40

*Bigelow v. Virginia,*
  421 U.S. 809 (1975) ......................................................................... 38

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ................................................................ 20-21

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
    476 U.S. 573 (1986) ................................................................ 35, 36

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ................................................................ 20

*City of Erie v. Pap's A.M.,*
    529 U.S. 277 (2000) ................................................................ 12, 22

*City of Ladue v. Gilleo,*
    512 U.S. 43 (1994) ................................................................ 18

*City of Los Angeles v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ................................................................ 17

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ................................................................ *passim*

*CTIA-The Wireless Ass'n v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019) ................................................................ 40-41

*Doe v. Deschamps,*
    488 F.Supp.3d 912 (N.D. Cal. 2020) ................................................................ 38

*Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
    460 U.S. 37 (1983) ................................................................ 16

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................ 41

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................................ 20

*Foti v. City of Menlo Park,*
    146 F.3d 629 (9th Cir. 1998) ................................................................ 15

*Friends of the Wild Swan v. Weber,*
    955 F.Supp.2d 1191 (D. Mont. 2013) ................................................................ 8

*Haig v. Agee,*
    453 U.S. 280 (1981) ................................................................ 19

*hiQ v. LinkedIn,*
  31 F.4th 1180 (9th Cir. 2022) ........................................... 7-8

*Jacobs v. Clark Cnty. Sch. Dist.,*
  526 F.3d 419 (9th Cir. 2008) ............................................. 13

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
  508 U.S. 384 (1993) .................................................... 15-16

*Lawrence v. Texas,*
  539 U.S. 558 ........................................................... 18-19

*Leathers v. Medlock,*
  499 U.S. 439 (1991) ...................................................... 16

*Lone Star Sec. & Video, Inc. v. City of Los Angeles,*
  827 F.3d 1192 (9th Cir. 2016) ........................................ 14-15

*Lovell v.* City of *Griffin,*
  303 U.S. 444 (1938) ...................................................... 21

*Marland v. Trump,*
  498 F.Supp.3d 624 (E.D. Pa. 2020) ....................................... 29

*Martin v.* City of *Struthers,*
  319 U.S. 141 (1943) ...................................................... 18

*Metro. Life Ins. Co. v. Massachusetts,*
  471 U.S. 724 (1985) ....................................................... 1

*Mont. Chamber of Com. v. Argenbright,*
  28 F.Supp.2d 593 (D. Mont. 1998) ........................................ 21

*Moorman Mfg. Co. v. Bair,*
  437 U.S. 267 (1978) ...................................................... 37

*Morrison v. Nat'l Australia Bank Ltd.,*
  561 U.S. 247 (2010) ................................................... 36-37

*Movsesian v. Victoria Versicherung AG,*
  670 F.3d 1067 (9th Cir. 2012) (en banc) ........................... *passim*

*Nat'l Pork Producers Council v. Ross,*
  6 F.4th 1021 (9th Cir. 2021) ............................................. 36

*Nat'l Pork Producers Council v. Ross,*
  143 S. Ct. 1142 (2023) ........................................................ 36, 37, 38

*New Hampshire v. Maine,*
  532 U.S. 742 (2001) .................................................................. 30

*One World One Fam. Now v. City & Cnty. of Honolulu,*
  76 F.3d 1009 (1996) ............................................................ 19, 20

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970) ............................................................ 35, 37

*Police Dep't of Chi. v. Mosley,*
  408 U.S. 92 (1972) ...................................................................... 8

*Quebec v. Harris,*
  729 F.3d 937 (9th Cir. 2013) ..................................................... 36

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992) .................................................................. 15

*Raymond Motor Transp., Inc. v. Rice,*
  434 U.S. 429 (1978) .................................................................. 39

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ............................................................ 14, 18

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) .................................................................. 15

*S. Pac. Co. v. Arizona,*
  325 U.S. 761 (1945) .................................................................. 35

*S.O.C., Inc. v. Cnty. of Clark,*
  152 F.3d 1136 (9th Cir. 1998) ................................................... 14

*SPGGC, LLC v. Blumenthal,*
  505 F.3d 183 (2d Cir. 2007)................................................... 39-40

*Scarano v. Cent. R. Co.,*
  203 F.2d 510 (3d Cir. 1953) ...................................................... 30

*Schad v. Borough of Mount Ephraim,*
  452 U.S. 61 (1981) ................................................................ 17-18

*Talk of the Town v. Dep't of Fin. & Bus. Servs. ex rel. City of Las Vegas*,
    343 F.3d 1063 (9th Cir. 2003) ........................................................... 9

*TikTok Inc. v. CFIUS*,
    No. 20-1444 (D.C. Cir. Nov. 10, 2020) ......................................... 32, 33

*TikTok Inc. v. Trump*,
    490 F.Supp.3d 73 (D.D.C. 2020) ....................................................... 30

*Turner Broad. Sys.*, Inc. *v. FCC*,
    512 U.S. 622 (1994) .................................................................... 14, 18

*United States v. Carrillo-Lopez*,
    68 F.4th 1133 (9th Cir. 2023) ........................................................... 25

*United States v. O'Brien*,
    391 U.S. 367 (1968) .............................................................. 11, 12, 25

*United States v. Salerno*,
    481 U.S. 739 (1987) .......................................................................... 8

*United States v. Stevens*,
    559 U.S. 460 (2010) ....................................................................... 8-9

*U.S. WeChat Users All. v. Trump*,
    488 F. Supp. 3d 912 (N.D. Cal. 2020) ......................................... 19, 20

*Von Saher v. Norton Simon Museum of Art*,
    592 F.3d 954 (9th Cir. 2010) ........................................................... 26

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ........................................................ 12, 14, 15, 19

*Wash. Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) ........................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................... 7, 41

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ............................................................... *passim*

*Zschernig v. Miller*,
    389 U.S. 429 (1968) .............................................................. 22, 25, 26

OTHER AUTHORITIES

UNITED STATES CODE

50 U.S.C. § 1701(a) ............................................................ 27

50 U.S.C. § 1702(a)(1)(A) .................................................. 27

50 U.S.C. § 1702(a)(1)(B) .................................................. 27

50 U.S.C. § 1702(b)(1), (3) ................................................. 28

50 U.S.C. § 2170(a)(3) ....................................................... 32

50 U.S.C. § 4502(a)(1) ....................................................... 31

50 U.S.C. § 4502(a)(4) ....................................................... 32

50 U.S.C. § 4565(b)(1)(A) .................................................. 32

50 U.S.C. § 4565(b)(2)(A) .................................................. 32


CODE OF FEDERAL REGULATIONS

15 C.F.R. § 7.4(a)(1) ..................................... 6, 22, 24, 41


EXECUTIVE ORDERS AND PROCLAMATIONS

Executive Order 13873, 84 Fed. Reg. 22,689
(May 17, 2019) ................................................................. 29

Presidential Proclamation No. 10061, 85 Fed. Reg. 51297
(Aug. 14, 2020) ................................................................ 32

Executive Order 14034, 86 Fed. Reg. 31423 (June 9, 2021) ..... 22, 24


MONTANA CODE ANNOTATED

MCA § 30-14-103 .............................................................. 1

MCA § 30-14-101 ....................................................... 12, 23

MCA §§ 30-14-208 to 210 ............................................. 1-2

MCA §§ 30-14-1401 to 1414 ............................................ 2

MCA § 30-14-2103(1)(c) .................................................. 2

Montana Session Laws

SB419, 2023 Leg., 68th Sess., § 1 (Mont. 2023) ............................... 7

Publications

Ashley Gold, *Exclusive: Senator's TikTok whistleblower alleges data abuses*, Axios (Mar. 8, 2023)..................................................... 4

*Biden signs TikTok ban for government devices, setting up a chaotic 2023 for the app*, NBCNews (Dec. 30, 2022).......................................... 17

David Shepardson, *ByteDance finds employees obtained TikTok user data of two journalists*, Reuters (Dec. 22, 2022)..................................... 3

David Shepardson, *State AGs demand TikTok comply with US consumer protection investigations*, Reuters (Mar. 6, 2023) ................. 17

*Deputy attorney general warns against using TikTok, citing data privacy*, ABCNews (Feb. 16, 2023)......................................................... 17

Drew Harwell, *A former TikTok employee tells Congress the app is lying Chinese spying*, The Washington Post (Mar. 10, 2023), ............... 4

Emily Baker-White, *Leaked Audio from 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China*, BuzzfeedNews (June 17, 2022) ..................... 3, 6

Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, Forbes (Dec. 22, 2022) ............................................................. 3

Justine McDaniel, *Indiana sues TikTok, claiming it exposes children to harmful content*, Washington Post (Dec. 7, 2022) ............................ 17

Letter from TikTok Inc. to Senators Blumenthal and Blackburn (June 16, 2023) ...................................................................... 17

Press Release, Senator Ed Markey, *Amid Calls to Ban TikTok, Senator Markey Calls for Immediate Action on Privacy Protections for Children and Teens Online* (Mar. 22, 2023)................................. 16-17

Richard Nieva, *TikTok's In-App Browser Includes Code That Can Monitor Your Keystrokes, Researcher Says*, Forbes (Aug. 18, 2022) ....... 3

Sapna Maheshwari & Ryan Mac, *Driver's Licenses, Addresses, Photos: Inside How TikTok Shares User Data*, The New York Times (May 24, 2023) ...................................................... 5

Sapna Maheshwari, *After Montana Banned TikTok, Users Sued. TikTok Is Footing Their Bill*, N.Y. Times (June 27, 2023)) ................................. 7

Thomas Fuller & Sapna Maheshwari, *Ex-ByteDance Executive Accuses Company of 'Lawlessness*," N.Y. Times (May 12, 2023)............. 5

TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms, House Energy & Commerce, 118th Congress (Mar. 23, 2023) ...................................................... 16

Written Testimony of Geoffrey Cain on Social Media's Impact on Homeland Security, U.S House of Representatives, Homeland Security and Governmental Affairs Committee (Sept. 14, 2022) .... 16-17

Zen Soo, *Former exec at TikTok's parent company says Communist Party members had a 'god credential' that let them access Americans' data*, Business Insider (June 7, 2023) ...................................................... 6

## INTRODUCTION

State and federal officials have sounded alarms over TikTok for years.  Despite growing unease with the online platform, TikTok continues to operate across the United States, including in Montana.  Montana Senate Bill 419 (SB419) exercises Montana's consumer-protection power to stop a host of data-privacy and related harms by prohibiting TikTok from operating in Montana.  SB419 is a valid exercise of the Legislature's authority, so Plaintiffs' motion to preliminarily enjoin it must be denied.

## BACKGROUND

**A.** "The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (cleaned up).  Montana is no exception.  Vast parts of the Montana Code protect Montanans from unscrupulous actors.  Take the Montana Unfair Trade Practices and Consumer Protection Act.  It bans all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  M.C.A. §30-14-103.  Neighboring sections prevent unfair competition in sales and purchasing and proscribe selling goods at less than their cost.  *See id.* §§30-

1

14-208 to -210.  Still others regulate interstate actors in industries sub-ject to the United States Code and to potentially conflicting laws in other states.  *See, e.g.*, Montana Telemarketing Registration and Fraud Pre-vention Act, *codified at* M.C.A. §§30-14-1401 to 1414.  Montana even bans certain business activities altogether; as one example, debt settlement providers "may not" "make loans or offer credit" in Montana, despite those activities' expressive content.  *Id.* §30-14-2103(1)(c); *see Aargon Agency, Inc. v. O'Laughlin*, 2:21-cv-1202, 2022 WL 377784, at *18 (D. Nev. Feb. 7, 2022) (holding that states have a "substantial interest in protecting [their] citizens" by regulating debt collection).

**B.** Given the Legislature's interest in protecting Montanans from potentially harmful actors and practices, it's no surprise TikTok caught the Legislature's attention.  Last year, a tidal wave of news stories re-vealed many ways that TikTok could harm Montanans.  One report said that "leaked audio from more than 80 internal TikTok meetings" estab-lished that "China-based employees of ByteDance"—TikTok's "parent company," which "is located" in China—"have repeatedly accessed

2

nonpublic data about US TikTok users."[1] "'Everything is seen in China,' said a member of TikTok's Trust and Safety department in a September 2021 meeting," and in another meeting, "a director referred to one Beijing-based engineer as a 'Master Admin' who 'has access to everything.'"[2] A third reported that "[w]hen TikTok users enter a website through a link on the app, TikTok inserts code that can monitor much of their activity on those outside websites, including their keystrokes and whatever they tap on the page"—so "TikTok [could] capture a user's credit card information or password."[3] The researcher who discovered that code described this as "'a non-trivial engineering task'" that "'does not happen by mistake.'"[4] Late last year, two articles reported how ByteDance accessed TikTok user data from two U.S. journalists to try to identify the source of a leak about internal TikTok information.[5]

---

[1] Emily Baker-White, *Leaked Audio from 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China*, BuzzfeedNews (June 17, 2022), perma.cc/LAM2-PL6K.

[2] *Id.*

[3] Richard Nieva, *TikTok's In-App Browser Includes Code That Can Monitor Your Keystrokes, Researcher Says*, Forbes (Aug. 18, 2022), perma.cc/M578-4X29.

[4] *Id.*

[5] Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, Forbes (Dec. 22, 2022), perma.cc/8HSX-R74Q; David Shepardson, *ByteDance finds employees obtained TikTok user data of two journalists*, Reuters (Dec. 22, 2022), perma.cc/YH2U-RLA8.

Things got worse for TikTok this year. In March, a whistleblower told a U.S. Senator that "TikTok's access controls on U.S. user data are much weaker than the company says" and that "TikTok overstates its separation from its China-based owner ByteDance, relies on proprietary Chinese software that could have backdoors, and uses tools that allow employees to easily toggle between U.S. and Chinese user data."[6] A *second* whistleblower told congressional investigators and the *Washington Post* that TikTok's "plan for protecting United States user data is deeply flawed," that "issues could leave data from TikTok's more than 100 million U.S. users exposed to China-based employees of its parent company ByteDance," and "that a truly leakproof arrangement for Americans' data would require a 'complete re-engineering' of how TikTok is run."[7]

Two months later, the former head of engineering for ByteDance in the U.S. sued ByteDance; he alleged that "ByteDance offices in Beijing had a special unit of [C.C.P.] members sometimes referred to as the Committee," which "'maintained supreme access to all the company data,

---

[6] Ashley Gold, *Exclusive: Senator's TikTok whistleblower alleges data abuses*, Axios (Mar. 8, 2023), https://www.axios.com/2023/03/08/senators-tiktok-whistleblower-alleges-data-abuses.

[7] Drew Harwell, *A former TikTok employee tells Congress the app is lying Chinese spying*, The Washington Post (Mar. 10, 2023), perma.cc/997H-9GLY.

even data stored in the United States.'"[8]  Indeed, "[d]uring his tenure at the company, he said, certain engineers had 'backdoor' access to user data."[9]  A few weeks later, the *New York Times* reported on TikTok's "internal messaging and collaboration tool called Lark"—a tool "used every day by thousands of employees of the app's Chinese owner, ByteDance, including by those in China"—that "has been used for handling individual TikTok account issues and sharing documents that contain personally identifiable information since at least 2019."[10]  The director of Stanford University's Internet Observatory said "'Lark shows you that all the back-end processes are overseen by ByteDance.'"[11]  Most recently, the former ByteDance executive suing ByteDance alleged that "some members of the ruling Communist Party" had "access to U.S. user data" through a "'superuser' credential—also known as a god credential—that enabled a special committee of C.C.P. members stationed at the company

---

[8] Thomas Fuller & Sapna Maheshwari, *Ex-ByteDance Executive Accuses Company of 'Lawlessness*," N.Y. Times (May 12, 2023), perma.cc/DE96-KD7G.
[9] *Id.*
[10] Sapna Maheshwari & Ryan Mac, *Driver's Licenses, Addresses, Photos: Inside How TikTok Shares User Data*, The New York Times (May 24, 2023), perma.cc/2KBM-WSAZ.
[11] *Id.*

to view all data collected by ByteDance including those of U.S. users."[12] He alleged that "[t]he credential acted as a 'backdoor to any barrier ByteDance had supposedly installed to protected data from the C.C.P.'s surveillance."[13]

The Legislature reasonably viewed all this reporting as confirming "the reality that Chinese companies are subject to the whims of the authoritarian [C.C.P.]," raising the "risk" that the Chinese "government could force ByteDance to collect and turn over information" on Americans "as a form of 'data espionage.'" *Leaked Audio*, *supra*. That risk isn't speculative; the Secretary of Commerce designated the "People's Republic of China" a "foreign adversary" after determining that China has "engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons." 15 C.F.R. §7.4(a)(1).

**C.** Given that tsunami of reporting, Montana enacted SB419, which prohibits TikTok from operating within Montana and mobile application

---

[12] Zen Soo, *Former exec at TikTok's parent company says Communist Party members had a 'god credential' that let them access Americans' data*, Business Insider (June 7, 2023), perma.cc/5QXY-5GBE.
[13] *Id.*

stores from making TikTok's app downloadable in Montana. SB419, 2023 Leg., 68th Sess. §1 (Mont. 2023).

TikTok and a group of its users—funded by TikTok—now challenge SB419. Sapna Maheshwari, *After Montana Banned TikTok, Users Sued. TikTok Is Footing Their Bill*, N.Y. Times (June 27, 2023), perma.cc/R2EK-69PX. Both TikTok and its users have moved to preliminarily enjoin SB419.

## STANDARD OF REVIEW

A preliminary injunction is a drastic remedy "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This extraordinary remedy "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018). A preliminary injunction is permissible only when Plaintiffs carry their heavy burden of showing that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury without one; (3) their threatened injury outweighs whatever harm the proposed injunction would cause their opponent; and (4) if issued, the injunction is in the public's interest. *Winter*, 555 U.S. at 20. While the Ninth Circuit applies the "serious questions" test, it does

7

so only when "the balance of hardships tips *sharply* in the plaintiff's favor." *hiQ v. LinkedIn*, 31 F.4th 1180, 1188 (9th Cir. 2022) (emphasis added). That is, "[a]ll four elements must be satisfied," *id.*, by "clear and convincing evidence," *Friends of the Wild Swan v. Weber*, 955 F.Supp.2d 1191 (D. Mont. 2013).

ARGUMENT

## I. Plaintiffs Are Unlikely to Succeed on the Merits.

### A. SB419 Is a Valid Exercise of Montana's Police Power.

The First Amendment leaves Montana "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). But SB419 doesn't prohibit certain messages, ideas, subject matter, or content. It prohibits the use of a product in Montana.

Because Plaintiffs bring a facial challenge, they bear the burden of "establish[ing] that no set of circumstances exists under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *United*

8

*States v. Stevens*, 559 U.S. 460, 473 (2010). Plaintiffs do not, and cannot, make that showing.

### 1. SB419 permissibly exercises Montana's police power to ban TikTok's harmful conduct.

Plaintiffs' arguments rest on a "fallacy" the Supreme Court has rejected: "seeking to use the First Amendment as a cloak for obviously unlawful … conduct by … attributing protected expressive attributes to that conduct." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986). In *Arcara*, an adult bookstore became a site of prostitution and other public sex acts, yet the Court concluded that the First Amendment's protection for selling books didn't shield the bookstore from liability for violating prostitution laws: "the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." *Id.* at 707. That is, First Amendment jurisprudence "has no relevance to a statute directed at imposing sanctions on nonexpressive activity," and "[b]ookselling in an establishment used for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises." *Id.*; *see also Talk of the Town v. Dep't of Fin. & Bus. Servs.*, 343 F.3d 1063, 1069 (9th Cir. 2003).

9

So it is here.  Montana's police power comfortably lets it regulate (up to the point of banning) products or practices that, in Montana's judgment, impose unjustifiable consumer harms.  SB419 does just that: it bans TikTok because of harms inseparable from TikTok's data-harvesting practices and ownership by a hostile foreign government—facts unique to TikTok among social media apps.  As a condition of using it, TikTok captures reams of personal, private data from every Montana TikTok user.  Then C.C.P. members embedded in ByteDance can use a "god credential" to access those data at any time—*without asking TikTok*. *See supra* nn.12-13.  No other app conditions its use on making Montanans' digital privacy subject to data harvesting with at-will C.C.P. access; in this respect, TikTok stands alone.  And no protected expressive attributes can be attributed to a hostile foreign government's massive data-harvesting efforts intentionally directed at Montanans; that's the "non-expressive activity" SB419 targets.  *Id.*  And that's true even though TikTok harvests Montanans' data while transmitting expressive videos to them.  Just as books didn't override prostitution laws in *Arcara*, so TikTok's short-form videos (from TikTok itself or any other user) "do[] not confer First Amendment coverage to defeat a valid statute aimed at"

10

protecting Montanans from forced data-harvesting subject to at-will C.C.P. access. *Arcara*, 478 U.S. at 707.

Were it otherwise, Montana would be powerless to ban a cancer-causing radio merely because that radio also transmitted protected speech, or to ban sports-betting apps merely because those apps also shared informative videos teaching their users the intricacies of sports gambling. The targeted harms—preventing cancer, illegal gambling, or data-gathering by a hostile foreign state—are inherently nonexpressive and thus subject to Montana's plenary police-power regulations. Over-laying them with expressive conduct—radio communications or instruc-tive videos—doesn't change that calculus. *See id.* at 705-07.

### 2. If SB419 implicates First Amendment rights, it passes scrutiny under O'Brien.

Even if SB419 implicates the First Amendment, the Supreme Court has rejected the view that every person who engages in regulated conduct also "intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). If regulated nonspeech conduct also contains a speech element, the Court applies a four-part test to assess the law's con-stitutionality. *Id.* at 377. SB419 satisfies this standard.

11

As to the first two, SB419's consumer-protection function falls within Montana's "constitutional authority" and furthers Montana's "substantial interests" in consumer protection. *Id.*; *see, e.g.*, M.C.A. §§30-14-101 *et seq.* Third, the consumer-protection interest here is "unrelated to the suppression of free expression"; SB419 prohibits using TikTok *without respect to* the messages it conveys. *O'Brien*, 391 U.S. at 376. Rather, the "perceived evil" SB419 targets is TikTok's data harvesting and sharing with the C.C.P.—harms that would justify regulating TikTok were it a video app, dating app, or gaming app. *Barnes v. Glen Theatre*, 501 U.S. 560, 571 (1991). Montana's purpose of protecting consumer data, regardless of Plaintiffs' allegations of "illicit motive[s]," controls. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000).

Finally, SB419's restrictions are "no greater than is essential" to furthering Montana's interest in protecting Montanans' data privacy. *O'Brien*, 391 U.S. at 376. SB419 "need not be the least restrictive or least intrusive means of" furthering that interest to survive intermediate scrutiny. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989); *see id.* at 797-98. Applying that standard, the Ninth Circuit rejected a claim that mandatory school uniforms violated intermediate scrutiny because they

limited students' self-expression through clothing choices, holding that the students retained "'ample alternative channels' for student communication." *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 437 (9th Cir. 2008).  Even though that policy limited expression, students could "'express themselves through other and traditional methods of communication throughout the school day,'" including through "verbal communications with other students, publish[ing] articles in school newspapers, and join[ing] student clubs." *Id.*

SB419 survives intermediate scrutiny for the same reason.  It's like the school's uniform policy—limiting Montanans' abilities to express themselves via TikTok—but Montanans "may continue to express themselves through other and traditional methods of communication" by sharing videos, memes, and *every other* kind of expressive content on *every other* internet-based video or social-media platform.  Properly understood, SB419 is less restrictive than the uniform policy; because SB419 doesn't affect any other app or part of the internet, it's equivalent to proscribing only ripped jeans.  Thus, SB419 is "not a means to some greater end, but an end in itself." *Barnes*, 501 U.S. at 571; *see supra* nn.1-14.

### 3. *SB419 satisfies intermediate and strict scrutiny.*

Plaintiffs attack SB419 as a content-based speech restriction. Those claims fail. This inquiry first asks whether the regulation is "content neutral on its face." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015). If so, the pertinent question "is whether the government has adopted a regulation of speech *because* of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (emphasis added). Any such regulations are subject to strict scrutiny. *Reed*, 576 U.S. at 165. But "a regulation that serves purposes unrelated to the content of expression is deemed neutral," *Ward*, 491 U.S. at 791, and need only satisfy intermediate scrutiny, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

SB419 "regulate[s] the manner—not the content—of the affected speech." *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1200 (9th Cir. 2016). And it applies equally to all speech on the platform. *Id.* It doesn't prohibit TikTok "based on the type of information" it conveys, *Reed*, 576 U.S. at 159, nor does it distinguish "between commercial and noncommercial forms of expression," *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998). "[T]here has been no suggestion that [SB419] appl[]ies] differently to … political

14

endorsements than to its commercial promotional campaigns." *Lone Star*, 827 F.3d at 1200. Nor does SB419 prohibit only videos showing "cars swerving at high speeds," as Plaintiffs suggest. TikTok.Br.7; User.Br.10-11. SB419 doesn't apply based only on an enforcer's view of a user's message; it applies to the platform writ large. *Foti v. City of Menlo Park*, 146 F.3d 629, 635-36 (9th Cir. 1998). Each of these points to a content-neutral regulation.

TikTok's viewpoint-discrimination claim fails for these same reasons. Nothing in SB419 regulates use of TikTok "because of disagreement with the message," *Ward*, 491 U.S. at 791, or disagreement with "a particular view[]" of a subject, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). SB419 regulates all content, viewpoints, and speakers the same. *Cf. id.* at 830-31 (declaring unconstitutional the withholding of funding for a student newspaper because it "promote[d] or manifest[ed] a particular belief in or about a deity or ultimate reality") (cleaned up); *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992) (declaring unconstitutional a law prohibiting fighting words containing bias-motivated hatred); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993) (declaring unconstitutional a policy permitting

15

presentations "about family issues and child rearing except those dealing with the subject matter from a religious standpoint"). SB419 permits any person to make any statement about any topic, even China. It just prohibits one way they can make that statement. *See Leathers v. Medlock*, 499 U.S. 439, 444 (1991) (that one medium "is taxed differently from other media does not by itself, however, raise First Amendment concerns").

### i. SB419 passes intermediate scrutiny.

Because SB419 applies to all speech on TikTok no matter its substance or message, intermediate scrutiny applies. *Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Montana need only show that the regulation is "narrowly tailored to serve a significant government interest." *Id.* It does both.

Montana has a significant interest in its consumer-protection laws. While TikTok accuses Montana of "mak[ing] a series of unsubstantiated allegations," TikTok.Br.9, SB419 reflects a broad concern over TikTok.[14]

---

[14] *See* Letter from TikTok Inc. to Senators Blumenthal and Blackburn (June 16, 2023), perma.cc/4WXM-VR24; TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms, House Energy & Commerce, 118th Congress (Mar. 23, 2023), perma.cc/JTE9-5GLK; Written Testimony of Geoffrey Cain on Social Media's Impact on Homeland Security, U.S House of Representatives, Homeland Security and Governmental Affairs Committee (Sept. 14, 2022),

The widespread bipartisan responses to all the news reports about Tik-Tok belies TikTok's claim that the Legislature was "fishing" for a justification or that SB419 is based on "unfounded speculation." TikTok.Br.20.

SB419 is narrowly drawn. It doesn't ban all "online platform[s] that enable users to create, share, and view videos and other forms of content." TikTok.Br.2. Rather, it "eliminate[d] the exact source of the evil it sought to remedy." *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984). Plaintiffs' cases are inapposite. SB419 is like the school-uniform policy in *Jacobs*—it regulates one channel of internet expression but leaves all others untouched. Thus, it's not a blanket prohibition on creating, sharing, and viewing videos on *every* internet-based application in the same way that Plaintiffs' cases banned the speakers' preferred medium entirely. *Cf. Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 75

---

https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Testimony-Cain-2022-09-14.pdf; *Biden signs TikTok ban for government devices, setting up a chaotic 2023 for the app*, NBCNews (Dec. 30, 2022), perma.cc/4J7S-LGQS; *Deputy attorney general warns against using TikTok, citing data privacy*, ABCNews (Feb. 16, 2023), perma.cc/GKK7-BX9D; *see also, e.g.*, Press Release, Senator Ed Markey, *Amid Calls to Ban TikTok, Senator Markey Calls for Immediate Action on Privacy Protections for Children and Teens Online* (Mar. 22, 2023), https://perma.cc/QTR7-HTGU; David Shepardson, *State AGs demand TikTok comply with US consumer protection investigations*, Reuters (Mar. 6, 2023), perma.cc/9NL6-2VPW; Justine McDaniel, *Indiana sues TikTok, claiming it exposes children to harmful content*, Washington Post (Dec. 7, 2022), perma.cc/V2RV-AU3P.

(1981) (all live entertainment); *Martin v. City of Struthers*, 319 U.S. 141, 142 (1943) (all door-to-door distribution of literature); *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (all residential yard signs).

### ii. SB419 passes strict scrutiny.

Montana's significant interest in consumer protection laws, established above, is also a compelling interest. TikTok claims that the Legislature "undertook no analysis regarding the efficacy of TikTok's safety features." TikTok.Br.11. But the Legislature need not undertake an investigation before a court can recognize a compelling interest. *See Reed*, 576 U.S. at 171 (state only required to prove its compelling interest at summary judgment). Second, Montana, like 45 other States, is investigating TikTok's safety and data-harvesting features. *See supra* n.16.

TikTok also claims that Montana cannot legislate on issues "of national security," and therefore it lacks a compelling interest. TikTok.Br.9; *see also* User.Br.11. But even TikTok's cited cases confirm that states have an interest in national security. *See Wash. Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019) (affirming district court's conclusion that Maryland has a "compelling interest in combatting foreign meddling in U.S. elections" (internal quotations omitted)); *see also Lawrence v.*

*Texas*, 539 U.S. 558, 585 ("Texas cannot assert any legitimate state interest here, such as national security…."). There exists no interest "more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981).

For the reasons described above, SB419 is narrowly tailored. *See supra* n.14.

### 4. SB419 isn't a prior restraint.

SB419 also isn't a prior restraint on speech. The question is whether the challenged law "authorizes suppression of speech in advance of its expression." *Ward*, 491 U.S. at 795 n.5. Plaintiffs can use *any other* online video platforms and reach their "intended audience" using these other platforms. *One World One Fam. Now v. City & Cnty. of Honolulu*, 76 F.3d 1009, 1014-15 (1996).

That alone distinguishes *U.S. WeChat Users All v. Trump*. The district court there rested its prior-restraint analysis on the fact that "there are no viable substitute platforms or apps for the Chinese-speaking and Chinese-American community." 488 F.Supp.3d 912, 927 (N.D. Cal. 2020). Because "no options other than WeChat" existed, the plaintiffs were foreclosed from communicating altogether. *Id.* In comparison,

19

Plaintiffs have other alternatives, and they've provided no evidence they will be entirely foreclosed from expressive activity. *One World*, 76 F.3d at 1014-15.

SB419 differs significantly from laws at issue in other prior restraint cases. As discussed above, SB419 doesn't prohibit "the only means of communication" for an entire community. *WeChat*, 488 F.Supp.3d at 927. It also doesn't create a permitting regime or require preapproval from officials. *See, e.g., Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 130 (1992). Nor does it give the Montana Department of Justice discretion over whether certain speech violates SB419. *See, e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940). Because SB419 doesn't foreclose a community from speaking, establish a permitting scheme, or give discretion to any enforcement authority, it isn't a prior restraint.

### 5. *SB419 isn't overbroad.*

Plaintiffs make a passing argument that SB419 is facially overbroad because it prohibits a medium of communication. TikTok.Br.16; Users.Br.13. But that requires a showing of real and substantial overbreadth "judged in relation to the statute's plainly legitimate sweep."

*Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).  As discussed above, unlike Plaintiffs' cited cases, SB419 doesn't foreclose an entire medium. It doesn't prohibit sharing any online videos, like a prohibition on all corporate contributions to ballot initiatives, *Mont. Chamber of Com. v. Argenbright*, 28 F.Supp.2d 593, 594 (D. Mont. 1998), or a prohibition of "every sort of circulation" of printed materials without a permit, *Lovell v. City of Griffin*, 303 U.S. 444, 451 (1938).  SB419 governs only one *channel* for sharing videos; Plaintiffs may speak freely on any other "online platforms that enable[e] users to create, share, and view videos and other forms of content."  TikTok.Br.2.  Montana's targeted concern is TikTok's failure to protect user data from the Chinese government, not any broad concern over sharing videos online.  SB419, therefore, accomplishes its precise goal while still permitting robust speech on every other platform.

## B. SB419 Isn't Preempted by Federal Law.

### 1. *SB419 isn't preempted under the foreign affairs doctrine.*

Under the foreign affairs doctrine, a "state law must give way where … there is evidence of a clear conflict between the policies" adopted by the federal government and by a state on issues "within the traditional subject matter of foreign policy." *Am. Ins. Ass'n v. Garamendi*, 539 U.S.

396, 421 (2003). *Garamendi* shows how conflict preemption works: the Court held California's Holocaust Victim Insurance Relief Act preempted because it conflicted with how the "Executive Branch" had "in fact addressed" and "formalized" the "issue of restitution for Nazi war crimes" via "treaties and executive agreements over the last half century." *Id.* Nothing close to that kind of "clear conflict" exists between SB419 and any affirmative federal position on TikTok or ByteDance. On the contrary, SB419 aligns with both federal law and Presidential foreign policy. *See* 15 C.F.R. §7.4(a)(1); Executive Order 14034, 86 Fed. Reg. 31423 (June 9, 2021) ("E.O. 14034"). The Court needn't take Defendant's word for it; neither Plaintiff invokes foreign-affairs conflict preemption.

Instead, Plaintiffs contend that SB419 violates a "concept" the Ninth Circuit calls foreign affairs "field preemption." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012) (en banc). Relying on a footnote in *Garamendi* and *Zschernig v. Miller*, 389 U.S. 429 (1968), *Movsesian* suggests that "field preemption may be appropriate when a state intrudes on a matter of foreign policy with no real claim to be addressing an area of traditional state responsibility." 670 F.3d at 1075. Whatever this doctrine's vitality—the Supreme Court hasn't

squarely adopted it, *see Garamendi*, 529 U.S. at 419-20 & n.11—it does Plaintiffs no good here because they fail to make either showing.

First, SB419 is a "consumer-protection law[]," so it "fall[s] in an area that is traditionally within the state's police powers to protect its own citizens." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011); *see generally* M.C.A. §§30-14-101 *et seq.* (Montana Unfair Trade Consumer and Consumer Protection Act). The tsunami of reporting about TikTok's data-harvesting and storing practices amply justifies SB419 as a proper exercise of Montana's consumer-protection police powers. *See* supra nn.1-14 (reporting TikTok misled consumers about data security).

Plaintiffs don't dispute Montana's traditional police power to protect its consumers. Rather, they contend that SB419's "real purpose" is to "regulate U.S. relations with China." Users.Br.20; *see* TikTok.Br.20. Not so. SB419 regulates TikTok's operations in Montana to protect Montanans' privacy.

Nothing Plaintiffs cite to support their view of SB419's purported "true purpose" undermines this conclusion. Plaintiffs rely mostly on text in SB419's preamble and statements in legislative hearings. But those statements merely reiterate facts of record. The federal government

already determined that China is a "foreign adversary."   15 C.F.R.
§7.4(a)(1).   And the President already determined that China has ac-
cessed "large repositories of United States persons' data."   E.O. 14034.
TikTok is a subsidiary of a Chinese corporation.   *Compare* SB419 ("Tik-
Tok is a wholly owned subsidiary of ByteDance, a Chinese corporation.")
*with* About, ByteDance, https://perma.cc/P2N9-WWGX (ByteDance is a
Chinese company headquartered in Beijing); *compare* SB419 (TikTok
"may allow the People's Republic of China to track the real-time locations
of … individuals adverse to the [CCP]'s interests") *with supra* n.16 (Let-
ter to Senators Blumenthal and Blackburn), at 1 (admitting some TikTok
data is stored in China).   By reciting these facts, Montana neither made
political judgments nor "express[ed]" any "distinct political point of view"
about the treatment of China or its political arms nor "address[ed] foreign
relations."   *Movsesian*, 670 F.3d at 1076.   So SB419 doesn't require this
Court to undertake "a highly politicized inquiry into the conduct of a for-
eign nation."   *Id.* at 1076.

   User Plaintiffs assert that SB419 was "intended to send a political
message."   Users.Br.21.   But Plaintiffs' only evidence is a single state-
ment by a single legislator.   *See id.*   And the Supreme Court has

repeatedly cautioned against imputing intent of one legislator to the entire legislative body.  *E.g.*, *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023).  Plaintiffs cannot overcome their heavy burden by citing one legislative remark.

Second, Plaintiffs fail to establish that SB419 "intrudes on a matter of foreign policy."  *Movsesian*, 670 F.3d at 1075.  To make this showing, Plaintiffs must prove that SB419 "has 'more than some incidental or indirect effect' on foreign affairs."  *Id.* at 1076 (quoting *Zschernig*, 389 U.S. at 441).  That is, SB419 must "ha[ve] a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems."  *Id.* at 1076-77.

Plaintiffs fall well short.  They argue that SB419's preamble mentions China and therefore arrogates to Montana power reserved for the federal government.  That's a far cry from the kinds of "direct impact[s] upon foreign relations" that courts have held sufficient to establish preemption.  *Zschernig*, for example, held that Oregon's law preventing East German citizens from inheriting personal property was preempted because to implement that law, Oregon's probate courts had for over a

decade engaged in "minute inquiries concerning the actual administration of foreign law [and] into the credibility of foreign diplomatic statements."  389 U.S. at 435.  *Movsesian* held a California law preempted because it "establishe[d] a particular foreign policy for California—one that decries the actions of the Ottoman Empire and seeks redress for 'Armenian Genocide victim[s]' by subjecting foreign insurance companies to lawsuits in California."  670 F.3d at 1076.  And the Ninth Circuit held another California law preempted because it would have "require[d] California courts to review acts of restitution made by foreign governments" to victims of Nazi war crimes.  *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 967 (9th Cir. 2010).

Plaintiffs provide no comparable evidence of similar impacts.  One legislative statement and the text of the law's preamble aren't the kind of state intrusion on foreign affairs sufficient to subject SB419 to any field-preemption component of the foreign-affairs doctrine.

### 2. *SB419 isn't preempted by the IEEPA or the DPA.*

Plaintiffs next assert that SB419 "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" in the International Emergency Economic Power Act (IEEPA) and

the Defense Production Act (DPA) and is thus preempted.  Not so.  Even obstacle-preemption cases "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up).  From there, obstacle-preemption claims require courts to "examin[e] the federal statute as a whole" and identify both "its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000).

### i. SB419 doesn't interfere with IEEPA's purpose or intended effects.

IEEPA gives the President peacetime authority to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. §1701(a).  After declaring an emergency, the President can "investigate, regulate, or prohibit" specific and limited economic transactions.  *Id.* §1702(a)(1)(A).  The President can also block "any right, power, or privilege" in "any property in which any foreign country or a national thereof has any interest by any person."  *Id.* §1702(a)(1)(B).  But the President may not "regulate or

27

prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value" or the importation or exportation of "any information or informational materials."  *Id.* §1702(b)(1), (3).  If the President seeks to regulate these activities, he must rely on a source of authority other than IEEPA.

Citing *Crosby*, Plaintiffs argue that §1702(b)'s prohibition on the President's regulating informational materials means that states cannot regulate those materials, either.  This misstates the issue: SB419 is a consumer-protection regulation of a *product* because of its detrimental effects on Montanans' digital privacy.  Even so, *Crosby* doesn't help Plaintiffs.  There, Congress spoke directly to the President's authority "over economic sanctions against Burma," 530 U.S. at 374, and the Court determined that a Massachusetts law—which also imposed economic sanctions against Burma—conflicted with the federal law and hampered Congress's objective, *id.* at 377-78.  Unlike Massachusetts, which sought to impose sanctions directly on a foreign country, Montana regulates a product that operates within Montana's borders to protect its consumers.  To be sure, SB419 responds to concerns raised about Chinese access to

Montanans' private data, but it doesn't impose any burden *on China itself*—unless TikTok is arguing that to regulate TikTok *is* to regulate China. Second, the federal law in *Crosby* directly regulated Burma, but IEEPA doesn't directly regulate China. Instead, it gives the President authority to act in some cases subject to certain exceptions. SB419 fits comfortably within the scope of activity that IEEPA leaves untouched.

TikTok's prior litigation positions about IEEPA suggest it doesn't really believe this argument, anyway. TikTok challenged the *President*'s authority to regulate TikTok under IEEPA. *See* Compl., *TikTok Inc. v. Trump*, 20-cv-2658 (D.D.C. filed Sept. 18, 2020).[15] There, TikTok argued that it "does not provide the type of technology and services contemplated" by the Executive Order issued under IEEPA. *Id.* ¶116 (citing Executive Order 13873, 84 Fed. Reg. 22,689 (May 17, 2019)). TikTok further argued that the Executive Order was "a gross misappropriation of IEEPA authority" because IEEPA bars "executive regulation of personal communications or the transmission of information or informational materials." *Id.* ¶3. The district court accepted those arguments, concluding that Plaintiffs were "likely to succeed on their claim that the prohibitions

---

[15] *See Marland v. Trump*, 498 F.Supp.3d 624, 636-37 (E.D. Pa. 2020).

constitute *indirect* regulations of 'personal communication[s]' or the exchange of 'information or informational materials.'"  *TikTok Inc. v. Trump*, 490 F.Supp.3d 73, 83 (D.D.C. 2020).  In other words, Plaintiffs got a district court to order that the President lacks authority under IEEPA to do what Plaintiffs now claim is within "the President's discretion to respond to foreign threats" under IEEPA.  *Compare* TikTok.Br.23, *with* Compl., *TikTok Inc. v. Trump*, 20-cv-2658 (D.D.C. filed Sept. 18, 2020).  TikTok's apparent position is it cannot be regulated—by anyone.

Given Plaintiffs' prior litigation success, they're now judicially estopped from making this argument.  Judicial estoppel prevents parties from "playing fast and loose with the courts."  *Scarano v. Cent. R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953) (internal quotations omitted).  It precludes parties from (1) taking a position inconsistent with (2) a position on an issue on which the party previously succeeded (3) when it will give that party an unfair advantage.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  That describes precisely TikTok's current circumstances.  By previously interpreting the scope of the Executive's authority narrowly, TikTok successfully evaded *federal* regulation under IEEPA; and now by asking this Court to interpret the scope of the Executive's authority

30

broadly, TikTok seeks to evade *state* regulation.  TikTok thinks it wins, heads or tails.[16]  This is precisely the type of unseemly litigation gamesmanship that judicial estoppel thwarts.

### ii. SB419 doesn't interfere with the DPA's purposes or intended effects.

Plaintiffs also assert that because the federal government is negotiating with TikTok about a national security risk, the DPA prevents States from regulating in this space at all.  Users.Br.24; TikTok.Br.21.  It doesn't.

Congress's purpose in enacting the DPA, *see Wyeth*, 555 U.S. at 566, appears in the statute itself: the DPA "promote[s] industrial resources preparedness," "support[s] continuing improvements in industrial efficiency," "provide[s] for the protection and restoration of domestic critical infrastructure operations under emergency conditions," and "respond[s] to actions taken outside of the United States that could result in reduced supplies of strategic and critical materials."  50 U.S.C. §4502(a)(1).  To further those goals, the DPA grants the President "an array of authorities to shape national defense preparedness programs and to take

---

[16] Individual Plaintiffs' litigation is funded by TikTok, so TikTok cannot further immunize itself by paying other litigants to raise arguments that TikTok itself is estopped from making.

appropriate steps to maintain and enhance the domestic industrial base." *Id.* §4502(a)(4). The DPA also delegates certain authority to the Committee on Foreign Investment in the United States (CFIUS), which reviews "covered transactions" that "could result in foreign control of any person engaged in interstate commerce in the United States." *Id.* §2170(a)(3); *id.* §4565(b)(2)(A). CFIUS then can refer the transaction to the President for further action. *Id.* §4565(b)(1)(A).

Plaintiffs fail to articulate their precise theory of conflict preemption under the DPA. No matter; SB419 doesn't "obstruct the purposes and objectives" of the DPA. *Wyeth*, 555 U.S. at 573. First, §721 applies only to "covered transactions." 50 U.S.C. §4565(b)(2)(A). Plaintiffs identify no transaction at issue, let alone a "covered transaction" under §721. Plaintiffs allude to negotiations between the federal government and Tik-Tok in *TikTok Inc. v. CFIUS* where TikTok sought review of Presidential Proclamation No. 10061, 85 Fed. Reg. 51297 (Aug. 14, 2020). There, President Trump ordered ByteDance to divest certain assets "used to enable or support ByteDance's operation of the TikTok application in the United States" and "any data obtained or derived from TikTok application or Musical.ly application users in the United States." 85 Fed. Reg. at 51297.

In that litigation, though, TikTok asserted that the "covered transaction" at issue "did *not* include the core technology or other aspects of the Tik-Tok business." *TikTok Inc. v. CFIUS*, No. 20-1444, Doc. #1870778, at *2-3 (D.C. Cir. Nov. 10, 2020).  SB419 doesn't interfere with these ongoing negotiations, particularly since by TikTok's own terms, the negotiations don't involve TikTok's technology or business.  *Id.*

If Congress intended to preclude *any* state regulation of a business that was simultaneously being investigated by CFIUS, "it surely would have enacted an express pre-emption provision." *Wyeth*, 555. U.S. at 574. And whatever the outcome of those negotiations, SB419 won't conflict with them.  If Plaintiffs prevail, the President and CFIUS cannot prohibit the ByteDance and Musical.ly transaction.  *See TikTok Inc.*, No. 20-1444, Doc. #1870778.  Or if the federal government prevails, TikTok will need to divest certain assets.  Either way, TikTok can still comply with SB419. *See Wyeth*, 555 U.S. at 573.

That conclusion follows *Crosby* where Massachusetts's law barred doing business with Burma—the same problem addressed by the federal sanctions. 530 U.S. at 367, 379-80.  The applicability of the DPA is only triggered by the ByteDance and Musical.ly transaction.  And as TikTok

33

itself has made clear, this is unrelated to TikTok's operations. *TikTok Inc.*, No. 20-1444, Doc. #1870778, at *2-3. Any future agreements between the federal government and TikTok cannot preempt today an otherwise valid state law. *See Crosby*, 530 U.S. at 367.

### C. SB419 Doesn't Violate the Commerce Clause.

Finally, Plaintiffs argue that SB419 violates the dormant Commerce Clause. TikTok.Br.23-26; Users.Br.25-26. TikTok contends that SB419 imposes burdens that "disproportionately fall on non-Montanan TikTok users." TikTok.Br.23. User Plaintiffs contend that TikTok is a critical cross-border instrumentality much like this nation's railroad system. Users.Br. 25. Plaintiffs seem to take divergent views on the essence of the commerce at issue. TikTok suggests that the problem is one of access—the application itself is the commodity. TikTok.Br.24. User Plaintiffs, on the other hand, identify the problem as SB419's "restrict[ing] the distribution of information across state lines." Users.Br.25. In other words, TikTok isn't the *product*, as TikTok suggests, but an instrumentality used to transport information or other products. *Id.* This distinction matters—much of dormant Commerce Clause jurisprudence is reasoned through "analogue." *Am. Trucking Ass'n, Inc. v.*

34

*Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 439 (2005) (Scalia, J., concurring).  But neither view can be squared with the law.

The Commerce Clause implicitly limits the states' authority to enact legislation about interstate commerce.  *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945).  Courts approach this give-and-take in a "two-tiered approach."  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).  If a state "directly regulates" interstate commerce or "favor[s] in-state economic interests over out-of-state interests," the law likely violates the Commerce Clause.  *Id.* at 578-79.  But when a state law "regulates even-handedly" and has an "*indirect* effect[t]" on interstate commerce, courts must balance the state's legitimate interests against the burden imposed.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  SB419 regulates intrastate activity—it expressly prohibits the operation of TikTok "within the territorial jurisdiction of Montana." SB419, §1.  The only question, then, is whether it has an indirect effect on interstate commerce that outweighs Montana's interests in protecting user data.

Consider TikTok's framing.  TikTok relies on *Pike*, asserting that "non-Montanan TikTok users" will have to share "*more* data with

TikTok." TikTok.Br.23-24. The gravamen of this argument is that SB419 effectively regulates commerce outside of Montana. But if TikTok really is making an extraterritorial-effects argument, the facts here conflict with those in cases invalidating state laws on this ground. *See, e.g.*, *Brown-Forman*, 476 U.S. at 579 (prohibiting sellers from selling at a price lower than the posted price). And the Ninth Circuit has limited the extraterritoriality principle to statutes that expressly dictate the price of products and tie in-state prices to out-of-state prices. *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013); *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1028 (9th Cir. 2021).

SB419's prohibition on operating TikTok "does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices." *Eleveurs*, 729 F.3d at 951. State laws that regulate only intrastate conduct don't have impermissible extraterritorial effects. *Nat'l Pork Producers Council*, 143 S. Ct. 1154, 1154 (2023) (requiring "purposeful discrimination against out-of-state economic interests"); *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a

statute gives no clear indication of an extraterritorial application, it has none.").

If TikTok is making an undue burden argument, its dismissal of Montana's concerns as "conjecture" fails to grapple with the abundance of evidence that TikTok poses harm to users.  TikTok.Br.23-24; *see supra* nn.1-16.  TikTok also merely asserts that out-of-state users will have to share more data with TikTok.  TikTok.Br.23-24.  Because this line of argument requires the Court to balance Montana's interests with the burden imposed, TikTok's cursory treatment only undermines their argument.  *See Pike*, 397 U.S. at 142.  TikTok provides no authority, nor does any exist, for resolving whether Montana's concerns about the harms from TikTok's operating within Montana outweigh TikTok's unsupported allegation that users will "be required to share *more* data," Users.Br.24.  *See Pork Producers*, 143 S. Ct. at 1160; *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment).  Legislatures, not courts, "are entitled to weigh the relevant 'political and economic' costs and benefits for themselves."  *Pork Producers*, 143 S. Ct. at 1160 (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279

(1978)).  Plaintiffs' *Pike*-balancing argument fail to show that SB419 imposes a substantial burden on out-of-state TikTok users.  *Id.* at 1161.

User Plaintiffs frame the commerce question differently by treating the platform as an instrumentality, but their *Pike* claim similarly fails. Users.Br.25-26.

Because User Plaintiffs see the platform as an instrumentality, they focus on the "distribution of information across state lines."  Users.Br.25.  None of their cited cases support this argument.  *Bigelow v. Virginia* involved a First Amendment challenge to Virginia's law prohibiting the "sale or circulation of any publication, to encourage or prompt the procuring of an abortion."  421 U.S. 809, 811 (1975).  More to the point, the User's selective quote is misleading—the Court said that a State cannot "bar a citizen of another State from disseminating information *about an activity that is legal in that State.*"  *Id.* at 824-25 (emphasis added).  SB419 doesn't prohibit the circulation of information about legal activities outside of Montana.  It prohibits the use of TikTok— the instrumentality—in Montana to circulate that information.  *Doe v. Deschamps* is inapplicable for the same reasons.  461 F.Supp. 682, 688-89 (D. Mont. 1976).  In *ACLU v. Johnson*, a law prohibited the

"[d]issemination of material that is harmful to a minor."  194 F.3d 1149, 1151 (10th Cir. 1999).

Each of these cases involved a prohibition on the information itself—harmful content.  In contrast, SB419 prohibits the use of the instrumentality.  SB419 would be analogous to the cases that User Plaintiffs cite only if it prohibited information from being shared about the People's Republic of China or by members of the C.C.P. or, more broadly, if it prohibited material harmful to minor children, as discussed above.  SB419 doesn't restrict content.

The few cases in which the Supreme Court has overturned nondiscriminatory restrictions on commerce involved a barrier to the physical, interstate movement of vehicles transporting goods.  *See, e.g.*, *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 521 (1959); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 450 (1978).

Courts have hesitated to expand this narrow class of cases, and Plaintiffs provide no support for doing so today.  *Cf. Raymond Motor Transp., Inc.*, 434 U.S. at 450 ("overwhelming empirical data" about the burdens); *Bibb*, 359 U.S. at 521 ("massive showing" of actual costs of burden on interstate commerce).  In *SPGGC, LLC v. Blumenthal*, for

example, the Second Circuit upheld a law that regulated gift cards sold via the internet by eliminating fees and expiration dates.  505 F.3d 183, 187 (2d Cir. 2007).  The court found *Bibb* inapplicable because the plaintiff could not show the state law "impede[d] the interstate movement of gift cards subject to different terms and conditions." *Id.* at 196.  It added that the sellers had a near-perfect ways to distinguish between online consumers who resided in Connecticut and those who resided elsewhere. *Id.* at 195.  SB419 similarly doesn't impede the interstate movement of information, and there are near-perfect ways to determine whether the application is operating in Montana.

Whether TikTok is a product or an instrumentality, Plaintiffs fail to show they are likely to succeed on their Commerce Clause claim.

## II. The Remaining Factors Do Not Weigh in Plaintiffs' Favor.

### A. Plaintiffs Have Not Shown Immediate Irreparable Harm to Support Preliminary Relief.

Plaintiffs assert two theories of irreparable harm.  First, they contend that they suffer a First Amendment injury.  *See* TikTok.Br.26; Users.Br.27.  But "the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA-The Wireless*

*Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). Indeed, Plaintiffs must "sufficiently demonstrat[e] a probability of success on the merits," which they fail to do. *Elrod v. Burns*, 427 U.S. 347, 374 (1976). They must also show the injury was "both threatened and occurring at the time." *Id.* . SB419's delayed effective date of January 1, 2024, undermines Plaintiffs' claim of imminent harm.

Plaintiffs next assert irreparable economic harm. TikTok.Br.27 (describing "business" damage and "erosion" to "competitive position"); Users.Br.27. But Users Plaintiffs' harms are speculative—they fail to sufficiently show what monetary harm they might suffer if they use a different online video platform. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy[.]").

### B. The Balance of the Equities and Public Interest Favor Montana.

Finally, the balance of equities favors Montana. The federal government has already determined that China is a foreign adversary. 15 C.F.R. §7.4(a)(1). And the concerns with TikTok are well documented at both the state and federal level, Democrat and Republican. SB419,

therefore, furthers the public interest because it protects the public from the harms inseparable from TikTok's operation.

CONCLUSION

For these reasons, the Court should deny Plaintiffs' motions.

DATED this 18th day of August, 2023.

> AUSTIN KNUDSEN
> Montana Attorney General
>
> /s/ *Christian B. Corrigan*
> CHRISTIAN B. CORRIGAN
>   *Solicitor General*
> BRENT MEAD
>   *Deputy Solicitor General*
> PETER M. TORSTENSEN, JR.
>   *Assistant Solicitor General*
> 215 North Sanders
> P.O. Box 201401
> Helena, MT 59620-1401
> p. 406.444.2026
> christian.corrigan@mt.gov
> brent.mead2@mt.gov
> peter.torstensen@mt.gov
>
> *Counsel for Defendant*

### CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 7,987 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/  *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN

### CERTIFICATE OF SERVICE

I hereby certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: August 18, 2023      /s/  *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN