IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

SAMANTHA ALARIO, et al.,

           Plaintiffs,

and

TIKTOK INC.,

           Consolidated Plaintiff,

vs.

AUSTIN KNUDSEN, in his official
capacity as Attorney General of the
State of Montana,

           Defendant.

Lead Case No.
CV 23–56–M–DWM

Member Case No.
CV 23–61–M–DWM

OPINION and
ORDER

     In this consolidated matter, the social media company TikTok Inc.

("TikTok") and a group of TikTok users ("User Plaintiffs") (collectively

"Plaintiffs") seek a preliminary ruling enjoining the effective date of Montana

Senate Bill 419 ("SB 419"), a ban on the social media application TikTok within

the territorial jurisdiction of the State of Montana.[1]

     The defendant is Montana's Attorney General (hereinafter referred to as the

"State"), sued in his official capacity as his office is tasked with enforcing SB 419.

---

[1] The parties agree that SB 419 does not apply within the boundaries of the Indian
reservations located within Montana.  (*See* Doc. 112 at 20–21, 45.)

*See* S.B. 419 § 1(6), 68th. Leg. (Mont. 2023) ("The department of justice shall enforce the provisions of this section."); (*see also* Doc. 1-2).[2]  Plaintiffs' motions are fully briefed.  (*See* Docs. 11, 12, 17, 18, 51, 68.)  Four Amici submitted briefs in support of Plaintiffs, (*see* Docs. 37 (Reporters Committee for Freedom of the Press and the Media Law Resource Center), 41 (Chamber of Progress and NetChoice, LLC), 48 (Computer & Communications Industry Association), 50 (American Civil Liberties Union, American Civil Liberties Union of Montana, and Electronic Frontier Foundation)); two Amici submitted briefs in support of the State, (*see* Docs. 69 (Digital Progress Institute), 70 (Commonwealth of Virginia and 17 Other States)[3]).  The Court heard argument on the motions for preliminary injunction, (Docs. 11, 17), on October 12, 2023.  (Doc. 110.)  All three parties argued, and no additional evidence was presented.  (*See* Doc. 112.)  The Court granted a request to stream the oral argument at the request of the *New York Times* and others.  (Docs. 79, 81–109.)

Plaintiffs argue a preliminary injunction is necessary because they are likely to succeed on the merits of their First Amendment, Supremacy Clause, and Commerce Clause claims.  The crux of each argument rests on the parties'

---

[2] Record citations refer to filings in the lead case, CV 23–56–M–DWM, unless otherwise indicated.

[3] The additional Amici states are Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, North Dakota, South Carolina, South Dakota, Tennessee, and Utah.

disagreement about the constitutionality of and Montana's purpose in enacting SB 419. Despite the State's attempt to defend SB 419 as a consumer protection bill, the current record leaves little doubt that Montana's legislature and Attorney General were more interested in targeting China's ostensible role in TikTok than with protecting Montana consumers. This is especially apparent in that the same legislature enacted an entirely separate law that purports to broadly protect consumers' digital data and privacy. *See* S.B. 384, 68th. Leg. (Mont. 2023). In showing its foreign affairs hand, the State has identified the Achilles' heel of SB 419. For the reasons stated below, Plaintiffs have shown a likelihood of success as to the merits of each claim and a preliminary injunction on the effective date of SB 419 is warranted.

## BACKGROUND

This challenge to SB 419 comes as courts across the country grapple with the limits of government regulation of large social media companies. For example, on October 20, 2023, the Supreme Court granted a shadow docket request from the United States Department of Justice to temporarily block a lower court's order that would limit a government's ability to communicate with social media companies about their content moderation policies. *See Murthy v. Missouri*, ___ S. Ct. ___ 2023 WL 6935337 (Oct. 20, 2023). The Supreme Court is also hearing oral argument in the current term on two cases involving issues like those presented

3

here.  The first case questions whether a public official's social media activity is a state action if the official posted in their official capacity.  Second, and more relevant to this dispute, the Supreme Court will consider the constitutionality of Florida and Texas laws regulating how social media companies, like TikTok, control content posted by users on their sites.  But courts and state legislators are not alone in their concerns about digital privacy.  The United States House of Representatives recently held hearings on TikTok's operations.  *TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms Before the House Committee on Energy and Commerce*, https://perma.cc/A97C-3WEG (last visited Nov. 2, 2023).  This fluid foundation concerning privacy as well as the collection and use of that information informs the disputes and the matter at hand.

## I.     TikTok and Its Users

TikTok is owned by TikTok Inc., a U.S. company with its principal address in Culver City, California.  (Doc. 14 at ¶ 5.)  The company is "led by a Singapore- and U.S.-based leadership team" and is "ultimately owned" by ByteDance Ltd. ("ByteDance").  (*Id.* at ¶¶ 5–6.)  TikTok is offered in more than 170 countries but is not offered in China.  (*Id.* at ¶ 6.)  Based on information gathered from IP addresses, TikTok estimates that around 150 million people in the United States access the application every month, including over 380,000 people in Montana.

(*Id.* at ¶¶ 7–8.)  TikTok concedes that these numbers are rough estimates because it does not collect GPS information from its users.  (*Id.*)

According to TikTok's President of Global Business Solutions Blake Chandlee, "TikTok is an entertainment platform" on which users "primarily engage . . . by creating and sharing videos or by watching and interacting with videos posted by others."  (*Id.* at ¶ 3.)  People use TikTok for a variety of reasons, including for entertainment, religious, and political purposes.  (*Id.* at ¶¶ 9–12.) People, including some User Plaintiffs, access TikTok to generate revenue for themselves and their businesses.  (*Id.* at ¶ 13.)  As an example, Plaintiff Samantha Alario runs a local business selling sustainably-made swimwear over the Internet and uses TikTok to market her goods.  (*See* Doc. 18-1.)  Unlike other social media applications, such as Facebook, TikTok allows Alario to market her company and gain new customers without paying for advertising.  (*Id.* at ¶¶ 5–6.)  She has ten times as many followers on TikTok as on Facebook.  (*Id.* at ¶ 5.)  The other User Plaintiffs similarly use TikTok for personal and professional gains.  (*See* Docs. 18-2, 18-3, 18-4, 18-5, 18-6.)  Carly Ann Goddard uses TikTok to generate revenue by sharing her ranching lifestyle with her 101,000 followers.  (Doc. 18-3 at ¶¶ 2, 4, 7.) Her YouTube following is a minuscule 157 individual accounts.  (*Id.* at ¶ 9.) Similarly, Heather DiRocco uses TikTok to discuss issues like mental health and suicide prevention with fellow veterans around the country.  (Doc. 18-2 at ¶ 8.)

She has over 200,000 followers on TikTok, but only 23,500 on Instagram, and earns approximately 10 to 30 percent of her annual income through the TikTok application.  (*Id.* at ¶¶ 6, 7, 11.)

## II.    TikTok, Data Security, and Age Restrictions

TikTok collects usernames, dates of birth, phone numbers, and email addresses from its users, information users voluntarily report before use.  (Doc. 14 at ¶ 29.)  Users agree to TikTok's data collection policy when they sign up for the application.  (*Id.*)  TikTok affirms it has "not received any requests for U.S. user data from the Chinese government"; has "not shared any U.S. user data with the Chinese government in response to such a request; and would not do so if [it] were to receive a request."  (*Id.* at ¶ 30.)  TikTok's privacy policy regarding data security and retention states:

> We retain information for as long as necessary to provide the Platform and for the other purposes set out in this Privacy Policy. We also retain information when necessary to comply with contractual and legal obligations, when we have a legitimate business interest to do so (such as improving and developing the Platform, and enhancing its safety, security and stability), and for the exercise or defense of legal claims.

> The retention periods are different depending on different criteria, such as the type of information and the purposes for which we use the information. For example, when we process your information such as your profile information to provide you with the Platform, we keep this information for as long as you have an account. If you violate our Terms of Service, Community Guidelines, or other conditions or policies, we may remove your profile immediately, but may keep other information about you to process the violation.

> TikTok may transmit your data to its servers or data centers outside of the United States for storage and/or processing. Other entities with whom TikTok may share your data as described herein may be located outside of the United States.

*Privacy Policy*, TikTok, https://perma.cc/89XU-75VP (last visited Nov. 2, 2023).

The extent to which China controls TikTok, and has access to its users' data, forms the heart of this controversy. The State's factual position, presented mainly in the form of citations to news coverage, is that the Chinese government has a "superuser" credential that allows it to access the personal information of any TikTok user; data it can access without asking either ByteDance or TikTok. (Doc. 51 at 17 n.12 (citing Zen Soo, *Former exec at TikTok's parent company says Communist Party members had a 'god credential' that let them access Americans' data*, Business Insider, https://perma.cc/5QXY-5GBE (June 7, 2023)).) This general concern over TikTok's data practices is shared by other United States jurisdictions. TikTok's own data security expert testified by affidavit that China reportedly hacked into United States government data through the Office of Personnel Management. (*See* Doc. 15 at ¶ 13.) In response to federal concerns over TikTok's data practices, TikTok created internal systems to "safeguard U.S. user data and prevent foreign access to TikTok's data systems." (*Id.* at ¶ 14.) TikTok also contracted U.S.-based Oracle Corporation to serve as the cloud storage facility for all U.S. user data. (*Id.* at ¶ 15.)

7

TikTok has features, policies, and procedures aimed at limiting the content

minors can access on the application.  (*See generally* Doc. 14 at ¶¶ 17–30.)  For

example, TikTok has Community Guidelines that "prohibit users from posting

certain categories of videos to the app, including videos that feature nudity, sexual

activity, and sexually explicit or exploitative content, as well as videos that appear

dangerous or otherwise harmful."  (*Id.* at ¶ 18.)  To enforce the Community

Guidelines, every TikTok video must pass through "automated moderation so that

content flagged as potentially violative can be automatically removed or escalated

for human review by trained moderators."  (*Id.* at ¶ 22.)  TikTok also has various

age-based settings and family controls such as prohibiting anyone under age 13

from having a TikTok account.  (*Id.* at ¶ 26.)

## III.   SB 419: An Act Banning TikTok in Montana

On May 4, 2023, the Montana Legislature ("Legislature") passed SB 419,

and Governor Greg Gianforte signed the bill into law the following month.

Montana Legislature, https://perma.cc/R5U8-CVQD (last visited Nov. 2, 2023).

SB 419 bans TikTok from "operat[ing] within the territorial jurisdiction of

Montana."  S.B. 419 § 1(1).  It imposes a $10,000 penalty on either TikTok or a

mobile application store for "each time that a user accesses TikTok,[4] is offered the

---

[4] SB 419 refers to its subject as "tiktok."  To avoid confusion and to maintain
consistency, this Order will refer to the platform using the spelling used by the
parties: "TikTok."

ability to access TikTok, or is offered the ability to download TikTok," and an additional $10,000 assessment for each day the violation continues. *Id.* § 1. SB 419 is scheduled to take effect January 1, 2024, *id.* § 5, and "is intended to be codified as an integral part of [Montana's Unfair Trade Practices and Consumer Protection Acts]," *id.* § 2.

SB 419's preamble states two reasons for the ban. First, because "TikTok is a wholly owned subsidiary of ByteDance, a Chinese Corporation," and because "TikTok gathers significant information from its users, accessing data against their will to share with the People's Republic of China," SB 419 is necessary to prevent both "the Chinese Communist Party" and the People's Republic of China from "conduct[ing] corporate and international espionage in Montana." *Id.* Preamble. Ostensibly for this reason, SB 419 "is void if TikTok is acquired by or sold to a company that is not incorporated in any other country designated as a foreign adversary in 15 C.F.R. [§] 7.4[5] at the time TikTok is sold or acquired." *Id.* § 4.

Second, the preamble asserts that "TikTok fails to remove, and may even promote, dangerous content that directs minors to engage in dangerous activities." *Id.* Preamble. Dangerous content:

---

[5] This list includes: "(1) The People's Republic of China, including the Hong Kong Special Administrative Region (China); (2) Republic of Cuba (Cuba); (3) Islamic Republic of Iran (Iran); (4) Democratic People's Republic of Korea (North Korea); (5) Russian Federation (Russia); and (6) Venezuelan politician Nicolás Maduro (Maduro Regime)." 15 C.F.R. § 7.4(a)(1)–(6).

include[es] but [is] not limited to throwing objects at moving automobiles, taking excessive amounts of medication, lighting a mirror on fire and then attempting to extinguish it using only one's body parts, inducing unconsciousness through oxygen deprivation, cooking chicken in NyQuil, pouring hot wax on a user's face, attempting to break an unsuspecting passerby's skull by tripping him or her into landing face first into a hard surface, placing metal objects in electrical outlets, swerving cars at high rates of speed, smearing human feces on toddlers, licking doorknobs and toilet seats to place oneself at risk of contracting coronavirus, attempting to climb stacks of milkcrates, shooting passersby with air rifles, loosening lug nuts on vehicles, and stealing utilities from public places[.]

*Id.*

## ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To analyze a request for preliminary injunctive relief, a district court must determine "whether a movant has established that (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Winter*, 555 U.S. at 20). However, "when plaintiffs establish that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, they need only show 'serious questions' on the merits." *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

(9th Cir. 2011)).  In this case, Plaintiffs have demonstrated each element;

consequently, a preliminary injunction is warranted to enjoin the effective date of

SB 419 pending a final determination on the merits.

## I.      Likelihood of Success on the Merits

Plaintiffs argue they are likely to succeed on the merits in three ways: (1) SB

419 does not comport with the First Amendment; (2) SB 419 is preempted by

federal national security law; and (3) SB 419 violates the Commerce Clause.  In

response, the State argues: (1) because SB 419 is a valid exercise of Montana's

police power, the First Amendment is not implicated; (2) preemption does not

prevent Montana from legislating to ban TikTok; and (3) SB 419 has only an

indirect effect on interstate commerce, which is permissible under the Commerce

Clause.  Because Plaintiffs have the better arguments, they have demonstrated a

likelihood to succeed on the merits.

### A.      First Amendment

Plaintiffs argue SB 419's total ban on TikTok unconstitutionally targets

speech and that the law is subject to the highest level of constitutional scrutiny.

The State disagrees, arguing that to the extent SB 419 implicates the First

Amendment at all, it merely regulates expressive nonspeech conduct, thus it need

only pass intermediate scrutiny.  Like the curate's egg, neither argument is entirely

persuasive.  However, because Plaintiffs have shown that SB 419 is unlikely to pass even intermediate scrutiny, it likely violates the First Amendment.

### i.   Protected Expression versus Non-Expressive Conduct

Because Plaintiffs argue SB 419 implicates the First Amendment, the threshold question is whether the First Amendment applies to the conduct and speech the bill prohibits.  TikTok argues that SB 419 infringes on its First Amendment right to make editorial choices over content curation.  And User Plaintiffs argue their right to speak on the platform is limited by SB 419.  The State counters that the bill is merely a generally applicable consumer protection law that does not implicate speech.  But, if the bill implicates speech at all, it merely bans non-expressive conduct that contains a speech element.

The State's defense of SB 419 rests on the proposition that the First Amendment is not implicated at all because the bill does not regulate speech.  It argues instead that because the Legislature "may make its own reasoned judgment about what conduct is permitted or proscribed within its borders," *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003), its TikTok ban can sit comfortably alongside its many other generally applicable consumer protection laws.  The State and Amicus Virginia, (*see* Doc. 70), are correct that consumer protection laws "fall in an area that is traditionally within the state's police powers to protect its own citizens."  *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir.

12

2011).  However, SB 419 is not merely a generally applicable consumer protection statute without any First Amendment implications.

In *Arcara v. Cloud Books, Inc.*, a case on which the State heavily relies, the Supreme Court considered whether a state statute authorizing the closure of premises designated public health nuisances could be applied to shut down a bookstore because the store was also being used for soliciting prostitution.  478 U.S. 697, 698–99 (1986).  In that case, New York initiated an enforcement action against a bookstore specializing in selling "sexually explicit books and magazines with booths available for the viewing of sexually explicit movies" when prostitution allegedly also occurred there.  *Id.*  The store argued that shutting down the business because of the prostitution activity interfered with its First Amendment right to sell books.  *Id.*  The Supreme Court held that the store's activity "manifest[ed] absolutely no element of protected expression," but rather, the store sought to use the First Amendment to cloak "obviously unlawful . . . conduct" by "attributing protected expressive attributes to that conduct."  *Id.* at 705.  The Court further explained that First Amendment scrutiny need not be applied to conduct unless the conduct has "a significant expressive element that drew the legal remedy in the first place," or "where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity."  *Id.* at 706–07.  The State argues that SB 419 bans TikTok

because of its allegedly harmful data-harvesting practices and that TikTok's "conduct" has no protected First Amendment expressive attributes.  If it were not allowed to regulate TikTok in this way, the State argues it would be akin to prohibiting Montana from "ban[ning] a cancer-causing radio merely because that radio also transmitted protected speech."  (Doc. 51 at 22.)  The State's analogy is not persuasive and is seemingly undermined by the separate passage of SB 384, which, as discussed below, broadly protects consumers' digital data and privacy.

First, SB 419 is not a generally applicable law like the one in *Arcara*, which authorized the closure of *any* building found to be a public health nuisance.  Unlike that law, SB 419 targets one entity, which on its face makes it not generally applicable.  Second, the Court in *Arcara* determined that the conduct there was "nonspeech," subject to New York's general regulation, and that it had "absolutely no connection to any expressive activity."  478 U.S. at 707 n.3.  For both groups of Plaintiffs, SB 419 implicates traditional First Amendment speech.  It does so for User Plaintiffs by banning a "means of expression" used by over 300,000 Montanans.  *See Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 582–83 (1983) (holding a statute singling out expressive activity violates the First Amendment even when it is apparently based on a nonexpressive activity).  Without TikTok, User Plaintiffs are deprived of communicating by their preferred means of speech, and thus First Amendment scrutiny is appropriate.

Likewise, SB 419 implicates TikTok's speech because the application's decisions related to how it selects, curates, and arranges content are also protected by the First Amendment.  SB 419 prevents the company from "the presentation of an edited compilation of speech generated by other persons . . . which, of course, fall squarely within the core of First Amendment security."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995); *see also Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (holding that a newspaper's moderation of third-party content is generally protected by the First Amendment).  These speech concerns place SB 419 and the activity it bans squarely within the First Amendment's protections.

### ii.    First Amendment Analysis

Although the First Amendment protects these activities, the Legislature may still regulate them, but it must do so with a constitutional scalpel to meet the confines of the Constitution.  Accordingly, it is necessary to determine what level of constitutional scrutiny to apply.  Plaintiffs argue that SB 419 must pass strict constitutional scrutiny because, *inter alia*, it is a prior restraint, a content-based restriction, and a viewpoint-based restriction.  The State does not concede that any First Amendment analysis applies, but argues that if it does, SB 419 merely regulates non-expressive conduct, and thus a lower level of scrutiny is required.  Although neither side is completely correct, the State has the better argument as to

the level of scrutiny that should be applied.  However, even applying intermediate

scrutiny, the State fails to show how SB 419 is constitutionally permissible.

### 1.    Type Of First Amendment Scrutiny

#### a.    Content- and Viewpoint-Based vs. Content Neutral

Plaintiffs argue that SB 419 is a content- and viewpoint-based restriction on

speech for which strict scrutiny analysis applies.  On the other hand, the State

argues that the intermediate scrutiny test set out in *United States v. O'Brien* applies

because SB 419 only regulates content-neutral expressive conduct.  391 U.S. 367

(1968).  Again, neither argument is completely accurate, but the State's is closer to

the legal mark.

"The principal inquiry in determining content neutrality, in speech cases

generally and in time, place, or manner cases in particular, is whether the

government has adopted a regulation of speech because of disagreement with the

message it conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

"As a general rule, laws that by their terms distinguish favored speech from

disfavored speech on the basis of the ideas or views expressed are content based."

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).  "By contrast, laws that

confer benefits or impose burdens on speech without reference to the ideas or

views expressed are in most instances content neutral."  *Id.*  SB 419 bans TikTok

from operating in Montana.  The parties disagree as to whether this ban is with or

16

without reference to the speaker's ideas.  In *IMDb.com Inc. v. Becerra*, the Ninth

Circuit held that a state statute prohibiting the dissemination of personal

information of celebrities on the Internet was content-based because it prohibited

"one type of speech" and a "single category of speakers."  962 F.3d 1111, 1120

(9th Cir. 2020).  In another First Amendment case, the Ninth Circuit held that a

local ordinance prohibiting the parking of mobile advertising billboards on public

streets was content-neutral.  *Lone Star Sec. & Video, Inc. v. City of L.A.*, 827 F.3d

1192, 1200 (9th Cir. 2016).  Like in *IMDb.com Inc.*, SB 419 restricts TikTok

videos and TikTok users from speaking but it does not consider the message of the

speaker, merely the act of speaking itself.  Like in *Lone Star*, SB 419 restricts the

manner of the speech, but it does so by banning the platform completely, not just

where the platform can be used.  Thus, neither *IMDb.com Inc.* nor *Lone Star* is

exactly on point.

Neither is the State's preferred case study, *United States v. O'Brien*.  In

*O'Brien*, individuals protesting the Vietnam War burned their draft cards in

violation of a federal law subjecting anyone who "knowingly destroys (or)

knowingly mutilates" a draft certificate to criminal liability.  391 U.S. at 375.  The

Supreme Court held that because the law did not directly implicate speech and

created multiple other justifications unrelated to the suppression of speech, the

statute was constitutional.  *Id.* at 378–80.  But here, where the law "directly and

immediately affects" First Amendment rights, "*O'Brien* is inapplicable." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000).  In this case, SB 419 completely bans a platform where people speak, so it directly implicates speech; thus, *O'Brien* is not directly applicable for the reasons the State claims.

As an alternative analysis, TikTok argues that SB 419 is a content-neutral regulation on speech that merely restricts the "time, place, or manner" of protected speech, and is therefore subject to intermediate scrutiny.  *See Ward*, 491 U.S. at 791.  SB 419 bans a single social media application that has over 300,000 monthly users in Montana.  "Today, social media websites like . . . [TikTok] are, for many, 'the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.'" *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1162 (9th Cir. 2022) (quoting *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017)).  Defendant Attorney General Knudsen, who wrote the bill and went on a national public speaking tour touting its merits, agrees.  (*See, e.g.*, Doc. 13-6.)  In his remarks to the House Judiciary Committee when the bill was introduced, Attorney General Knudsen stated:

> When we're talking about the First Amendment, what is the best way to get your message, to get your free speech out there?  It's not longer to stand on an apple cart [sic] in the public square and give a speech. It's to get on social media.  We know that.  The best way to spread your message is via social media.

(Doc. 13-2 at 31.)  This sentiment is almost verbatim to the Supreme Court's position on the subject: "[Social media] allow[s] a person with an Internet connection to become a town crier with a voice that resonates farther than it could from any soapbox." *Packingham*, 582 U.S. at 107 (internal quotation marks omitted).  Following this line of reasoning, SB 419 could be seen as a restriction on the time, place, or manner that a person could speak in the public forum—that is, the Internet.  Given such a proposition, intermediate scrutiny should be applied here.

For a preliminary injunction to issue, it only requires determination of a likelihood of success on the merits.  It is unnecessary to precisely categorize SB 419 as a content-based or content-neutral time, place, or manner restriction because it is likely that the bill is, at the very least, a regulation of expressive conduct that triggers intermediate scrutiny.  *See Turner Broad. Sys.*, 512 U.S. at 643; *Yim v. City of Seattle*, 63 F.4th 783, 793 (9th Cir. 2023) (determining it was unnecessary to categorize the specific type of speech involved when it was clear that the law did not meet the lower, intermediate scrutiny).  Additionally, at the October 12 hearing, the parties acknowledged that at least intermediate scrutiny should be applied.  So, even if SB 419 is only a regulation of conduct that puts an incidental burden on speech, it must at least pass intermediate scrutiny.  *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020)

(applying *O'Brien*'s intermediate scrutiny test even when the facts of the case do not exactly implicate the expressive conduct analysis first laid out in that case); *see also Ward*, 491 U.S. at 798 (noting "the *O'Brien* test in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions" (internal quotation marks omitted)).

### b.     Prior Restraint

Plaintiffs layer their argument for a higher level of scrutiny by asserting that SB 419 is a prior restraint that completely limits one form of speech.  The State disagrees.  Instead, the State argues that "Plaintiffs can use any other online video platforms and reach their 'intended audience' using these other platforms."  (Doc. 51 at 30.)  In this limited circumstance, the State has the better argument.

A prior restraint is an "administrative and judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted).  In *U.S. WeChat Users Alliance v. Trump*, a district court recently considered a challenge to an executive order prohibiting people in the United States from using WeChat, a messaging, social-media, and mobile-payment application.  488 F. Supp. 3d 912, 916–17 (N.D. Cal. 2020).  The case provides some guidance here.  WeChat users sued and argued, like here, that the executive order was a prior restraint on their First Amendment speech; the district court

agreed.  It found that because WeChat was the only platform available to Chinese speakers with limited English proficiency to communicate in the way they wanted, no viable substitute platforms or applications existed for the Chinese-speaking and Chinese American community.  *Id.* at 927.

Here, like the ban on WeChat, SB 419 completely shuts off TikTok to Montana users.  But unlike *WeChat*, TikTok users may be able to use other platforms on the Internet, assuming they are willing to forego its benefits.  There is evidence to support Plaintiffs' position that TikTok is not interchangeable with other social media applications.  The State provides no support for the conclusion that User Plaintiffs may simply substitute another social media site in place of TikTok and achieve the same effect.  It is a "no harm no foul" argument.  That said, the State persuasively counters that unlike in *WeChat*, there is no language barrier preventing User Plaintiffs from accessing other social media applications.  There is perhaps an economic consequence, but not a ban on the users' sole means of communicating.  This does not mean that those other channels are sufficient to satisfy the intermediate scrutiny analysis, *see infra*, but they may be sufficient to satisfy the prior restraint analysis.  On the record at this preliminary stage, Plaintiffs have not shown it is likely that SB 419 is a prior restraint on protected speech.

## 2.    Intermediate Scrutiny

To pass intermediate scrutiny, a law must both "advance[] important governmental interests unrelated to the suppression of free speech[,] not burden substantially more speech than necessary to further those interests," *Pac. Coast Horseshoeing Sch., Inc.*, 961 F.3d at 1068; *Turner*, 512 U.S. at 661–62; *see also O'Brien*, 391 U.S at 377, and "leave open ample alternative channels for communication of the information," *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984).  Conceding for the sake of this argument that the State may have at least an important state interest in SB 419, the law is not narrowly tailored, nor does it leave open any alternative channels for targeted communication of information.  SB 419 does not pass intermediate scrutiny review.

### a.    State Interest

SB 419 states two governmental interests and purposes in the bill's preamble.  The first is the national security interest of protecting Montanans from Chinese corporate and business espionage.  SB 419, Preamble.  The second is the public interest of protecting Montana youth from dangerous content on TikTok. *Id.*  Plaintiffs argue these are the Legislature's stated interests in passing SB 419.  Despite providing no affidavits or additional evidence, the State contends that the Legislature's purpose in passing SB 419 was merely the protection of Montanans against TikTok's allegedly harmful data practices.  Plaintiffs have the better

argument.  *Compare with* SB 384 (providing broad protections for Montanans against harmful data-gathering practices).

"[A] court's job in evaluating a policy under [intermediate scrutiny] is to determine whether *the government's stated goals* qualify as important or substantial."  *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 435 (9th Cir. 2016). The government "must demonstrate that the recited harms are real, not merely conjectural."  *Turner Broadcast Sys.*, 512 U.S. at 664.  When considering the governmental interest in passing a law, courts look to a legislature's stated intent. *See id.* at 662 (finding that Congress's declaration of interests satisfied the intermediate scrutiny standard).

Here, reading the text of SB 419, including both the preamble and the operative language, the Legislature's stated purposes are clear.  The preamble begins: "WHEREAS, the People's Republic of China is an adversary of the United States and Montana and has an interest in gathering information about Montanans, Montana companies, and the intellectual property of users to engage in corporate and international espionage."  SB 419, Preamble.  It continues by stating: "WHEREAS, TikTok fails to remove, and may even promote, dangerous content that directs minors to engage in dangerous activities."  *Id.*

First, the law's foreign policy purpose is not an important Montana state interest.  The State posits there is nothing precluding a state from legislating in the

field of national security.  The Founding Fathers may have viewed that proposition skeptically considering the Constitution's particular provisions.  During the October 12 hearing, the State supported their argument by analogizing to a state statute that prohibits acts of terrorism.  That hypothetical law, the State argues, might have a national security element to it but it also has domestic and state-centered reason for enactment.  That analogy would be well taken given a different set of facts than are present here.  In the State's terrorism analogy, the named purpose of the law—banning terrorism—is secondary to the real purpose, which would be to protect the people of the state against acts of violence.  So, while that analogy may make sense on its face, it is inapposite.  Terrorism, while it may involve a foreign actor, is not by definition a foreign concern beyond the reach of state law.  *See generally Terrorism*, Fed. Bur. Inv., https://perma.cc/2NK8-GK3T (last visited Nov. 2, 2023) (noting that both international and domestic terrorism are the FBI's "number one priority"); *The Rising Threat of Domestic Terrorism in the U.S. and Federal Efforts to Combat It*, Gov't Accountability Off., https://perma.cc/X4MM-J628 (last visited Nov. 2, 2023) (noting that as of March 2023 that "[d]omestic terrorism is on the rise").  In contrast, SB 419 explicitly bans TikTok because of its direct connection to a specific foreign nation.  At best, the State's comparison is weak.  At worst, it is reflective of the pervasive undertone of anti-Chinese sentiment that permeates the State's case and the instant legislation.

As is explained in more detail below, Montana does not have constitutional authority in the field of foreign affairs. *See Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("The Federal Government, representing as it does the collective interest of the . . . states[] is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties.").

Second, the preamble's stated child-protection purpose may be an important state interest. While "a State possesses legitimate power to protect children from harm[,] . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 794 (2011); *see also Jacobs*, 526 F.3d at 435–36 ("[I]t is hard to think of a government interest more important than the interest in fostering conducive learning environments for our nation's children."). However, because the State did not address this interest in its briefing, and there is a question as to whether this interest is important for the purposes of First Amendment analysis, a determination of whether this interest provides an important state interest is not made here in light of the enactment of SB 384, which independently provides such protections.

The State attempts to persuade that its actual interest in passing this bill is consumer protection. However, it has yet to provide any evidence to support that argument. *See contra Jacobs*, 526 F.3d at 435 (noting that sworn affidavits from government officials are useful in demonstrating a government's purpose in

passing a bill).  Because Montana does not have an important government interest in regulating foreign affairs, and because the State has not demonstrated the Legislature's consumer protection interest in passing the bill, it is likely that Plaintiffs will succeed in showing SB 419 does not advance an important government interest as stated in the Act's preamble and text.

### b.    Tailoring

Even accepting the State's argument that its stated government interest is consumer protection, the law still must be narrowly tailored to that interest.  A law need not be the least intrusive means of establishing a desired end and is not invalid "simply because there is some imaginable alternative that might be less burdensome on speech."  *See Ward*, 491 U.S. at 797 (internal quotation marks omitted).  Rather, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Id.* at 799 (cleaned up).  That is to say that the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."  *Id.* Additionally, the government must demonstrate that "the regulation will in fact alleviate these harms in a direct and material way."  *Turner Broadcast Sys.*, 512 U.S. at 664.

The State claims that SB 419 is narrowly tailored and meets this standard. SB 419 only bans TikTok, not the other major social media applications, because of its grave risk to Montanans, e.g., Chinese spying on Montanans.  In doing so, it argues, SB 419 "eliminate[d] the exact source of evil it sought to remedy."  *City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984).  Plaintiffs argue that SB 419 burdens substantially more speech than is necessary to fulfill even its purported interests.  Because the Legislature used an axe to solve its professed concerns when it should have used a constitutional scalpel, Plaintiffs are correct.

First, SB 419 "burden[s] substantially more speech than is necessary." *Ward*, 491 U.S. at 799.  This is apparent on the law's face.  SB 419 completely bans TikTok in Montana.  It does not limit the application in a targeted way with the purpose of attacking the perceived Chinese problem.  At the October 12 hearing, the State argued that the law is narrowly tailored because it is the only way the Legislature could have stopped the purportedly improper behavior it wanted to prevent.  In its brief, the State cites a March 2023 article from Reuters reporting on a group of 45 United States attorneys general who moved to file in a Tennessee state court as amici curiae to argue that TikTok has deceptively and improperly ignored requests to produce internal company documents in response to state investigations.  (*See* Doc. 51 at 27 n.14 (citing David Shepardson*, State AGs demand TikTok comply with US consumer protection investigations,* Reuters,

27

https://perma.cc/4DR9-LQ3M (Mar. 6, 2023)).)  The State suggests that any

legislation less stringent than an all-out ban would not be properly tailored when

the company has already displayed a public willingness to disobey state regulatory

requests.  However, it is unclear how this single investigation into TikTok warrants

a complete ban on the application.

    In the same legislative session as SB 419, the Legislature also passed SB

384, a sweeping data privacy law called the Montana Data Privacy Act that

purports to protect Montanans against unsafe data collection practices from social

media companies in the state.  To be clear, courts may not "sift[] through all the

available or imagined alternative means of regulating [an issue] in order to

determine whether the [state's] solution was the least intrusive means of achieving

the desired end."  *Ward.*, 491 U.S. at 797.  But the State may not "regulate

expression in such a manner that a substantial portion of the burden on speech does

not serve to advance its goals."  *Id.* at 799.  Banning TikTok outright to support a

factually unsupported interest is a clear example of a regulation that burdens more

speech than is necessary.

    Second, it is likely that SB 419 is not narrowly tailored because the State has

not provided any evidence that the ban "will in fact alleviate these harms in a direct

and material way."  *Turner Broadcast Sys.*, 512 U.S. at 664.  In the first instance, it

is well-established that other social media companies, such as Meta, collect similar

data as TikTok, and sell that data to undisclosed third parties, which harms

consumers.  *See, e.g.*, *In Re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589,

596 (9th Cir. 2020); *In Re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2021

WL 10282172, at *4 (9th Cir. Oc.t 11, 2021).  Additionally, there are many ways

in which a foreign adversary, like China, could gather data from Montanans.  For

example, it could do so by "purchasing information from data brokers (a practice

in which U.S. intelligence agencies also engage), conducting open-source

intelligence gathering, and hacking operations like China's reported hack of the

U.S. Office of Personnel Management."  (Doc. 15 at ¶ 13.)  Thus, it is not clear

how SB 419 will alleviate the potential harm of protecting Montanans from

China's purported evils.

　　And, although the State does not explore this argument in any detail in its

briefing, SB 419 does not reasonably prevent minors from accessing dangerous

content on the Internet.  It is not hard to imagine how a minor may access

dangerous content on the Internet, or on other social media platforms, even if

TikTok is banned.  This "raises serious doubts about whether the government is in

fact pursuing" consumer protection interests, *Brown*, 564 U.S. at 802 (analyzing a

law under a strict scrutiny analysis), or targeting the application simply because of

its connection to China.

Indeed, the State concedes that this ban "is not a blanket prohibition on creating, sharing, and viewing videos on *every* internet-based application." (Doc. 51 at 28.)  That may well be the case, but even if SB 419 does not ban all social media in Montana, the ban is not narrowly tailored to its stated interests. Ultimately, if Montana's interest in consumer protection and protecting minors is to be carried out through legislation, the method sought to achieve those ends here was not narrowly tailored.

### c.    Alternative Channels

Even assuming the State established that SB 419 is narrowly tailored to its stated interest, the law fails intermediate scrutiny because it does not leave open "ample alternative channels of communication."  *Ward*, 491 U.S. at 802.  A statute "that forecloses an entire medium of public expression across the landscape of a particular community or setting fails to leave open ample alternatives." *Project Veritas v. Schmidt*, 72 F.4th 1043, 1064 (9th Cir. 2023) (internal quotation marks omitted).  "Regulations may not hamper a speaker's preferred mode of communication to such an extent that they compromise or stifle the speaker's message." *Id.* (citing *McCullen v. Coakley*, 573 U.S. 464, 487–90 (2014)).  And, "[a]lternatives that are less effective media for communicating the speaker's message are far from satisfactory." *Id.* (internal quotation marks and alterations omitted).

SB 419 prevents Plaintiffs, especially User Plaintiffs, from communicating in their preferred channel of communication.  Each User Plaintiff testifies in their affidavits that TikTok provides them a way to communicate with their audience and community that they cannot get elsewhere on the Internet.  (*See* Docs. 18-1, 18-2, 18-3, 18-4, 18-5.)  The State has presented no evidence that SB 419 does not "function[] as an absolute prohibition on a particular type of expression," *Project Veritas*, 72 F.4th at 1065 (internal quotation marks omitted), nor that TikTok is similar enough to other social media applications that they may be considered alternative channels of communication.  Thus, Plaintiffs have shown that it is likely SB 419 does not leave open ample alternative channels of communication.

### iii.    Conclusion

Ultimately, this analysis does not impede the State from acting as a leader in attempting to protect its residents from harm.  But to do so, it must act within the constitutional legal context to which the legislation belongs.  SB 419 bans TikTok outright and, in doing so, it limits constitutionally protected First Amendment speech.  Accordingly, SB 419 must pass at least intermediate scrutiny review.  Plaintiffs have demonstrated that it is unlikely the law will be able to do so.

### B.    Federal Preemption

The Constitution and "the Laws of the United States" are "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the

31

Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const.

art. VI cl. 2. This, the Supremacy Clause of the United States Constitution,

instructs that state law may be "preempted" by federal law. Preemption may

occur, *inter alia*, when a state law infringes on the federal government's

exclusivity over foreign affairs, *see Movsesian v. Victoria Versicherung AG*, 670

F.3d 1067, 1071 (9th Cir. 2012) (foreign affairs field preemption), and when a state

law actually conflicts with federal law, *see Gade v. Nat'l Solid Wastes Mgmt.*

*Ass'n*, 505 U.S. 88, 109 (1992) (Kennedy, J., concurring in part) (internal quotation

marks omitted) (conflict preemption). Plaintiffs argue that SB 419 is preempted by

both. The State disagrees. Both parties' arguments have merit, but ultimately,

because Plaintiffs have demonstrated a likelihood of foreign affairs field

preemption and at least one instance of conflict preemption, SB 419 is most likely

preempted by federal law.

### i.     Foreign Affairs Field Preemption

"[T]he Constitution entrusts foreign policy exclusively to the National

Government" and so "state law must give way" where there is a conflict between

state law and foreign policy. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11,

421 (2003). "Our system of government is such that the interest of the cities,

counties and states, no less than the interest of the people of the whole nation,

imperatively requires that federal power in the field affecting foreign relations be

left entirely free from local interference." *Hines*, 312 U.S. at 63.  Although "rarely invoked," the foreign affairs field preemption doctrine straddles both the conflict preemption and field preemption doctrines.  *See Movsesian*, 670 F.3d at 1071, 1075.  Under foreign affairs field preemption, a district court must prevent a state law from taking effect when it "(1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power." *Id.* at 1074.  Plaintiffs argue that this preemptive doctrine invalidates SB 419 while the State contends that the bill's consumer protection purpose prevents it from being preempted.  SB 419 meets both *Movsesian* elements.

### 1.    Area of Traditional State Responsibility

The State first argues that SB 419 is not aimed at creating a forum for suing China or regulating international matters but rather that it is a consumer protection law that "fall[s] in an area that is traditionally within the state's police powers." (Doc. 51 at 34 (quoting *Aguayo*, 653 F.3d at 917).)  Plaintiffs counter that the main purpose of SB 419 is to make a foreign affairs statement.  After considering the text and legislative history of SB 419, there is "no doubt that the law cannot be fairly categorized as a garden variety [consumer protection] regulation." *Movsesian*, 670 F.3d at 1075 (internal quotation marks omitted).  Plaintiffs are correct in their assertion.

"Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010). Here, just like the laws in *Movsesian*, SB 419 "is *not* a neutral law of general application." 670 F.3d at 1075. And just like in *Von Saher*, the "scope of the statute as enacted belies [Montana's] purported interest in protecting its residents." 592 F.3d at 965. Despite the State's attempt to make an ex post facto argument that SB 419's only purpose was consumer protection, the language of the statute and the political context under which it was enacted do not support that conclusion.

A determination of a state law's purpose under the foreign affairs field preemption analysis "cannot begin and end, as [the State] suggest[s], with the area of law that the state statute addresses." *Movsesian*, 670 F.3d at 1075. Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1738 (2020). On its face, SB 419 does not espouse its consumer protection purpose. The only clues provided by the statute's text are in Section 2, which instructs that the bill's language "is intended to be codified as an integral part of Title 30, chapter 14," the "unfair trade practices and consumer protection" chapter of the Montana Code Annotated. (*See* Doc. 13-1 at 4.) This demonstrates a

consumer protection purpose. However, the bill also instructs that SB 419 "is void

if [TikTok] is acquired by or sold to a company that is not incorporated in any

other country designated as a foreign adversary." (*Id.*) This demonstrates a

foreign affairs purpose.

After looking at the text of the bill's operative language, courts "must look

further to determine the real purpose of the state law." *Movsesian*, 670 F.3d at

1075 (internal quotation marks omitted). The State argues that because China

exerts control over TikTok, it can gain access to Montanan's data without their

consent; however, the State does not support this argument with evidence. Its

allegations of the Chinese government's control over ByteDance and TikTok are

mainly supported by news articles. (*See* Doc. 51 at 27 n.14.) The news coverage,

although credible, is contradicted by sworn affidavits by a TikTok executive and

its data privacy experts. (*See* Docs. 14, 15, 16.)

And, after "look[ing] further to determine the real purpose of the state law,"

*Movsesian*, 670 F.3d at 1075, SB 419's foreign affairs purpose becomes even more

clear. First, the preamble states that "TikTok gathers significant information from

its users, accessing data against their will to share with [China]." (Doc. 13-1 at 2.)

It further states that the "continued operation [of TikTok] in Montana serves as a

valuable tool to [China] to conduct corporate and international espionage in

Montana and may allow [China] to track the real-time locations of public officials,

journalists, and other individuals adverse to the Chinese Communist Party's interests." (*Id.* at 3.) This demonstrates that the purpose of the statute is to prevent and prohibit the "international espionage" of one of the United States' few enumerated foreign adversaries, not to merely protect Montana consumers.

The bill's legislative history further supports this conclusion. For example, in the first Montana House of Representatives hearing on the bill, Defendant Attorney General Knudsen explained: "TikTok is spying on Americans, period. TikTok is a tool of the Chinese Communist Party. It is owned by a Chinese company, and under China law, if you are based in China, you will cooperate with the Chinese Communist Party, period." (Doc. 13-2 at 5.) He further explained his belief that China sees "a war with the United States as inevitable, and [China is] using TikTok as an initial salvo in that war." (*Id.* at 6.) This, he explains, is a reason the bill is necessary.

During the second reading of the bill, Representative Brandon Ler, a Republican from Savage, stated:

> we are facing a threat unlike any other from the Chinese Communist Party hiding behind TikTok where they can spy on Americans by collecting personal information by keystrokes and even use their locations. That's why I urge you to join me in voting yes on Senate Bill 419 to ban TikTok in Montana. TikTok is a national security threat.

(Doc. 13-3 at 2.) At the same hearing, Representative Katie Sullivan, a Democrat from Missoula, noted that TikTok is perhaps dangerous but that the bill is not

"taking privacy and security seriously" because it only limits one company and one country "when we know very well that [other] social media companies are doing the same thing." (*Id.* at 4.) Representative Sullivan's comment is instructive. The actual purpose of the bill is to stop a perceived national security threat, which cannot serve as an important state interest, *Hines*, 312 U.S. at 63 (noting that the federal government alone has the authority to regulate regarding national security issues), and it has "no serious claim to addressing a traditional state responsibility," *Movsesian*, 670 F.3d at 1076 (internal quotation marks omitted). The Legislature may have set out to protect Montanans from an allegedly grave threat. But "however laudable it may be, [it] is not an area of traditional state responsibility." *Id.*

## 2.    Intrusion of Federal Foreign Affairs Power

The next question is whether SB 419 "intrudes on a power expressly or impliedly reserved to the federal government." *Id.* Despite the State's protestations to the contrary, SB 419 "intrudes on the federal government's exclusive power to conduct and regulate foreign affairs," *id.*, and is preempted.

A state law is intrusive if it has "'more than some incidental or indirect effect' on foreign affairs." *Id.* (quoting *Zschering v. Miller*, 389 U.S. 429, 434 (1968)). Because SB 419 "expresses a distinct political point of view on a specific matter of foreign policy," *id.*, it is intrusive. In *Movsesian*, the Ninth Circuit held

37

that a California statute that imposed a "politically charged label of 'genocide' on the actions of the Ottoman Empire (and, consequently, present-day Turkey)," was making a political statement. *Id.* Similarly, SB 419 attempts to establish a foreign policy for Montana. As explained in detail above, from the very first line of the bill, the Legislature makes a distinct foreign policy statement, which is that TikTok is owned by a Chinese corporation that is taking Montanans' TikTok user data and sharing it with the Chinese government for nefarious purposes.

This intrusion has an "effect on foreign affairs [that] is not [merely] incidental." *Id.* at 1077. As the bill's language, Attorney General Knudsen, and various legislators have made clear, this bill targeted China's alleged involvement in Montana. (*See* Doc. 13-2 at 6 (Attorney General Knudsen said in reference to TikTok: "This is a business that is controlled by an existential threat and enemy of the United States, and that's China's own words. China considers America its largest enemy by their own military doctrines and publications. They see a war with the United States as inevitable, and they're using TikTok as an initial salvo in that war.").) Just like in *Movsesian*, SB 419, "is, at its heart, intended to send a political message on an issue of foreign affairs," 670 F.3d at 1077, by cutting off access to what it alleges is "a valuable tool to the People's Republic of China to conduct corporate and international espionage in Montana," SB 419, Preamble.

The State finally argues that SB 419 is not intrusive because it fits within the federal government's foreign policy as it merely restates the federal government's labelling of China as a "foreign adversary." *See* 15 C.F.R. § 7.4. But "even in the absence of conflicting federal policy, a state may violate the Constitution by 'establishing its own foreign policy.'" *Movsesian*, 670 F.3d at 1076 (quoting *Zschering*, 389 U.S. at 441). Montana's foray into foreign affairs interprets the United States' current foreign policy interests and intrudes on them. Because it does so, SB 419 is likely preempted.

### ii.   Conflict Preemption

"[W]hen Congress enacts a valid statute pursuant to its Article I powers, 'state law is naturally preempted to the extent of any conflict with a federal statute.'" *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Plaintiffs argue that Section 721 of the Defense Production Act, 50 U.S.C. § 4565, and the International Emergency Economic Powers Act (the "Economic Powers Act"), 50 U.S.C. § 1701, directly conflict with SB 419. Only the former argument is persuasive.

### 1.   Defense Production Act

Plaintiffs argue that the Defense Production Act directly conflicts with SB 419 because TikTok's parent company, ByteDance, and the United States are currently engaged in negotiations under the law. The State responds that Plaintiffs

have not identified a specific transaction covered by the Defense Production Act and so have not demonstrated why there is a conflict.  The State's argument may have some merit, but it does not overcome Plaintiffs' demonstration of a likelihood of preemption.

Congress passed the Defense Production Act to help ensure the "ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States."  50 U.S.C. § 4502(a)(1). The sprawling act also establishes the Committee on Foreign Investment in the United States (the "Committee"), *id.* § 4565(k), which is tasked with "conduct[ing] an investigation of the effects of [some foreign] transaction[s] on the national security of the United States and take any necessary actions in connection with the transaction to protect the national security of the United States," *id.* § 4565(b)(2)(A).  If the investigation returns credible risks, the Committee can either negotiate with the parties to the transaction or refer the matter to the President of the United States to prohibit it.  *See id.* § 4565(b)(l), (d).

In 2020, TikTok and ByteDance petitioned for review of a Trump Administration August 2020 executive order requiring certain divestment activity for TikTok in the United States.  (Doc. 18-6 at 215.)  As of February 2023, the negotiations under the Committee's framework have been held in abeyance while a

mutual agreement is privately negotiated between the parties.  (*See id.* at 214–15.)
This Committee matter is not the same as the instant matter before the Court, but it
does indicate the depth of the federal government's involvement with TikTok
under the Defense Production Act.

Conflict preemption doctrine seeks to protect the federal government's
"capacity to bargain for the benefits of access to the entire national economy."
*Crosby*, 530 U.S. at 381.  Accordingly, although SB 419 may not directly impact
the Committee's activity, the Committee's ongoing engagement with TikTok
under the provisions of the Defense Production Act likely implicates the exact type
of conflict the preemption doctrine seeks to prevent.  The State argues in its
defense that if Congress intended the Defense Production Act to preclude any state
regulation of a business that was being investigated by the Committee, it would
have explicitly said so by express preemption.  This argument misses the point of
conflict preemption, which preempts state regulation even in the absence of
explicit federal preemption.  *See Crosby*, 530 U.S. at 372.  Because SB 419
conflicts with the United States' ability to interact with and regulate TikTok, the
Defense Production Act likely preempts SB 419.

### 2.  Economic Powers Act

The State argues that because SB 419 regulates a product and does not
impose any regulation on China itself, the Economic Powers Act does not preempt

it.  Plaintiffs counter that SB 419 squarely "upsets the balance" struck by the Economic Powers Act.  *See Arizona v. United States*, 567 U.S. 387, 403 (2012). The State's argument is more persuasive.

The Economic Powers Act gives the President peacetime authority to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  The President may not "regulate . . . personal communication, which does not involve a transfer of anything of value." *Id.* § 1702(b)(1), (3).

Here, Plaintiffs concede that TikTok regulates personal communications, and thus cannot be regulated under the Economic Powers Act.  However, they also argue that because that Act cannot regulate this activity, neither can Montana.  But conflict preemption exists when "it is impossible for a private party to comply with both state and federal law."  *Crosby*, 530 U.S. at 372.  Thus, it is unclear how a party could have trouble complying with both a state and federal law when the federal law itself cannot regulate the conduct at issue.  Thus, Plaintiffs have not demonstrated a likelihood that the Economic Powers Act preempts SB 419.

## C.   Commerce Clause

The Commerce Clause grants Congress power to "regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3. Plaintiffs argue that SB 419 violates the Commerce Clause "because it regulates a platform Montanans use to conduct worldwide commercial activity."  (Doc. 68 at 25.)  TikTok further argues that the Commerce Clause is violated here because SB 419 facially discriminates against a foreign nation—China—in commerce.  In countering, the State argues that SB 419 permissibly legislates purely intrastate issues with a minor burden on interstate commerce.  Again, Plaintiffs have the stronger argument.

### i.   Dormant Commerce

"Although the Clause is framed as a positive grant of power to Congress, [the Supreme Court has] consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 548–49 (2015) (internal quotation marks omitted).  This Clause provides that "in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (internal quotation marks omitted).

43

Because the parties agree that SB 419 regulates interstate commerce, the relevant question here is whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Courts are afforded enormous discretion in balancing these interests. *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring) (noting that this determination is "ill suited to the judicial function" and is more appropriate for Congressional determination). The parties' arguments here are unsurprising. Plaintiffs contend the burden exceeds the benefit and the State argues the opposite.

Because this determination is so discretionary, it is helpful to consider how courts have previously considered similar issues. One such analogous case is *Bibb v. Navajo Freight Lines, Inc.*, where the Supreme Court declared unconstitutional a state law that required all trucks passing through a state to use a specific type of mudflap. 359 U.S. 520, 525 (1959). The Supreme Court reasoned that because all but five other states allowed the regulated type of mudflaps, trucks would need to avoid the state or swap out their mudflaps upon entry. *Id.* This burden on interstate commerce did not exceed the local benefits, of which the Court found few. *Id.* Like the law in *Bibb*, SB 419 imposes a burden on interstate commerce. SB 419 would burden User Plaintiffs by prohibiting them from conducting business on the app, and it would also burden TikTok by requiring the company to

44

completely change its business to operate in Montana by selling to an owner based in a non-adversarial country.  While the State argues that the law's local benefits are significant, and they may be, it has not provided any evidentiary support for those benefits.  Thus, Plaintiffs have demonstrated a likelihood that SB 419 puts a burden on interstate commerce that exceeds its local benefits.

### ii.    Facial Discrimination

The second way Plaintiffs argue that SB 419 violates the Commerce Clause is by facially discriminating against commerce with China.  The State does not substantively rebut this argument.  SB 419 becomes "void if [TikTok] is acquired by or sold to a company that is not incorporated in any other country designated as a foreign adversary in 15 C.F.R. [§] 7.4 at the time [TikTok] is sold or acquired." SB 419 § 4.  The State plainly admits that it "ban[ned] TikTok because of the harms inseparable from TikTok's data-harvesting practices and ownership by a hostile foreign government."  (Doc. 51 at 21.)  Facial discrimination, TikTok argues, per se invalidates a law.  *See Granholm*, 544 U.S. at 476.  The Court agrees.  Plaintiffs have thus shown a likelihood of success as to facial discrimination as well.

## II.    Irreparable Harm

After demonstrating a likelihood of success on the merits of its claim, a party seeking a preliminary injunction must establish that it is "likely to suffer

irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

"Irreparable harm is relatively easy to establish in a First Amendment case. The plaintiff need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (internal quotation marks and citations omitted). "When enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). A constitutional violation alone can suffice to show irreparable harm, as can the loss of business goodwill and reputation. *See Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1057 (9th Cir. 2009).

Tik Tok argues the First Amendment violation constitutes an irreparable harm for its business. The State responds that no First Amendment violation occurred, so no irreparable injury will take place. Plaintiffs are right. Because a fundamental constitutional violation is likely, TikTok has established the likelihood of irreparable harm. *See Cal. Chamber of Com.*, 29 F.4th at 482.

Although TikTok's business harms argument is not entirely persuasive, the State has not substantively rebutted it. TikTok's business harms are irreparable both because they are economic in nature and because they constitute a damage to

goodwill of the business, *see Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (noting that "economic injury alone does not support a finding of irreparable harm" but can be a factor).  SB 419 is damaging to the company's goodwill by painting them as both disreputable and controlled by China.  (*See* Doc. 14 at ¶ 40.)

User Plaintiffs establish a likelihood of irreparable harm too.  In shutting off TikTok, the Legislature has both harmed User Plaintiffs' First Amendment rights and cut off a stream of income on which many rely.  Thus, Plaintiffs have established a likelihood of irreparable harm. Notably, neither party takes issue with the Governor's mandate that TikTok is banned from all state computers.

### III.    Balance of the Equities and the Public Interest

When the government is a party, courts merge the balance of equities and public interest factors.  *See California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Cal. Chamber of Com.*, 29 F.4th at 482 (internal quotation marks omitted).  The Ninth Circuit has gone so far as to hold "the fact that Plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in Plaintiffs' favor."  *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up).  As demonstrated above, SB 419 violates the Constitution in more ways than one, thus

the balance of equities "tips sharply" in Plaintiffs' favor.  While there may be a

public interest in protecting Montana consumers, the State has not shown how this

TikTok bill does that.  Instead, SB 419 oversteps state power and infringes on the

Constitutional rights of users and businesses.  In conclusion, the balance of the

equities and the public interest weigh in Plaintiffs' favor.[6]

CONCLUSION

For the reasons stated above, a preliminary injunction of SB 419 is

warranted.  Accordingly,

IT IS ORDERED that TikTok's and User Plaintiffs' motions for a

preliminary injunction (Docs. 11, 17) are GRANTED.  The January 1, 2024

effective date for SB 419 is enjoined until a final determination on the merits of

Plaintiffs' claims is made.

DATED this 30th day of November, 2023.


Donald W. Molloy, District Judge
United States District Court

---

[6] Under Federal Rule of Civil Procedure 65(c) a district court may grant a
preliminary injunction "only if the movant gives security in an amount that the
court considers proper to pay the costs and damages sustained by any party found
to have been wrongfully enjoined or restrained."  However, "[t]he district court
retains discretion as to the amount of security required, *if any*."  *Diaz v. Brewer*,
656 F.3d 1008, 1015 (9th Cir. 2011) (internal quotation marks omitted).  Here, the
parties did not request a bond and the Court is not imposing one.